```
            IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF UTAH

                   CENTRAL DIVISION


In re:                    )
                          )
UNITED STATES OF          )
AMERICA,                  )
                          )
        Plaintiff,        )
                          )
vs.                       )   Case No.
                          )   2:19-CR-00125
DESMOND TRAVIS            )
JORDAN,                   )
                          )
        Defendant.        )
                          )
_____    )
```


BEFORE THE HONORABLE CLARK WADDOUPS

March 3, 2020


Motion to Suppress

**Appearances of Counsel:**

For the Plaintiff:      Joshua A. Brotherton
                        Attorney at Law
                        US Attorney's Office
                        111 S. Main Street
                        Suite 1800
                        Salt Lake City, Utah 84111


For the Defendant:      Emily A. Stirba
                        Spencer W. Rice
                        Attorneys at Law
                        Utah Federal Defender Office
                        46 West Broadway
                        Suite 110
                        Salt Lake City, Utah  84101

Court Reporter:

           Laura W. Robinson, RPR, FCRR, CSR, CP
                   351 South West Temple
                   8.430 U.S. Courthouse
               Salt Lake City, Utah 84101
                     (801)328-4800

```
                         I N D E X
```

Examinations                                                Page

**DAVID ALLEN**                                                5
DIRECT EXAMINATION                                            6
BY MR. BROTHERTON
CROSS-EXAMINATION                                            27
BY MR. RICE
**CLINTON MOORE**                                            46
DIRECT EXAMINATION                                           46
BY MR. BROTHERTON
CROSS EXAMINATION                                           103
BY MS. STIRBA

```
                     E X H I B I T S
```

Description                                                 Page

Government's Exhibit 9                                       19
Government's Exhibit 10                                      24
Government's Exhibit 7                                       70
Government's Exhibit 11                                     102
Government's Exhibits 1 and 2                               103
Defendant's Exhibit 1                                      108
Defendant's Exhibit 2                                      128
Defendant's Exhibits 3 and 4                               131

```
 1   Salt Lake City, Utah                    March 3, 2020

 2                    (10:34 a.m.)

 3           THE COURT:  Good morning.  We are here in the

 4   matter of the United States of America versus Desmond

 5   Travis Jordan, case 2:19-CR-125.

 6           Will counsel please state their appearance?

 7           MR. BROTHERTON:  Joshua Brotherton for the

 8   United States, Your Honor.

 9           MS. STIRBA:  Emily Stirba on behalf of

10   Mr. Jordan.

11           THE COURT:  We're here on the defendant's

12   Motion to Suppress.  The United States has the burden

13   of proceeding first.

14           Mr. Brotherton, you may proceed.

15           MS. STIRBA:  Your Honor, I actually have just

16   two preliminary matters -- well, three.  I also want

17   to introduce Spencer Rice who is also present on

18   behalf of Mr. Jordan.

19           The first is that we are invoking the rule on

20   witnesses, but I would ask for our defense expert,

21   Dr. Mary Cablk, to be present in the courtroom during

22   the testimony.

23           THE COURT:  The expert has the right to

24   remain in the courtroom under the rule.  So that's

25   granted.
```

```
 1              MS. STIRBA:  And then the second issue is --
 2     I raised this very briefly with the marshals, but I
 3     would ask if Mr. Jordan can have his writing hand
 4     uncuffed so he can take notes during the hearing as
 5     well and participate.
 6              THE COURT:  That seems appropriate in this
 7     case.
 8              MS. STIRBA:  And that's all I have.
 9              THE COURT:  Mr. Brotherton, you may proceed.
10              MR. BROTHERTON:  Thank you, Your Honor.
11     Government first calls Detective David Allen.
12              THE CLERK:  If you could stand right here.
13                        DAVID ALLEN,
14      called as a witness at the request of the Plaintiff,
15          having been first duly sworn, was examined
16                   and testified as follows:
17              THE WITNESS:  Yes, ma'am.
18              THE CLERK:  Please be seated on the stand.
19              If you will please state your name and spell
20     it for the record.
21              THE WITNESS:  David Allen.  My first name is
22     D-A-V-I-D, last name, A-L-L-E-N.
23              MR. BROTHERTON:  Your Honor, do you prefer me
24     at the podium or can I remain at the table?
25              THE COURT:  I prefer you come to the podium.
```

Time stamps: 10:35:29 (line 5), 10:35:52 (line 10), 10:36:11 (line 15), 10:36:36 (line 20), 10:36:49 (line 25)

**DIRECT EXAMINATION**

BY MR. BROTHERTON:

Q.   Thank you, Detective Allen.

Before we begin, could you tell us how you're currently employed?

A.   I'm employed with the West Valley City Police Department.  I'm currently a detective with the street crimes unit.

Q.   How long have you been with West Valley?

A.   Approximately four and a half years.

Q.   Any police officer experience before West Valley?

A.   Prior to that, I was -- worked as a corrections officer at the Salt Lake County Jail for about three years.

Q.   What kind of training did you go through to become a corrections officer?  What kind of training did you receive to become a corrections officer and then a police officer?

A.   For corrections I went through POST.  I received my SFO certifications, which is a Special Functions Officer, and also my BCO certification, which is a Basic Corrections Officer.

Once I was hired by West Valley, I then re-attended POST.  I received my SFO certification again, and then also my LEO certification which is

1    Law Enforcement Officer.

2    Q.   Thank you.  You said your current assignment is

3    with street crimes; is that correct?

4    A.   Correct.

5    Q.   How long have you been on street crimes?

6    A.   A little over a year and a half.

7    Q.   Okay.  February 28th of 2019, were you assigned

8    to street crimes on that day?

9    A.   Yes.

10   Q.   Okay.  We're here to discuss events on that date.

11   Do you recall that date in your mind?

12   A.   Yes, sir.

13   Q.   Could you tell us, in your own words, what were

14   you doing on that day and -- what were you doing on

15   that day?

16   A.   Sure.  I was conducting surveillance at the

17   address of 6694 West 4100 South.  I had received a

18   complaint of a distribution case and, um, I was

19   conducting surveillance west of the house right on

20   4100 South proper.

21   Q.   I want to ask you more specifically about that

22   complaint.

23        What was the nature of that complaint and

24   where did that come from?

25   A.   So that stemmed from an investigation

1   approximately six months before this incident.  I had

2   observed an individual named Desmond Jordan conduct a

3   hand-to-hand transaction in a Sinclair parking lot at

4   2320 South and Redwood Road.  At the time, he was

10:39:06   5   driving a brown Honda Accord.  It might have been an

6   Accord or Civic, I don't recall.

7           Um.  So I initially was on to Desmond from

8   that incident where I watched him do a hand-to-hand

9   transaction.  His location during that transaction

10:39:21   10   afterwards was unknown.

11           Then approximately two weeks before this

12   incident occurred, I watched this silver Mazda

13   Protégé vehicle conduct what I believe to be a

14   hand-to-hand transaction with a female at 4700 South

10:39:35   15   and 4000 West.  I then stopped the female, who was

16   not in the silver passenger car, and during my

17   interview with that female, she stated that she

18   receives her narcotics from Mr. Jordan and also his

19   address.

10:39:50   20   Q.   So you've mentioned a silver passenger car.  I

21   think you said it was a Mazda?

22   A.   Yes.

23   Q.   And this was two weeks prior to February 28th?

24   A.   Yes, approximately.

10:40:02   25   Q.   Okay.  Um, who -- who was driving that silver

1    Mazda two weeks before February 28th?

2    A.   I did not see who was driving at the time, I just

3    had the license plate and the registered owner.

4    Q.   Who was the -- were you able to determine the

5    registered owner?

6    A.   Yes, sir.

7    Q.   And do you recall who that person is?

8    A.   Desmond Jordan.

9    Q.   Okay.  So let's talk more specifically then about

10   February 28th.  You were doing surveillance at an

11   address in West Valley City; is that correct?

12   A.   Correct.

13   Q.   6694 West and 4100 South?

14   A.   Yes.

15   Q.   Um, how were you able to come up with that

16   address?

17   A.   That was the address that the female, who was

18   involved in the incident a couple of weeks prior,

19   provided me for Mr. Jordan.

20   Q.   Okay.  Did she say that she knew Mr. Jordan?

21   A.   Yes.

22   Q.   How did she know him?

23   A.   A previous relationship.

24   Q.   Okay.  Um, did she claim to have any knowledge of

25   illegal activities involving Mr. Jordan?

10:40:15

10:40:24

10:40:34

10:40:47

10:41:03

```
 1              MR. RICE:  Objection as to hearsay,

 2    Your Honor.

 3              THE COURT:  Sustained.

 4    Q.   (By Mr. Brotherton)  On this day, February 28th,

 5    2019, while surveilling this address on 4100 South,

 6    did you see the same silver Mazda?

 7    A.   Yes.

 8    Q.   Were you able to verify the license plate?

 9    A.   Yes, sir.

10    Q.   Okay.  What did you observe with regard to that

11    car?

12    A.   That vehicle backed out of the driveway of the

13    residence.  It then proceeded to travel eastbound on

14    4100 South.  That's when I began to conduct mobile

15    surveillance of the vehicle.

16    Q.   Were you able to see who was driving the car?

17    A.   Not initially, no.

18    Q.   Okay.  Um, about how long did you follow the car?

19    A.   Approximately a minute and a half to two minutes.

20    Q.   Did you ever initiate a traffic stop?

21    A.   Yes.

22    Q.   Why did you initiate a traffic stop?

23    A.   The speed limit on that roadway is 40 miles an

24    hour.  I was traveling 55 miles an hour in my police

25    vehicle and the suspect vehicle was still -- I was
```

10:41:15
10:41:27
10:41:41
10:41:52
10:42:05

1   unable to gain that ground on the suspect vehicle

2   until it came to a stop at a red light.

3   Q.   Okay.  The vehicle you were driving, was it a

4   marked police vehicle?

10:42:20   5   A.   No.

6   Q.   That would be kind of silly to do surveillance in

7   a marked car, wouldn't it?

8   A.   Yes.

9   Q.   Where did you make that traffic stop?

10:42:33   10   A.   Approximately 4100 South and 4600 West.

11   Q.   Did he pull into a driveway or parking lot, or

12   where did he --

13   A.   He pulled to the south side of the roadway, just

14   on the shoulder.

10:42:43   15   Q.   So was he -- was he still parked in a lane of

16   travel then?

17   A.   Partially, half and half.  He was on the right

18   side of the fog line.

19   Q.   Okay.  You approached the car then?

10:42:55   20   A.   Yes, sir.

21   Q.   And what did you do when you approached the car?

22   A.   I approached on the passenger side and I asked

23   for a driver's license from the individual driving

24   it.  At that point, he provided me a Utah

10:43:06   25   identification for Desmond Jordan.

```
 1   Q.   And the ID that he gave you, were you able to
 2   verify that was the person?
 3   A.   Yes.  It was by the colored photograph.
 4   Q.   Okay.  Did you speak with Mr. Jordan at that
 5   time?
 6   A.   Yes.
 7   Q.   What did you talk about?
 8   A.   Just the reason for the traffic stop.
 9   Q.   Did you tell him that you pulled him over because
10   he was speeding?
11   A.   Yes, sir.
12   Q.   How did he reply?
13   A.   He told me that he wasn't, he was only going 45.
14   Q.   And the speed limit in that area is what?
15   A.   40.
16   Q.   Okay.  What actions did you take at that point?
17   A.   At that point I returned to my police vehicle and
18   conducted wants and warrants inquiries to Mr. Jordan.
19   And I also looked up if he was on O-Track, which is
20   the state corrections website -- or the state
21   corrections database for individuals who are on
22   probation or parole.
23   Q.   Okay.  And did you check to see if he had a valid
24   driver's license?
25   A.   Yes, I did.
```

Timestamps:
- 10:43:20 — line 5
- 10:43:28 — line 10
- 10:43:37 — line 15
- 10:43:52 — line 20
- 10:44:01 — line 25

1 Q. And what were you able to find out about his

2 license?

3 A. He did not.  It was suspended.

4 Q. Do you recall the reason for the suspension?

10:44:09 5 A. I do not.

6 Q. Okay.  Was there anyone else in the car with

7 Mr. Jordan?

8 A. No.

9 Q. Did you check his insurance information?

10:44:16 10 A. Yes.

11 Q. And did he have -- was the car validly insured?

12 A. Correct.

13 Q. You said that you checked for wants and warrants

14 as well; is that correct?

10:44:27 15 A. Correct.

16 Q. Were you able to find anything regarding that?

17 A. No.

18 Q. Did you discover anything else of note with

19 regard to Mr. Jordan?

10:44:36 20 A. No, not during the traffic stop.

21 Q. Okay.  What did you do then?

22 A. At that point I -- actually immediately when I

23 initiated that traffic stop I called for

24 Officer Moore to assist on a K9 sniff due to the

10:44:54 25 complaint of drug distribution.

1          I then re-approached Mr. Jordan and then I

2    advised him -- I started -- we started the

3    conversation about his license and he had a license

4    from another state, apparently, and he was unaware

10:45:07   5    that he was on AP&P, on probation.

6    Q.   Were you able to find a valid license from out of

7    state?

8    A.   No.

9    Q.   Are you able to check that?

10:45:20   10    A.   I can, yes.

11    Q.   And did you make inquiries to see if he had a

12    valid license anywhere else?

13    A.   Yes.

14    Q.   But you were unable to find one, is that correct?

10:45:28   15    A.   Correct.

16    Q.   Um, at what point exactly did you reach out to

17    Officer Moore regarding potentially doing a K9 sniff?

18    A.   Immediately when I -- I believe it was when I

19    returned to my vehicle after my initial contact with

10:45:48   20    Mr. Jordan.

21    Q.   Did you call him at any time before you made the

22    initial traffic stop?

23    A.   Yes.

24    Q.   And so you called him on the phone; is that

10:45:58   25    correct?

```
 1    A.    Correct.

 2    Q.    Before you made the stop?

 3    A.    Correct.

 4    Q.    What was the purpose of that call?

 5    A.    To notify him that I was conducting the

 6    investigation at the residence and that I believed

 7    the vehicle was going to be leaving there shortly.

 8    Q.    Okay.  Did you anticipate -- or did you ask him

 9    to respond to your location in anticipation that he

10    would do a K9 sniff?

11    A.    Yes.

12    Q.    Okay.  But all of this was while the car was

13    still driving; is that correct?

14    A.    The first call was to notify him, hey, I'm

15    watching a residence, I'm conducting surveillance,

16    can you just be available if this car goes mobile to

17    assist me on a traffic stop and a K9 sniff.

18    Q.    Okay.  And then the second call.  What was the

19    second call to Officer Moore, what was that about?

20    A.    To notify him that the traffic stop was made.

21    Q.    Did you give him the address where you were

22    located?

23    A.    Yes.

24    Q.    And asked him to respond with his K9 to conduct a

25    sniff; is that correct?
```

10:46:04 (line 5)
10:46:19 (line 10)
10:46:30 (line 15)
10:46:46 (line 20)
10:46:54 (line 25)

1    A.   Yes.

2    Q.   After determining that Mr. Jordan did not have a

3    valid license, did you intend to let him drive away

4    in his vehicle?

10:47:11    5    A.   No.

6    Q.   And why would that be?

7    A.   By state code I kind of can't.  It would require

8    him to receive another ticket if I were to let him go

9    away, and if he were to get in an accident then -- I

10:47:23    10    mean in my morals I would be liable if he is driving

11    without a license then.

12    Q.   Is it your practice to let unlicensed drivers

13    operate motor vehicles?

14    A.   No.

10:47:35    15    Q.   With regard to what to do with his car, did you

16    ask Mr. Jordan to do anything?

17    A.   I asked for him to call for a licensed driver.

18    Q.   And was he able to do that?

19    A.   Yes.

10:47:44    20    Q.   Okay.  How did he do that?

21    A.   I believe when I asked him to step out of his

22    vehicle, he just had his phone in his hand and began

23    a phone call.

24    Q.   Was he ever actually able to make contact with

10:47:55    25    someone who could come and drive his car for him?

1    A.    Yes.

2    Q.    And did that person ever respond to your

3    location?

4    A.    Yes.

5    Q.    About how long after you initiated the traffic

6    stop before Officer Moore arrived to conduct that

7    K9 sniff?

8    A.    So just to clarify, the time frame between my

9    asking and him arriving?

10   Q.    Yes.

11   A.    About eight minutes.

12   Q.    Okay.  Were you wearing a body worn camera --

13   A.    Yes.

14   Q.    -- on that day?

15   A.    Yes.

16   Q.    And was it on and operational during the --

17   during the entirety of your investigation this day?

18   A.    Yes.  At one point I did shut it off to consult

19   with some of my assisting detectives on our avenue of

20   approach from -- after this traffic stop to finish

21   up.

22   Q.    Okay.  In preparation for your testimony today,

23   have you had an opportunity to review the recordings

24   made from your body warn camera?

25   A.    Yes.

```
 1    Q.   On the screen in front of you, there is a still

 2    image.

 3              Do you recognize that image?

 4    A.   Yes.

 5    Q.   I apologize for that delay.

 6              Um, do you recognize that still image.

 7    A.   Yes.

 8    Q.   And can you tell us what that is?

 9    A.   That is 4100 South traveling eastbound.  And it

10    looks like it is between 6000 West and 6400 West.

11    Q.   Is that a location that you are familiar with?

12    A.   Yes.

13    Q.   Is that where you were on February 28th --

14    A.   Yes.

15    Q.   -- 2019?

16    A.   Correct.

17    Q.   I see a part of a face there on the left-hand

18    side of the screen.  Do you recognize that face?

19    A.   Yes.

20    Q.   Could you tell us what that is?

21    A.   That is myself.

22    Q.   Okay.  So is this an image taken from your

23    body worn camera --

24    A.   Yes.

25    Q.   -- on February 28, 2019?
```

10:50:48 (line 5)
10:51:09 (line 10)
10:51:18 (line 15)
10:51:26 (line 20)
10:51:35 (line 25)

18

A.   Correct.

          (Whereupon, Exhibit 9 was played.)

          THE COURT:  You are showing me the tape?  I
assume you're going to move its admission into
evidence.

          MR. BROTHERTON:  Yes.  I apologize,
Your Honor.  The Government offers this as, and I
know my numbering is a little out of order, but this
would be Exhibit 9.

          THE COURT:  Any objection to the videotape
being received in evidence?

          MR. RICE:  No, Your Honor.  We were going to
introduce the same tape.

          THE COURT:  Exhibit 9 is received.

          (Whereupon, Government's Exhibit 9 was
           received into evidence.)

          THE COURT:  You may proceed.

          (Whereupon, Exhibit 9 was played
           for the record.)

Q.  (By Mr. Brotherton)  I want to ask you a couple
of questions about that video.

          At some point there you made a phone call.
Who was the person on the other end of that phone
call?

A.   That was Officer Moore.

Q.   Okay.  You made a couple of references that I wanted to clarify.

You referred to a "primary."  Could you explain what that is for me?

A.   Yes.  So in my lingo, in our unit's lingo, that is our primary target who we have reason to believe is either selling narcotics or is in possession of a firearm or has a felony warrant, that we're going to arrest.

Q.   Okay.  And did you know who that individual was then?

A.   Yes.  At that point I did.

Q.   So at this point, had you been able to recognize Mr. Jordan as the person driving the vehicle?

A.   Yes.

Q.   Okay.  You also said that he was supposedly dealing?

A.   Uh-huh (affirmative).

Q.   Could you explain that for me?  How did you -- what information did you have that led you to believe that?

A.   Um, from my previous surveillance or observations about six months ago, and then also the observations of the two weeks prior with the traffic stop where I watched Mr. Jordan and another individual meet up.

1    And that individual, who I stopped after that meet

2    up, told me that he was dealing from that house.

3    Q.   Okay.  You said that he was possibly "88."  Can

4    you explain that?

5    A.   Sure.  1088 is our 10 code for armed.

6    Q.   What information did you have that might make you

7    believe that he was armed at that time?

8    A.   The individual who --

9         MR. RICE:  Objection as to hearsay.  This is

10   all requiring a hearsay statement, Your Honor.

11        THE COURT:  Why isn't this not admissible as

12   hearsay?

13        MR. BROTHERTON:  I will withdraw the question

14   then, Your Honor.

15        THE COURT:  Okay.

16   Q.   (By Mr. Brotherton) This recording is made prior

17   to you initiating the traffic stop; is that correct?

18   A.   Correct.

19   Q.   Okay.  I'm showing you another still image.

20        Do you recognize that image as well?

21   A.   Yes.

22   Q.   Okay.  Could you tell us what that is?

23   A.   That is still 4100 South traveling eastbound.  I

24   believe that's around the 5400 West area.

25   Q.   Is this from the same day that previous video was

1    taken?

2    A.    Yes.

3              MR. BROTHERTON:   Okay.   Your Honor,

4    Government offers this as Exhibit 10?

10:56:37    5              THE COURT:   Is this just a continuation of

6    the prior video?

7              MR. BROTHERTON:   There is a -- the prior

8    video ends.   This is a -- the body worn camera is

9    turned back on at some point.   This is when the

10:56:51   10    camera is turned back on.

11             THE COURT:   Do we know how long the body cam

12    was turned off?

13             MR. BROTHERTON:   I do not know.   I can ask

14    the detective.

10:56:57   15             THE COURT:   Do we have a time signal on these

16    two videos that indicates the difference between the

17    two?

18             MR. BROTHERTON:   They do.   Um, the time stamp

19    on Exhibit 9 is 10 minutes and 47 seconds.   The time

10:57:22   20    stamp on this video would be 13 minutes and 9

21    seconds.   So if I can do math, it is just about two

22    minutes or a little longer.

23             THE COURT:   I just noticed, looking at the

24    videos, they appear to be dated on March 1, 2019.

10:57:46   25    What is the date of the -- of the video as shown on

```
 1   the body camera?
 2            MR. BROTHERTON:  The -- as I understand it,
 3   Your Honor, the recording system that the body
 4   cameras utilize operates on Zulu time which is
 5   Greenwich Central Time.  So it gives a date and time
 6   according to Greenwich Central Time, which then has
 7   to be adjusted for whatever local time the officer is
 8   operating in.
 9            So in this case, it would be March 1st, 2019,
10   at just after midnight in Greenwich, England but
11   still February 28th in the afternoon in Salt Lake
12   City, Utah.
13            THE COURT:  Is there any dispute that this is
14   the video of the actual stop?
15            MR. RICE:  No, Your Honor.
16            THE COURT:  Okay.  You may proceed.
17            MR. BROTHERTON:  Thank you.
18   Q.  (By Mr. Brotherton)  Detective Allen, do you
19   recognize -- I asked you this already.  Do you
20   recognize this still image?
21   A.  Yes.
22   Q.  Is this the same day at approximately the same
23   time when you were driving in your vehicle?
24   A.  Yes.
25            MR. BROTHERTON:  Okay.  Your Honor, the
```

10:58:09  (line 5)
10:58:25  (line 10)
10:58:41  (line 15)
10:58:57  (line 20)
10:59:05  (line 25)

```
 1    Government would offer this separate video as Exhibit

 2    Number 10.

 3              THE COURT:  Any objection to Exhibit 10?

 4              MR. RICE:  No objection.

 5              THE COURT:  Exhibit 10 is received.

 6              (Whereupon, Government's Exhibit 10

 7               was received into evidence.)

 8              MR. BROTHERTON:  Thank you.  Your Honor, this

 9    is a longer video, about 16 minutes, um --

10              THE COURT:  I think we're going to have to

11    see it.

12              MR. BROTHERTON:  -- just for the Court's

13    information.

14              (Whereupon, Exhibit 10 was played

15               for the record.)

16              MR. BROTHERTON:  If you could just pause

17    there for a moment.

18    Q.  (By Mr. Brotherton)  You said, "thanks, CJ."  Is

19    that correct?

20    A.  Correct.

21    Q.  Is that Officer Moore that you were speaking then

22    on the phone with?

23    A.  Yes.

24              (Whereupon, Exhibit 10 was played

25               for the record.)
```

10:59:13  (line 5)
10:59:35  (line 10)
10:59:40  (line 15)
11:03:09  (line 20)
11:09:05  (line 25)

24

1          THE WITNESS:  I apologize for my terrible

2     singing.

3     Q.   (By Mr. Brotherton)  Detective Allen, I only have

4     got a couple more questions for you.

11:15:55    5          Um, you approached Mr. Jordan's car.  The

6     first time you had a conversation with him about

7     speeding and all that stuff.  You go back to your car

8     and you come and talk to him a second time.  Um, you

9     informed him that he doesn't have a valid license in

11:16:13    10    Utah and then you go back to your car again.  It is

11    that second -- the second time you returned to your

12    car that I want to ask you a couple of questions

13    about.

14         Um, you asked -- Mr. Jordan told you that he

11:16:25    15    maybe had a license out of South Carolina, is that

16    correct?

17    A.   Correct.

18    Q.   So that second time when you returned to your

19    vehicle, is that when you -- did you then attempt to

11:16:34    20    locate a valid license for Mr. Jordan from South

21    Carolina?

22    A.   Yes.  That was on NLETS.

23    Q.   And I think I asked you this already, but were

24    you able to find a valid license for him there?

11:16:46    25    A.   No.

```
 1   Q.   When you perform that search, do you look for
 2   specific states?
 3   A.   Correct, you can.
 4   Q.   Is there a generalized search to look for a
 5   license anywhere?
 6   A.   I believe there is.  I have never had success
 7   with it though.
 8   Q.   Okay.  Did you specifically look for a license in
 9   South Carolina?
10   A.   Yes.
11   Q.   And were you able to find one there?
12   A.   No.
13   Q.   Okay.  So, to your knowledge, at that point
14   Mr. Jordan did not have a valid driver's license; is
15   that correct?
16   A.   Correct.
17   Q.   Okay.  He didn't have one with him?
18   A.   Correct.
19   Q.   And you weren't able to find one?
20   A.   Correct.
21         MR. BROTHERTON:  Okay.  I think that's all of
22   the questions I have.
23         THE COURT:  Cross-examination?
24         MR. BROTHERTON:  And just to put on the
25   record, the time stamp located in the video
```

11:16:54  (line 5)
11:17:02  (line 10)
11:17:10  (line 15)
11:17:14  (line 20)
11:17:35  (line 25)

1    internally is 29 minutes and 8 seconds.

2              THE COURT:   Thank you.

3              MR. BROTHERTON:   Thank you.

4                    **CROSS-EXAMINATION**

11:17:45   5    BY MR. RICE:

6    Q.   Good morning, Detective Allen.

7    A.   Good morning.

8    Q.   When you graduated from your corrections duties

9    to becoming a street police officer, you took

11:18:11   10   training, right?

11   A.   Yes.

12   Q.   Part of that training was on how to write police

13   reports?

14   A.   Correct.

11:18:16   15   Q.   You're trained to be thorough in your police

16   reports?

17   A.   Yes.

18   Q.   Accurate in your police reports?

19   A.   Yes.

11:18:21   20   Q.   You were trained of the importance of police

21   reports?

22   A.   Yes, sir.

23   Q.   So that a judge can use them in future

24   proceedings?

11:18:27   25   A.   Yes, sir.

1   Q.   A prosecutor can use them?

2   A.   Yes, sir.

3   Q.   Defense attorneys can use them?

4   A.   Yes, sir.

11:18:35   5   Q.   Did you fill out and create a police report in

6   this case?

7   A.   I believe so, yes.

8   Q.   Did you have a chance to review it?

9   A.   Yes.

11:18:41   10   Q.   Prior to this hearing?

11   A.   Correct.

12   Q.   You can go back and you can amend police reports

13   after the fact, right?

14   A.   Yeah, I can.

11:18:49   15   Q.   You can go back and make a supplemental police

16   report, right?

17   A.   Correct.

18   Q.   Change information that maybe you didn't include?

19   A.   I can add information, yes.

11:18:56   20   Q.   Add information?

21   A.   Yes.

22   Q.   Okay.  Did you do a supplemental police report in

23   this case?

24   A.   Later on down the road when I screened the

11:19:03   25   charges.

1    Q.   Today you claim that there was an incident six

2    months prior to February 28th, 2019, with Mr. Jordan?

3    A.   Yes.

4    Q.   That's not in your police report, is it?

11:19:15    5    A.   No.

6    Q.   Today you also claim there was an incident two

7    weeks prior to February 28th, 2019, with Mr. Jordan,

8    right?

9    A.   Correct.

11:19:22    10    Q.   And that's not in your police report, is it?

11    A.   Correct.

12    Q.   And you claim that there was an incident with a

13    female that you stopped?

14    A.   Yes.

11:19:36    15    Q.   You stopped that female?

16    A.   Yes.

17    Q.   You believe she had just participated in a

18    hand-to-hand buy?

19    A.   Correct.

11:19:43    20    Q.   And that was two weeks before this incident?

21    A.   Approximately, yes.

22    Q.   Have you had a chance to review your body worn

23    camera in this case?

24    A.   Yes.

11:19:53    25    Q.   We just watched it, right?

```
 1   A.    (Witness nodded.)

 2   Q.    So before you even started pacing Mr. Jordan's

 3   car, you had already called for the drug dog?

 4   A.    I had asked him to be available.

 5   Q.    So you hadn't called him to come?

 6   A.    No.  I asked him if he could start floating this

 7   way in case the vehicle goes mobile.  Yes.

 8   Q.    So you had called him to come?

 9   A.    Correct.

10   Q.    And that would have been before you noticed any

11   speeding infraction?

12   A.    Yes.

13   Q.    And before you noticed any seatbelt infraction?

14   A.    Yes.

15   Q.    As we can see, it was light outside, right?

16   A.    Correct.

17   Q.    You could see that Mr. Jordan was black at that

18   time, right?

19   A.    Yes.

20   Q.    That he was African American?

21   A.    Sure.

22   Q.    And you hadn't had any contact with Mr. Jordan

23   prior to this?

24   A.    Correct.

25   Q.    Before you stopped Mr. Jordan you announced to
```

```
 1   dispatch that you were stopping the car?

 2   A.   Uh-huh (affirmative), correct.

 3   Q.   You called out Yankee 13 traffic?

 4   A.   Correct.

 5   Q.   Yankee 13 is you?

 6   A.   Yes.  It's my call sign.

 7   Q.   Traffic means you're making a traffic stop?

 8   A.   Correct.

 9   Q.   When you turned on your lights, Mr. Jordan

10   immediately pulled over?

11   A.   Yes.

12   Q.   And then you approached the car?

13   A.   Yes.

14   Q.   On the passenger side?

15   A.   Correct.

16   Q.   And we saw that you told him he was going too

17   fast?

18   A.   Yes.

19   Q.   You told him he didn't have a seatbelt on?

20   A.   Yes.

21   Q.   At that point you did not arrest Mr. Jordan for

22   going too fast, did you?

23   A.   Correct.

24   Q.   Or for not wearing a seatbelt?

25   A.   Correct.
```

```
     1    Q.   You asked him for his ID?

     2    A.   True.

     3    Q.   You didn't ask him for his driver's license?

     4    A.   Okay.

     5    Q.   Is that right?

     6    A.   Correct.  I believe so.

     7    Q.   You didn't ask him for the registration on his

     8    vehicle?

     9    A.   Correct.

    10    Q.   You didn't ask him for the proof of the insurance

    11    on the vehicle?

    12    A.   Correct.

    13    Q.   As part of your training, did you receive

    14    training on how to conduct a routine traffic stop?

    15    A.   Yes.

    16    Q.   How many hours of training did that -- did that

    17    include?

    18    A.   I couldn't even begin to tell you.

    19    Q.   A lot?

    20    A.   Yes.

    21    Q.   So would you agree that it is pretty standard in

    22    a traffic stop situation for speeding or for a

    23    seatbelt that you ask for a driver's license?

    24    A.   Sure.

    25    Q.   And for proof of registration?
```

11:21:50 (line 5)
11:21:57 (line 10)
11:22:08 (line 15)
11:22:17 (line 20)
11:22:28 (line 25)

```
 1   A.   No.

 2   Q.   Proof of insurance?

 3   A.   Not necessarily.

 4   Q.   That wasn't part of your training?

 5   A.   So state code now doesn't require the drivers to

 6   provide the registration because it is on the actual

 7   computer database.

 8        And also, Insure-Rite is the one -- is the

 9   contracted company with the state database to update

10   that insurance.  So usually, by the time I know -- or

11   by the time I run that information on the license

12   plate, I know if it is going to be registered and

13   insured or not.

14   Q.   Are you still required to carry your registration

15   with you as a driver in your car?

16   A.   Not that I'm aware of.  I believe you can have it

17   either in a physical form or also a photograph.

18   Q.   After Mr. Jordan gave you his identity card, you

19   went back to your vehicle, right?

20   A.   Correct.

21   Q.   The first thing you did when you got in your

22   vehicle was not to check the driver's license

23   information, was it?

24   A.   No, I don't believe so.

25   Q.   It was to call the drug dog?
```

11:22:36 (line 5)
11:22:49 (line 10)
11:22:59 (line 15)
11:23:13 (line 20)
11:23:21 (line 25)

33

```
 1   A.   Correct.

 2   Q.   To see how far away they were?

 3   A.   Correct.

 4   Q.   And you told him your exact location where you

 5   were?

 6   A.   Yes.

 7   Q.   And he told you that he was at another stop but

 8   that he was trying to get to you?

 9   A.   Yes.

10   Q.   Something to that effect?

11   A.   Yeah.

12   Q.   Once you hang up with the drug -- with the dog

13   handler, then we hear you start searching on your

14   computer?

15   A.   Correct.

16   Q.   We hear you typing on the keypad, right?

17   A.   Correct.

18   Q.   We can actually see your screen making inquiries

19   and turning pages, right?

20   A.   Yes.

21   Q.   There is a point where we actually see

22   Mr. Jordan's name pop up?

23   A.   Correct.

24   Q.   And that is when you're doing -- I think you

25   mentioned in direct examination you're doing a wants
```

11:23:33 (line 5)
11:23:41 (line 10)
11:23:53 (line 15)
11:24:03 (line 20)
11:24:10 (line 25)

1    and warrants check?

2    A.   Yes.

3    Q.   Let me see what else you said in direct

4    examination.

11:24:37    5         You did a wants and warrants check and you

6    also mentioned you did an O-Track.

7    A.   Correct.

8    Q.   That's to see if he is on probation?

9    A.   Correct.  So to clarify, when you initially do a

11:24:49   10    driver's license check it pops up if they have an

11    offender number at the bottom of their license.  And

12    so that is how I was aware.

13    Q.   Does that require you to click into the O-Track?

14    A.   I'm sorry?

11:24:57   15    Q.   Does that require you to click into the O-Track?

16    A.   No.  So that's basically on the actual driver's

17    license form.  Near the bottom it shows offender

18    number which is O-Track ID, I believe, and it's

19    usually four to six digits.  So if that pops up, you

11:25:14   20    know at some point in time they have either been on

21    probation or parole.

22    Q.   Okay.  Then you did the driver's license check?

23    A.   That is -- so that was -- the way I found out

24    about the offender trick was through the driver's

11:25:24   25    license check.

35

```
 1   Q.   Is a driver's license check different than the

 2   wants and warrants check?

 3   A.   So the code that I used to check it, there is, I

 4   believe, three screens that pop up all pretty

 5   relatively at the same time --

 6   Q.   Okay.

 7   A.   -- with driver's license information, warrants,

 8   and NCIC.

 9   Q.   All that comes up with the driver's license?

10   A.   Normally, yes.

11   Q.   He didn't give you a driver's license though?

12   A.   No.   So when I went back to my car and punched in

13   his identification number, through the Utah database

14   it comes back with everything associated with that

15   number to include IDs and driver's licenses.

16   Q.   As you're toggling through those screens, we hear

17   you say denied, denied.

18        Do you remember hearing that?

19   A.   Yes.

20   Q.   And that's the moment that you learn that his

21   driver's license was denied?

22   A.   Correct.

23   Q.   And at a certain point we also hear a broadcast

24   over your radio on that video, I think it was the dog

25   handler, telling you where he was and that he was a
```

11:25:35  5
11:25:43  10
11:25:56  15
11:26:25  20
11:26:45  25

36

1  little bit delayed?

2  A.   I don't recall saying he was delayed, just that

3  he was on his way.

4  Q.   On his way, but still at the other stop while you

5  were in the car?

6  A.   I don't recall that, but --

7  Q.   Let's just go play it and see if it reminds you.

8  17:40 about.

9       Could you please put it on -- right about

10  there (indicating).

11       I'm just going to play you a little piece

12  here.

13       (Whereupon, Exhibit 10 was played

14        for the record.)

15  Q.   (By Mr. Rice) That's good.   Thank you.

16       So that was your drug dog handler?

17  A.   Yes.

18  Q.   And he said, "When I clear this, I'll be out to

19  Yankee 13."

20  A.   I believe he said, "I'm clear of this stop.   I'm

21  in route to Yankee 13."

22  Q.   That's what you heard?

23  A.   Yes.

24  Q.   Okay.   So at that point you decide to re-approach

25  Mr. Jordan's car?

A.   Correct.

Q.   You knew from your database system that he had a denied license?

A.   Yes.

Q.   When you re-approached the car, you did not decide to put him under arrest for a denied license?

A.   No.

Q.   And you did not decide to put him under arrest for no seatbelt or for speeding?

A.   Correct.

Q.   You didn't tell him at that point to call someone to come and get the car?

A.   Correct.

Q.   You didn't write him a ticket?

A.   Correct.

Q.   You didn't write him a warning?

A.   Correct.

Q.   You went up to ask him when his license had been denied?

A.   Uh-huh (affirmative).

Q.   You would have known that from your database search, right?

A.   If I looked through it line for line, word for word, yes.

Q.   Did you read it?

1    A.   I didn't read it line for line, no.  It said it

2    was denied.

3    Q.   Then you asked him how long he had been in Utah,

4    I think, something like that?

11:29:30    5    A.   Correct.

6    Q.   And then you returned to your car?

7    A.   I asked him other questions, too, if he had a

8    license out of a different state.

9    Q.   And he said he didn't?

11:29:40    10    A.   Correct.  I believe he said he had one out of --

11    I am sorry, I'm having a brain fart.  He told me --

12    he lived in a different state, came back to Utah, or

13    came to Utah.

14    Q.   Okay.

11:29:54    15    A.   That was North Carolina, correct?

16    Q.   South Carolina.

17    A.   South Carolina.  Yeah, I apologize.

18    Q.   He said that when you said, when was your license

19    denied and he said it was in South Carolina?

11:30:01    20    A.   I can't quote you on the exact avenues of the

21    conversation, but during that 30, 45 seconds, that's

22    when he said he might have an out-of-state license.

23    Q.   Then you went back to your car?

24    A.   Yes.

11:30:12    25    Q.   And immediately upon entering your car you

1   communicate again with your -- with your partners?

2   A.   Okay.

3   Q.   Right?

4   A.   Yeah.

11:30:23   5   Q.   And they told you, again, we're coming.  We're on

6   our way?

7   A.   That was my -- I believe that was my backup

8   officer, not the actual K9 handler.

9   Q.   That was -- what was his name, officer what?

11:30:33   10   A.   Hagemann.

11   Q.   Okay.  And then you said to him, "We're good.

12   He's being nice."

13   A.   Yeah.

14   Q.   And you were referring to Mr. Jordan being nice?

11:30:43   15   A.   Absolutely.

16   Q.   Meaning that he wasn't demanding to leave?

17   A.   No.

18   Q.   You didn't tell him he could leave?

19   A.   No, he couldn't leave at that time.

11:30:52   20   Q.   He wasn't free to leave?

21   A.   Correct.

22   Q.   You weren't writing a ticket at that point?

23   A.   No.

24   Q.   You were waiting for your partners to arrive?

11:31:00   25   A.   Well, still doing my inquiries.  Yes.

1    Q.   But you were waiting for your partners to arrive?

2    A.   Well, it happens at the same time, but

3    essentially sure.

4    Q.   Do you think that we hear you searching on your

5    computer after you enter your car again a second

6    time?

7    A.   I believe so.

8    Q.   Okay.  At some point after you enter your car

9    again for the second time, your partner with the drug

10   dog arrives?

11   A.   Yes.

12   Q.   And you say do you mind helping me?

13   A.   Yup.

14   Q.   And he says, okay, yeah.

15        And you tell him take your time because we're

16   going to be waiting for a licensed driver.

17   A.   Sure.

18   Q.   At that point you hadn't told Mr. Jordan you were

19   waiting for a licensed driver?

20   A.   No.

21   Q.   You went back to the car to order Mr. Jordan out,

22   right?

23   A.   Yes.

24   Q.   And when you ordered him out, you patted him

25   down?

1    A.    Correct.

2    Q.    It was -- we can see it was daytime, right?

3    A.    Yes.

4    Q.    It was pretty busy traffic?

11:32:13    5    A.    Yes.

6    Q.    You had two other police officers with you?

7    A.    Yes.

8    Q.    Mr. Jordan hadn't been making any furtive

9    movements?

11:32:21    10    A.    No.

11    Q.    He hadn't been misbehaving?

12    A.    Correct.

13    Q.    And you had -- you were feeling somewhat

14    lighthearted in the moment, right?

11:32:30    15    A.    Sure.

16    Q.    You had been singing?

17    A.    I was singing and not very well.

18    Q.    Okay.  After you removed him from the vehicle, at

19    some point you asked him about any smoking in the

11:32:48    20    vehicle?

21    A.    Yeah.

22    Q.    Any drug use in the vehicle?

23    A.    Correct.

24    Q.    And you hadn't read him any sort of Miranda

11:32:53    25    rights at that point, right?

A.   Correct.

Q.   At that point, he was there by the side of the road with three officers there?

A.   Myself and Hagemann were there, and then, I believe, K9 Handler Moore was walking past us at that time.

Q.   So there were three officers present?

A.   Yes.

Q.   He wasn't free to leave obviously?

A.   Correct.

         MR. RICE:  One moment, Your Honor, please.

Q.   (By Mr. Rice)  Two other questions.

         The incident two weeks before with the female, did you create a police report with regard to that incident?

A.   Yes.

Q.   Did you turn that police report over to the prosecutor in this case?

A.   Not that I'm aware of, no.

Q.   Okay.

         MR. RICE:  We would request that police report and think that it should have been turned over.  If it was going to be mentioned or referred to in this hearing today, it should have been made a part of this.  We just want to put that on the

1    record.

2    Q.   (By Mr. Rice) What was the name of the female?

3             THE COURT:  Let me get a commitment from

4    Mr. Brotherton that he will produce that.

11:34:36    5             MR. BROTHERTON:  I will absolutely get that

6    and turn that over to counsel.

7             THE COURT:  Thank you.

8    Q.   (By Mr. Rice)  Could we get the name of the

9    female, please?

11:34:42   10    A.   I actually have it back by the bench.  Can I walk

11    back there?  I have that report with me.

12             MR. RICE:  Yeah, that's fine.

13             (Witness so complying.)

14    Q.   (By Mr. Rice)  Officer, just the name, please?

11:35:56   15    A.   Sure.  Esther Lavitae.

16    Q.   Thank you.

17             MR. RICE:  Your Honor, we have no further

18    questions for this witness right now.  But with

19    regard to any mention of this officer's prior

11:36:11   20    dealings with this particular Esther Lavitae, what

21    happened two weeks before, we asked the government

22    for Jencks material that might be used in this

23    hearing yesterday.  And given the fact that it has

24    been brought up and we haven't been made aware of it

11:36:26   25    beforehand with an ample opportunity to prepare and

44

1    cross-examine, we are going to ask that any portion

2    of this officer's testimony with regard to that

3    two-week ago incident specifically dealing with

4    Esther Lavitae be stricken from this hearing.

11:36:38    5         THE COURT:  I'm going to reserve ruling on

6    that until you've briefed the case, but you made the

7    motion and I'll rule on it once I have heard full

8    briefing on it.

9         Any redirect?

11:36:49    10         MR. BROTHERTON:  One question for Your Honor.

11    Am I free to pursue an avenue of questioning with

12    regard to that that Mr. Rice has just referenced?

13         THE COURT:  I think in the absence of

14    providing the Jencks material, you should be

11:37:04    15    precluded from pursuing that avenue.  The defense

16    does not have a fair opportunity to prepare.

17         MR. BROTHERTON:  I understand, Your Honor.

18    Thank you.  I don't have any other questions right

19    now.

11:37:19    20         THE COURT:  Thank you, Officer.  You may step

21    down.

22         THE WITNESS:  Thank you.

23         THE COURT:  I'm not going to release you

24    because it may be necessary to re-call you after we

11:37:28    25    have heard further testimony.

1          THE DEFENDANT:  Okay.

2          THE COURT:  Thank you.  You are required to

3     leave the courtroom.

4          THE WITNESS:  Yeah.

11:37:35    5          THE COURT:  United States may call its next

6     witness.

7          MR. BROTHERTON:  Officer C. J. Moore, please,

8     Your Honor.  I believe he is outside if I can go grab

9     him.

11:38:22   10          THE CLERK:  If you will pause by the podium

11    and raise your right hand, please.

12                    **CLINTON MOORE,**

13    called as a witness at the request of the Government,

14        having been first duly sworn, was examined

11:38:40   15                 and testified as follows:

16          THE WITNESS:  I do.

17          THE CLERK:  Thank you.  If you will please

18    take a seat, sir.

19          Sir, would you please state your name and

11:38:59   20    spell it for the record.

21          THE WITNESS:  First name is Clinton,

22    C-L-I-N-T-O-N, last name is Moore, M-O-O-R-E.

23                    **DIRECT EXAMINATION**

24    BY MR. BROTHERTON:

11:39:06   25    Q.  Officer Moore, good morning.

46

1           Would you please start by telling us how

2    you're currently employed?

3    A.    I work for the West Valley Police Department.

4    Q.    How long have you been a police officer with West

5    Valley?

6    A.    Five years now.

7    Q.    Did you receive any training to become a police

8    officer?

9    A.    Yes, sir.

10   Q.    And what did that training consist of?

11   A.    Sixteen weeks at the police academy at POST.

12   Q.    Um, what is your current assignment with the West

13   Valley City?

14   A.    I'm in the K9 unit.

15   Q.    Any specific training to become a K9 officer?

16   A.    Yes.  There's -- depending on what type of a dog

17   you have, you go through training such as narcotics

18   training and patrol training.

19   Q.    I want to dig into that in a little bit more

20   detail.

21           Um, how -- are you currently certified to

22   work with the K9s?

23   A.    Yes, sir.

24   Q.    And what certifications do you hold?

25   A.    I have the narcotics certification and patrol

1    certification.

2    Q.   Okay.  In order to become narcotics certified,

3    could you explain to us, if you would, what that

4    training is to become narcotics certified?

5    A.   Typically it's several months of training with

6    the dog, imprinting them on specific odors, training

7    them to find the odor, indicate.  Um, the POST manual

8    is roughly 300 hours until -- with training with your

9    dog before you're -- before you can certify.

10   Q.   So with that certification does that mean you are

11   certified with a particular dog or are you certified

12   to work with dogs generally?

13   A.   A specific dog.

14   Q.   Okay.

15   A.   So I -- I have my own narcotics certification as

16   a narcotics K9 handler, and then on top of that we

17   do -- my dog and myself perform a certification test

18   for the dog to become narcotics certified with me.

19   Q.   Okay.  And who issues that certification?

20   A.   POST.

21   Q.   And the State of Utah Peace Officers Standards

22   and Training, is that --

23   A.   Yes, sir.

24   Q.   -- what you're referring to?

25   A.   Yes.

1    Q.   Okay.  When did you first become certified as a

2    K9 officer, as far as narcotics detection?

3    A.   With Tank?  With this current dog specifically?

4    Q.   You personally.  When was your first narcotics

11:42:03    5    detection certification?

6    A.   When I first joined the K9 unit in April --

7    around April of 2017, and I believe it was August or

8    September of that year I became narcotics

9    certified --

11:42:19    10    Q.   Okay.

11    A.   -- with a dog.

12    Q.   What dog were you using at that time?  Who were

13    you partnered with at that time?

14    A.   My previous dog was -- his name was Lobo.

11:42:28    15    Q.   But that is not your current partner?

16    A.   No.  He has since retired.  I have a different

17    dog now.

18    Q.   So after Lobo retired, did you become certified

19    with another dog then?

11:42:39    20    A.   Yes, sir.  I -- we first got Tank in about April

21    of 2018.  And we certified the first time in

22    narcotics together in July of that year.

23    Q.   Okay.  As far as that training and certification

24    process goes, what is your role, as far as you

11:42:59    25    partnering with the dog, to go through that training?

```
 1   A.   What is my role with the dog?

 2   Q.   Yeah.

 3   A.   I'm his handler.  I am -- I am the one that works

 4   him.  I am the one who is controlling him at the end

 5   of the leash.  So together we imprint the dog first

 6   on the specific odors we need them to look for.  So

 7   for Tank, an example is marijuana, heroin, cocaine,

 8   and methamphetamine.

 9   Q.   Okay.

10   A.   My training is supervised by my supervisor who is

11   certified as a K9 instructor and a K9 judge through

12   POST.

13   Q.   Who was that supervisor?

14   A.   His name is Jacob Palmer.

15   Q.   Okay.  Is he also with West Valley?

16   A.   Yes, sir.  He is my current supervisor.  He is

17   over the K9 unit.

18   Q.   So April 2018 is when you began partnering with

19   Tank; is that correct?

20   A.   Yes, sir.  That's when we first got him from the

21   kennel.

22   Q.   Did he have any other handlers before that time?

23   A.   No.  No, he -- we bought him from a local kennel

24   near Ogden.  He had been at that kennel for, I

25   believe, just under two weeks.  He had been flown
```

11:43:11 (line 5)
11:43:28 (line 10)
11:43:41 (line 15)
11:43:54 (line 20)
11:44:06 (line 25)

1    over from Slovakia from the original breeder.

2    Q.   Okay.  So had he received any police related

3    training before you -- before you partnered with him

4    in April of 2018?

11:44:23    5    A.   No.  Tank was considered a green dog, meaning he

6    didn't have any formalized training other than in

7    Slovakia they introduced him to bite work, getting

8    them familiar with bite suits, bite sleeves, seeing

9    if they will engage.  But as far as narcotics

11:44:38    10    training, to my knowledge he had none.

11    Q.   Okay.  And so tell me about the kinds of things

12    that you do to train, beginning in April 2018.

13         You mentioned imprinting on narcotics.  What

14    does that entail?

11:44:53    15    A.   So when we begin our initial training, we try to

16    have them exposed not only to the odor, the desired

17    odor, for example methamphetamine, but they're also

18    exposed to odors which we would call diversions such

19    as laundry detergent, dryer sheets, dog treats, dog

11:45:16    20    food, um, the odor of gasoline.  Things that might be

21    in the area of narcotics when they're performing the

22    job, whether they're searching inside of a home for

23    narcotics, or around the outside of a car.

24         So they, from the very beginning, they start

11:45:34    25    with those diversions so that they learn that those

1    other novel odors, such as like coffee, has no value

2    to them.  That they're taught that the value comes

3    from finding a specific odor, so meth, marijuana,

4    heroin, cocaine.

11:45:50    5    Q.   Okay.  How are those odors introduced?

6    A.   We use these boxes called Hare Boxes developed by

7    Randy Hare.  Each box contains a different odor such

8    as dog food or human food.  And then there is one box

9    that has the desired odor we want them to locate, so

11:46:11   10    the methamphetamine.  The boxes are lined up kind of

11    on a rack.  You know, we walk the dog by each box.

12    And when the dog gets to the box that has the -- this

13    is in the very initial stages -- gets to a box that

14    has like the meth in it, as soon as the dog shows any

11:46:29   15    kind of changed behavior to that odor, he is rewarded

16    with a toy and we develop -- you know, we kind of

17    piggyback off of that.

18         So soon they learn that the other odors

19    present have no value to them, that it is this one

11:46:44   20    specific odor that when they show attention to it,

21    they get their reward.  Once they have shown that

22    attention to it, the alerts to it, we then train them

23    an indication.  Um, the indication is -- you know,

24    for us we like to train a passive indication to where

11:47:02   25    they will sit or lay down and just focus on that odor

1    and then they get their toy.

2         Um, there is other departments that will do

3    an aggressive indication where they will train the

4    dog to scratch at the odor.  We do a passive

11:47:15    5    indication.

6    Q.   You said change of behavior when they come into

7    contact with the desired odor.

8         What exactly does that mean, the change of

9    behavior?

11:47:24   10    A.   So, if you could imagine a series of boxes on a

11    rack, the dog is walking by, was he -- as he walks by

12    the box that has the methamphetamine in it, as he

13    walks by it, he is going to change direction and come

14    back to it.  That is a change in direction, that is

11:47:42   15    an alert.  He has sniffed the odor but then he has

16    left it, but he knows in his mind he has been trained

17    to find that odor so he will turn back to it and

18    locate where that odor is coming from.

19    Q.   Are there any other physical behavior changes

11:47:58   20    that would indicate or that you would recognize in a

21    dog that is in that odor?

22    A.   So alerts, they can be varied.  It is the dog's

23    natural behavior to -- to an odor that he has been

24    trained to find.  So with Tank, it is -- oftentimes

11:48:16   25    it is a quick change of direction.  When he has

```
1    passed the odor he has been trained to find, and he

2    realizes he has passed it, he quickly turns back.

3    And once he is back in that odor, he will work to

4    find the source.

5         And for Tank, specifically, his sniffing will

6    intensify, will become quick, almost like a quick in

7    and out, in and out, in and out.  His ears will often

8    become more alert or stand up a little bit more than

9    usual.  Um, his head can kind of move in a snake-like

10   back and forth direction as he is trying to figure

11   out or he is working along that kind of the scent

12   cone we call it.  So those are the typical alerts I

13   will see from him.

14   Q.   Is that unique to Tank or is that dogs generally?

15   A.   Um, it's --

16        THE COURT:  Could we have some foundation as

17   to how he knows what other dogs do generally?  His

18   only experience is with two dogs.

19   Q.   (By Mr. Brotherton)  Sure.  Are those behavior

20   changes the same that you recognized with the dog you

21   worked with previously?

22   A.   The dog I worked with previously, his sniffing

23   wasn't loud like Tank's is.  Um, his -- his head

24   didn't move in the quick back and forth kind of like

25   I described it as a snake-like fashion that Tank's
```

11:48:28
11:48:47
11:49:03
11:49:17
11:49:34

1    does.  So my experiences with those two dogs, their

2    alerts are different to me from one dog to the other.

3    Q.   Okay.  Now, you said these are natural behaviors

4    that occurred on their own from Tank.  Is that

11:49:55    5    correct?

6    A.   Yes, sir.

7    Q.   You didn't train him to intensify his sniffing or

8    perk up his ears?

9    A.   No.  He is trained to locate a specific odor.

11:50:05    10    The body language he exhibits when he is trying to

11    locate that odor is unique to him.

12    Q.   Okay.  You mentioned a couple of different

13    behaviors that he exhibits.  Could you talk a little

14    bit more in detail about his behaviors when he is in

11:50:26    15    a desired odor?

16    A.   Um, so typically, once Tank enters into where the

17    scent is most likely to be --

18         THE COURT:  Lay some foundation for this.

19         MR. BROTHERTON:  Sure.

11:50:42    20    Q.   (By Mr. Brotherton)  Um, we're talking about the

21    Hare Boxes?

22    A.   Yes, sir.

23    Q.   And the one box would have a desired odor like

24    methamphetamine, and then the other boxes would have

11:50:54    25    odors that -- you called them diversions, I think.

1              Is that correct?

2    A.   Yes.

3    Q.   When he approaches a -- the box that's known to

4    you to be the methamphetamine --

5              THE COURT:  You're not laying foundation.

6              MR. BROTHERTON:  I apologize, Your Honor.

7    I'm a little bit lost.

8              THE COURT:  I have got to have a basis for

9    why he knows that this is how Tank behaves.  The fact

10   that he observed him do it one time does not give

11   foundation for him to talk about what his universal

12   and unique response is.

13             So you have got to give me some foundation of

14   how many times you have done it, when he did it, how

15   he verified it, how it was observed.

16             MR. BROTHERTON:  Okay.  I can do that.

17   Q.   (By Mr. Brotherton)  In your POST training with

18   Tank, um --

19             THE COURT:  Let's lay foundation as to when

20   this POST training was, who did it, and who observed

21   it?

22   Q.   (By Mr. Brotherton)  Okay.  When did you begin

23   POST training with Tank?

24   A.   So my training with Tank started in April

25   of 2018.  We did our training with Tank -- we call

1    in-house due to having a certified K9 instructor and

2    judge in our unit I was able to train under him

3    versus having to --

4              THE COURT:  Who was that?

5              THE WITNESS:  Sergeant Jake Palmer.

6              THE COURT:  Okay.  And what is his training?

7              THE WITNESS:  He is a certified K9 instructor

8    in narcotics and patrol, a certified judge in

9    narcotics and patrol through Utah POST.

10             THE COURT:  When was he certified and by

11   whom?

12             THE WITNESS:  He was certified by the Utah

13   Peace Officers Standing and Training K9 program.  The

14   exact dates he got those I'm not aware.  I know he

15   was, when I started the training with Tank, he was a

16   K9 instructor.

17             THE COURT:  Okay.  Thank you.  You may

18   continue.

19             MR. BROTHERTON:  Thank you, Your Honor.

20   Q.  (By Mr. Brotherton)  You began your training with

21   Tank in April 2018.  Is that correct?

22   A.  Yes, sir.

23   Q.  Um, and you said this was in-house.  So meaning

24   in West Valley City?

25   A.  Yes, sir.  So every -- every time we would train,

1    I would be supervised by Jake Palmer.

2    Q.   Okay.  And what did that training consist of?

3    A.   So every day when we would come in to work we

4    would typically have about two hours of training.

5    Um, when be first got Tank, it was decided we would

6    start him on narcotics training first.  So from April

7    2018 to July 2018, the vast majority of our training

8    every day was narcotic related.

9         First, it was imprinting him on each odor,

10   having him learn the four odors that he is being

11   trained to locate.  Once he has been imprinted on

12   each of those odors, we move on to -- we move away

13   from the boxes and move on to more real-world

14   settings such as like office spaces, residential

15   settings, vehicles.  So we would place out different

16   narcotic hides in different training scenarios.  Most

17   of the time, once we moved away from the box

18   training, I did not know where the narcotics were

19   hidden, it was all unknown to me.

20        We do that so that me as a handler I can

21   observe Tank work.  I can see his changes in

22   behavior, I can see his alerts, um, versus knowing

23   where the hides are at, I wouldn't be focused on Tank

24   as much.  So that is all supervised by Palmer.

25        Um, like I said, the majority of the time I

1    don't know where the narcotic hides are.  Um, there

2    are some trainings where I will place out the

3    narcotic hides just so the other dog handlers won't

4    know where they are, so those rare occasions I would

5    know.

6            Um, once the dog had shown that he can locate

7    narcotics and bypass any other novel odors that might

8    be present in these real-world settings, then he is

9    tested in a certification.  The certification is done

10   by a K9 judge other than anybody from West Valley.  I

11   think we did a K9 judge from West Jordan Police

12   Department.  So he will test me and my dog together

13   and score us on various different scenarios.  And we

14   certified in July.

15   Q.   So July of 2018, is that correct?

16   A.   Yes, sir.

17   Q.   So approximately three months from when you began

18   training to when you became certified?

19   A.   Yes, sir.

20   Q.   Okay.  Approximately how many hours every day did

21   you spend in training with Tank?

22   A.   So we would try the first two hours of each shift

23   to do K9 training.  Now, that's not two hours

24   straight of Tank training, it's not practical, but it

25   is two hours of K9 training.

1           In the early stages with Tank, a lot of the

2    focus is on him just because he is a new dog and he

3    needs to be trained.  Um, so on a good day it is --

4    the first two hours of our shift is training.  On

11:56:27    5    Tuesdays, the K9 unit, both shifts overlap and we

6    train for four to five hours.  And that's so -- at

7    least two hours a night, four days a week we try to

8    get.  And then throughout the night, if time permits,

9    we would set up training scenarios such as like a

11:56:50    10   mock traffic stop on the side of a road.

11   Q.   And is that what you're referring to is in your

12   current assignment with Tank as a certified dog, is

13   that two hours every day is what you typically do?

14   A.   Yes.  Yes, that's pretty much for the life of the

11:57:05    15   dog.  We try to do some sort of training every single

16   day we're on duty.

17   Q.   Okay.  Prior to Tank becoming certified, though,

18   how much of your time every day did you spend in

19   training with him?

11:57:16    20   A.   Prior to him becoming certified?

21   Q.   Yeah.

22   A.   Um, the same.  So when I first got him, it was

23   the first two hours of our shift was dedicated to K9

24   training.  And then I'm still a police officer so I

11:57:27    25   would still have to go out and do my police officer

```
 1    duties for the city and so I was not able to train my
 2    entire shift.  So the first two hours is set aside
 3    for the K9 unit.
 4    Q.   Okay.  I want to talk a little bit more in detail
 5    about the narcotics specific training.
 6              Um, you mentioned a lot of things about
 7    placing hides and sometimes you would place them
 8    sometimes you didn't know where the hides were
 9    placed.
10    A.   Yes, sir.
11    Q.   Talk to me about what a typical training search
12    would be for Tank.
13    A.   Typically when we do a narcotics training,
14    somebody will put out six to upwards of 12 different
15    narcotics hides.  And depending on where we're
16    training at that day --
17    Q.   I hate to interrupt.  Help me.
18              Specifically, what is a hide?
19    A.   Sorry.  It is a -- so say like you had 10 grams
20    of marijuana.  That would be something that you would
21    put out to hide, so a hide, right.  It is hidden from
22    the dog.
23    Q.   So a specific item of controlled substance?
24    A.   Yeah.  A specific narcotic item, yeah.
25    Q.   Okay.
```

11:57:45   (line 5)
11:57:57   (line 10)
11:58:19   (line 15)
11:58:31   (line 20)
11:58:43   (line 25)

1   A.   So, typically we do six to 12 different hides,

2   um, depending on where we're training.  If we're

3   training at say one of West Valley's own warehouses,

4   it would be indoors, it would be more of an

5   industrial setting.  We have access to a few vacant

6   office spaces so we could do those in an office-type

7   setting.

8          Um, or if we go to say the West Valley City

9   shops where all of the city vehicles are, we could

10  put hides out on different vehicles so it would be

11  more of a vehicle setting.

12  Q.   Okay.  And what would you have Tank do then?

13  A.   Um, so whoever is running the training that night

14  is typically the one that puts out the different

15  narcotic hides.  So they will take you around to the

16  different areas and be like, okay, you know, these

17  four vehicles is your search area.  And they might

18  tell you there is two hides on these four vehicles or

19  they might tell you nothing.  It's just up to how

20  they want to run the training that day.

21          So they will say here are these four

22  vehicles, run your dog on these four vehicles.  So I

23  wouldn't know where the hides are at, but I'll just

24  go based off of what my dog tells me.  Once my dog

25  locates the hide and indicates, I would say, okay, he

1    is indicating on this rear passenger door and the

2    instructor will say correct.  And I would pay him

3    with his reward.

4    Q.   Did you ever have training scenarios where there

5    was no hide placed anywhere?

6    A.   Yes.  So every now and then we'll do like a blank

7    or a controlled negative, I think is what they call

8    it, where just like in the real-world not every car

9    you sniff is going to have drugs on it.  So it is

10   important for the dog to sniff cars that don't have

11   drugs.  Um, so they -- the officer running the

12   training that night might say, okay, you know, here

13   are these three cars, sniff these three cars, without

14   telling you that there is nothing on them.  So you

15   sniff the three cars and your dog wouldn't locate

16   anything and you would say I'm not getting anything

17   on these cars.  And he would say, okay, correct.  I

18   didn't put out a hide.

19   Q.   Okay.  How did Tank perform in these training

20   scenarios?

21   A.   He did good.  He is, you know, early on it's --

22   it's baby steps with a dog.  Um, narcotic training

23   is, to the dog, is just all a game so it's low stress

24   on the dog, it's low stress on me.  He finds what

25   he's supposed to find and he gets a reward.  If he

12:00:10

12:00:26

12:00:43

12:00:57

12:01:15

1    doesn't find it, he doesn't get a reward.

2    Q.   Okay.  A reward being what?

3    A.   A ball.  A ball or rope is his toy.

4    Q.   Okay.  How does Tank let you know that he has

5    found something?

6    A.   Like an indication?

7    Q.   Yup.

8    A.   So the indication for Tank is once he has located

9    the source of the odor, he will -- depending on how

10   high or low it is, if it's really low to the ground

11   he will lay down and focus at it.  If it is kind of

12   medium height to him, he will sit down and focus at

13   it.  If it is high up on say a wall, he might stand

14   up on his hind legs and get as high as he can to it

15   and focus on it.  So kind of like a freeze in place

16   and just look at where it's at because he has been

17   trained to sit down or lay down, focus on where the

18   source is coming from, because he has been waiting

19   for his toy to appear which will come from the top or

20   below or just wherever I decide to throw it in at.

21   Q.   Okay.  Prior to the indication where he sits or

22   lays down, does that -- does Tank communicate with

23   you through his body language?

24   A.   Yes.  So as he -- as he is looking or as he is

25   trying to pinpoint the source of that odor, um, that

12:01:36
12:01:47
12:02:03
12:02:18
12:02:42

1    is when you will see the alerts.  You will see the
2    changes in his behavior.  If he is -- if he is just
3    running along the wall and there is no narcotics
4    hidden there, well, there is no reason for him to
5    stop and investigate anything.
6          If there is a narcotics odor present, he
7    might stop abruptly and change directions and go back
8    to where he discovered that odor and then begin to
9    work out where it's coming from, the source.  So
10   those are the alerts, the sudden change in direction,
11   his sniffing gets a little bit louder.  Um, his ears
12   will sometimes perk up.  Um, his head will move back
13   and forth quickly as he is working through the --
14   through the odor.
15         Um, that's -- that -- those body movements
16   have value to me in a narcotic search setting in that
17   he has discovered the odor of something that he has
18   been trained to find, and he is actively working to
19   find that source of the odor, where it is coming from
20   and the strongest point.  And once he has located the
21   strongest point is when you see the indication which
22   is a trained response, is what we train them to do
23   once he has found the source.
24   Q.   So those other movements, um, moving his head and
25   sniffing, those other movements that you've

1  described, those are not trained responses; is that

2  my -- am I understanding you correctly?

3  A.   Correct.  The alerts are just his natural

4  behavior.

12:04:14   5  Q.   Okay.  Under what circumstances does he display

6  those alert behaviors?

7  A.   So the alerts always come before an indication.

8  You can't have an indication without first having the

9  alert.  Um, so prior to an indication, or prior to

12:04:38   10  Tank finding the source of the odor, you will -- I

11  will see the alerts.

12       Like I described earlier, those movements

13  have value to me in that I can tell that he has

14  discovered an odor that he has been trained to find

12:04:54   15  and now he is actively working to find where it is

16  coming from.

17  Q.   Okay.  Does he ever display those behaviors when

18  he encounters an odor that he has not been trained to

19  find?

12:05:05   20  A.   No.  So like I mentioned earlier, on the training

21  we expose them to these -- these different, novel

22  odors that might be present in these different

23  settings to show that those odors don't have any

24  value to the dog.  He doesn't get a reward for

12:05:23   25  finding a dryer sheet or laundry detergent or dog

1    food or another -- another animal.  He has been

2    trained to ignore that odor because it has no value

3    to him.

4    Q.   You have mentioned several times four controlled

12:05:43    5    substances.  Has he been trained to receive a reward

6    when he does encounter those four controlled

7    substances?

8    A.   Trained to receive a reward?

9    Q.   Does he -- let me rephrase that.  That was worded

12:05:58    10   very awkwardly.  I apologize.

11   A.   That's all right.

12   Q.   What odors does he -- when he -- what odors does

13   he exhibit those behavior -- when he is in the

14   presence of which odors does he exhibit those

12:06:11    15   behaviors?

16   A.   He has been imprinted on marijuana, heroin,

17   cocaine and methamphetamine.

18   Q.   So those alert behaviors that he -- that you

19   described earlier, he will exhibit those behaviors

12:06:22    20   when he is in the presence of those odors.  Is that

21   correct?

22   A.   Yes, sir.

23   Q.   Okay.  But he does not exhibit those behaviors in

24   the presence of any other odors?  Am I understanding

12:06:33    25   you correctly?

1  A.    That is correct, sir.

2  Q.    Okay.  Um, during the course of your training

3  with Tank from April 2018 to July 2018, did Tank have

4  any problems or setbacks or anything that delayed his

5  training or caused a problem for him?

6  A.    None that I can recall.  No.

7  Q.    Okay.  How was his physical health?

8  A.    Good, as far as I know.  We do yearly checkups

9  for our dogs.

10  Q.    Specifically during your training period he was

11  in good physical health the whole time?

12  A.    Yes, sir.

13  Q.    Okay.  What does he -- when you're not on duty,

14  where does -- talking specifically about this time

15  period, April to July of 2018, who is Tank with all

16  of the time?

17  A.    Me.  He lives with me, we go to work together.

18  He is with me.

19  Q.    Even when not on duty he is still with you?

20  A.    Yes.

21  Q.    Okay.  Did you notice any physical problems,

22  impairments in Tank during his training period?

23  A.    No, none that I can recall.

24  Q.    Okay.  Did he have any limitations in what he was

25  able to do physically?

1    A.    No.

2    Q.    Okay.  Since then, after training, has he had any

3    injuries or exhibit any -- or has he had any

4    injuries?

12:08:19    5    A.    Aside from maybe scraping a pad every now and

6    then, nothing that stands out to me, no.

7    Q.    Okay.  During -- so during that training period

8    he was in good physical health.  Is that fair to say?

9    A.    Yes.

12:08:42    10   Q.    Did you keep record of your training activities

11   with Tank during the -- during that training period

12   from April to July of 2018?

13   A.    Yes, sir.

14   Q.    Okay.  For what purpose?  Why did you keep those

12:09:01    15   records?

16   A.    Um, any time we train the dog, whether it is

17   narcotics or obedience, we try and document it just

18   to show that, you know, we're spending this amount of

19   time training our dogs to do X number of different

12:09:18    20   things.  And what they're specifically being trained

21   to do, whether it is being trained to sit or find

22   drugs, it's -- you know, we log as much training as

23   we can along with our deployments.

24   Q.    Could we put that up?  Showing you a word

12:10:17    25   document there.  Do you recognize that document?

1    A.    Yes.

2    Q.    And could you tell us what that is?

3    A.    It looks like a training log.

4    Q.    Um, is that the log that you kept during your

5    time training with Tank?

6    A.    Yes, sir.  I think this was in the initial

7    beginning when we were logging our stuff in the

8    Spillman Program.

9    Q.    Okay.  About halfway down the page there, it says

10   work date 4-10-18.  Is that April 10th of 2018?

11   A.    Yes, sir.

12   Q.    Is that about the time that you began training

13   with Tank?

14   A.    Yes.  I believe I first got him maybe the very

15   last week of March, first week of April, and we kind

16   of usually give them a week to two weeks to kind of

17   just acclimate to their new environment before we put

18   them in training.  So that seems about right.

19            MR. BROTHERTON:  Okay.

20            Your Honor, Government offers this document

21   as Exhibit 7.  I apologize that they're a little bit

22   out of order.

23            MS. STIRBA:  No objection.

24            THE COURT:  Exhibit 7 is received.

25            (Whereupon, Government's Exhibit 7

1              was received into evidence.)

2 Q.   (By Mr. Brotherton)   In that paragraph below with

3 the date 4-10-18, I see something called "scent

4 memorization 28 grams of weed."

12:12:08   5         Can you tell us that that means?

6 A.   So that's the narcotic we used for that day of

7 that training was 28 grams of marijuana.

8 Q.   Okay.  So scent memorization.  What does that

9 mean exactly, though?

12:12:23  10 A.   So that's the more introducing him to the

11 narcotics.  So we're trying to imprint that odor into

12 his brain.

13 Q.   A little bit further down in the paragraph, there

14 is an item that says, "miscellaneous notes."  This

12:12:43  15 was Tank's first day of scent memorization.  So

16 April 10th of 2018, is that when he began memorizing

17 different scents?

18 A.   Yeah, so this was Tank's first day.

19 Q.   And "it was surprising how quickly he picked it

12:12:56  20 up considering all of the diversions we introduced

21 him to on the first day."  Um, a little earlier in

22 the paragraph, um, there is some items mentioned,

23 gasoline, cotton pads, cotton balls, tin foil, peanut

24 butter, balloons.  Are those the diversions that were

12:13:12  25 used during that exercise?

1    A.    Yes, sir.

2    Q.    Okay.  And you noted it was surprising how

3    quickly he picked it up.  Why was it surprising how

4    quickly he picked it up?

12:13:23    5    A.    I mean --

6    Q.    If you can recall.  I know this was a while ago.

7    A.    Yeah.  Um, it is day one of training.  You know,

8    you never know what you're going to get for day one.

9    So any -- any good progress is kind of surprising.

12:13:40    10          Initially you -- you kind of expect it not to

11    go very well since this is their first day of doing

12    something.  But based on these notes I put in, he

13    picked it up pretty quick.

14    Q.    Okay.  I don't want to go through the whole

12:13:58    15    document with you, but I do want to point out a

16    couple of key points.  I'm scrolling down to Page 5

17    here.

18          At the bottom of the first paragraph, go back

19    to Page 4 to get the date.  It says June 5th of 2018.

12:14:29    20    Um, I just want to look at the note there on the

21    bottom -- toward the bottom of that first paragraph.

22          "This was Tank's first time doing sniffs

23    where I didn't know the location of the hides.  This

24    was his first time running cars."

12:14:48    25          You testified earlier about hides where

1    another person had placed the hide.  Is that what

2    you're referring to in your report here?

3    A.    Yes, sir.

4    Q.    Okay.  And when you say "running cars," what

5    exactly does that mean?

6    A.    So the hides would be placed on vehicles.

7    Q.    Okay.  Um, I want to look at the next paragraph

8    down.

9          Under your notes it says, "Tank was shown

10   different types of vehicles to train on.  He

11   performed well.  It was discovered he should be

12   challenged with different heights of the hides.  He

13   tends to search low and he hasn't realized he" and

14   then it cuts off.

15         Um, would you explain that to me?  What does

16   it mean that he tends to search low?

17   A.    That is when -- at the beginning stages of

18   narcotic work, it's set up for the dog to succeed.

19   So most of the hides are at his level.  So as you

20   progress, you start to vary the hides, so maybe

21   putting it higher up on a car.  So I -- if I remember

22   early on he searched low really well, but he seemed

23   like he didn't want to -- or didn't know yet that

24   hides were higher than basically at his chest level.

25   So we started putting them higher to force him to

12:15:05

12:15:22

12:15:36

12:15:52

12:16:15

1   search higher.  That's it.

2   Q.   Okay.  Let me go on to the next page.  This

3   is -- and, again, the date is cut off.  Work date of

4   June 14th of 2018.

12:16:34   5        The note for that -- that paragraph, at the

6   bottom of the paragraph, "miscellaneous notes."

7        "Tank was challenged to search higher than he

8   is used to.  He struggled at first, but gradually

9   began to understand.  He ended very well.  We will

12:16:54   10   continue to vary the height of the hides."

11        Is that continuing -- a continuation of what

12   you were talking about before?

13   A.   Yes, sir.

14   Q.   Was this something that you worked with Tank on?

12:17:04   15   A.   Yes.

16   Q.   And did you notice that he had any difficulty

17   learning how to search high as opposed to searching

18   low?

19   A.   Not necessarily.  Once he learned that, you know,

12:17:18   20   sometimes the hides were high, he would start -- I

21   would say, you know, he would stand on his hind legs

22   to get his nose up higher.  So he is learning that

23   the hides would be high or would be low but that if

24   he picks up an odor that might be high, he has

12:17:36   25   figured out a way to work up towards it.

1   Q.   I want to read the bottom of the next paragraph.

2   This is from June 21, 2018.  And again from your

3   notes.

4           "Tank continues to perform well.  He will be

12:17:45   5   ready to certify very soon.  We continue to train on

6   hides which are up high forcing him to be comfortable

7   getting up on his hind legs."

8           Um, did he eventually become comfortable

9   getting up on his hind legs?

12:18:00   10   A.   Yes, sir.

11   Q.   I think that the date on that first note that I

12   read, back on page five, was June 5th, and this date

13   is June 21st.

14           So it took about two weeks, is that -- is

12:18:16   15   that fair to say?

16   A.   Yes, sir.

17   Q.   Two weeks of training.  And on that June 21st

18   date, when you made that note, was he comfortable

19   then about getting up on his hind legs?

12:18:34   20   A.   Yes, sir, he was much more comfortable.

21   Q.   Okay.  I kind of want to transition here.  We

22   have been talking about your training, um, and your

23   training with Tank.

24           I want to transition now and talk about

12:18:50   25   February 28th of 2019.  Do you recall that date?

1    A.    Vaguely.  But from my report, yes.

2    Q.    Okay.  Were you on duty on that date?

3    A.    Yes, sir.

4    Q.    And were you partnered with Tank --

12:19:06    5    A.    Yes, sir.

6    Q.    -- that day.  Did you receive a call from

7    Detective Allen to come and perform a vehicle dog

8    sniff?

9    A.    Yes, sir.

12:19:16    10    Q.    Okay.  Before receiving that call from Detective

11    Allen, what were you doing?

12    A.    I believe I had originally been on my way in to

13    work and another officer called for a sniff so I did

14    that.  And then when I was finishing up with that

12:19:32    15    one, Detective Allen asked for a sniff so I went from

16    one to the other.

17    Q.    Okay.  And this was on your way in to work,

18    before you even began duty.  Is that my

19    understanding?

12:19:41    20    A.    Yes, sir.

21    Q.    Okay.  And did you eventually respond to a

22    location with Detective Allen?

23    A.    Yes, sir.

24    Q.    What did he ask you to do when you got there?

12:19:52    25    A.    He asked me to do an exterior sniff of the car

1    that he had pulled over.

2    Q.    Okay.  Were you able to do so?

3    A.    Yes, sir.

4    Q.    And were you wearing a body worn camera that day?

5    A.    No, I was not.

6    Q.    Why is that?

7    A.    When I was on my way in to work -- my camera is

8    docked at the police station.  So since I was on my

9    way, I was asked to do two different sniffs and so I

10   went and did those while I was still on my way to

11   work.

12   Q.   You just hadn't had an opportunity to retrieve

13   your camera yet?

14   A.    Yes, sir.

15   Q.   Okay.

16        MR. BROTHERTON:  Your Honor, this is

17   Exhibit 10.  It has already been admitted.

18   Q.   (By Mr. Brotherton)  Do you recognize that image

19   on the screen in front of you?

20   A.    Yes.  I see myself and my dog.

21   Q.    And is that Tank there with you?

22   A.    Yes, sir.

23   Q.    Okay.  Um, is this the sniff that you performed

24   on -- or that you and Tank performed on February 28th

25   of 2019?

1    A.    Yes, sir.

2    Q.    Okay.  I would like to just watch -- it is about

3    three minutes of the sniff itself.

4              (Whereupon, Exhibit 10 was played

12:21:54    5              for the record.)

6    Q.    (By Mr. Brotherton) I just realized it is kind of

7    duplicative and not very useful unless I ask you some

8    questions.

9              I would like to ask you some questions about

12:23:19    10    what we're seeing there.

11    A.    Okay.

12    Q.    I'll go back to the beginning of that sniff -- of

13    the search there.

14              (Whereupon, Exhibit 10 was played

12:23:25    15              for the record.)

16    Q.    (By Mr. Brotherton)  You begin your search at the

17    rear driver's side of the vehicle; is that correct?

18    A.    Yes, sir.

19    Q.    And did you write a report in this case?

12:23:46    20    A.    I did.

21    Q.    Okay.  And did you indicate in your report that

22    you began at the front driver's side of the vehicle?

23    A.    Yes, sir.  I was mistaken about where I started.

24    The vast majority of the time I will try to start at

12:24:00    25    the front of the vehicle, unless there are

1   environmental issues that cause me to start somewhere

2   else.

3   Q.   Were there environmental issues in this case that

4   caused you to start in a different location?

12:24:09   5   A.   I believe it was -- what I was concerned about

6   was the traffic because, technically, this stop is in

7   a lane of travel.  There is not really a shoulder

8   right here (indicating).  So there is another lane of

9   travel to my left, so I -- I didn't want to walk past

12:24:24   10   the driver's side up to the front so I just started

11   at the rear.

12   Q.   Okay.  You described earlier for us changes in

13   behavior that Tank displays when he is in the -- when

14   he has detected an odor of a narcotics?

12:24:38   15   A.   Yes, sir.

16          (Whereupon, Exhibit 10 was played

17            for the record.)

18   Q.   (By Mr. Brotherton)  It was quick, but you can

19   see Tank's head go from the left to the right in an

12:24:51   20   arc across the rear of the vehicle?

21   A.   Yes, sir.

22   Q.   Is that one of the behaviors that you're looking

23   for?

24   A.   Yes, sir.  So that was the first thing that

12:24:57   25   caught my eye.  I kind of let him continue to work

1    and then he ventures back, I believe, on -- in this

2    pass around, ventures back to that trunk on his own.

3    So those two things, I kind of -- I kind of make

4    mental notes of the different alerts that I see and

12:25:14   5    what part of the car I see them at so if I need to

6    come back and detail them a little bit more.

7    Q.   So you say you make a mental note but what

8    meaning did you take from his behavior?

9    A.   Just how his head moved back and forth quickly,

12:25:27   10    it kind of swept upwards along the top of that trunk

11    and then down.  And then he crossed the back of the

12    trunk and then started going up the passenger side.

13    So it is quick, but to me it is a -- it is a big

14    sniff of that area that he is -- he has picked up an

12:25:43   15    odor and he is trying to figure it out.

16    Q.   An odor that --

17    A.   An odor that he had been trained to find, like a

18    narcotic odor.

19    Q.   Let's watch some more of it then.

12:25:58   20           (Whereupon, Exhibit 10 was played

21             for the record.)

22           THE WITNESS:  Then when he goes back on his

23    own right there (indicating), I make another mental

24    note of that because I didn't direct him to go back

12:26:06   25    to the trunk right there.  He just walked past it,

1    and quickly turned around and went back to the trunk

2    again.

3            So I -- I just keep mental notes of these

4    alerts that I'm seeing, so that next time around I

12:26:19    5    can either slow him down so that he gets a good sniff

6    in that area.

7            MR. BROTHERTON:  Okay.

8            (Whereupon, Exhibit 10 was played

9            for the record.)

12:26:37    10   Q.   (By Mr. Brotherton)   As he walks past the

11   passenger side of the vehicle there, did you see any

12   behaviors that you would classify as alerts?

13   A.   No.  So that's another -- I swung him around and

14   had him do it again.  Nothing stood out to me there.

12:26:55    15   Q.   Okay.

16           (Whereupon, Exhibit 10 was played

17           for the record.)

18   Q.   (By Mr. Brotherton)  By the front of the vehicle

19   did he display any behaviors that were alerts?

12:26:59    20   A.   Along the front, no.  But right here (indicating)

21   on the driver's side, I saw some more alerts.

22           (Whereupon, Exhibit 10 was played

23           for the record.)

24   Q.   (By Mr. Brotherton)  Could you describe that for

12:27:10    25   us?

1          What did you see exactly that was an alert to

2    you?

3    A.   Right there (indicating), as he passed the rear

4    passenger door, just kind of a quick head turn back

12:27:19   5    to it to sniff it further.  Um, that was another

6    alert, yeah, alert to me that I kept a mental note

7    of.  And then he went right back to this trunk.

8    Q.   Okay.  Let me go back just a little bit.

9               (Whereupon, Exhibit 10 was played

12:28:06  10               for the record.)

11    Q.   (By Mr. Brotherton)  There we can see he is

12    moving his nose up, his ears are a little bit pinned

13    back, and he is moving his head up, up in the air in

14    an arc around the back of the trunk.

12:28:16  15               Are those the behaviors that you're looking

16    for?

17    A.   Yes.  So as he kind of stepped off the back of

18    the car right there (indicating), he lifts his head

19    up high in the air sniffing.  And if I remember

12:28:25  20    right, there was a strong wind blowing from the front

21    of the car to the rear of the car.

22    Q.   Okay.  What impact would that have?

23    A.   That odor is being pushed to the rear.

24    Q.   Okay.

12:28:38  25    A.   Wherever it's escaping from, different points of

1    the car, the wind is pushing it in a specific

2    direction.

3    Q.   So with the wind blowing that way, would

4    he -- would he be more likely to detect an odor at

12:28:52    5    the back of the car as opposed to the front of the

6    car then?

7    A.   Yes, sir.

8    Q.   Okay.

9            THE COURT:  Do we have any foundation for

12:29:01    10   that?  What experience has he had with testing how

11   wind on a car affects where the odors escape from the

12   car?

13           MR. BROTHERTON:  I can ask some questions,

14   Your Honor.

12:29:12    15   Q.   (By Mr. Brotherton)  You testified earlier about

16   some real-world stimulation and other experiences in

17   office buildings, around vehicles.

18           Um, have you had times in your training, or

19   in your work with Tank, making -- doing sniffs where

12:29:30    20   the wind is blowing?

21   A.   Yes, sir.

22   Q.   And in your experience during those sniffs --

23           THE COURT:  Let's have how many, when, who

24   observed it.

12:29:39    25   Q.   (By Mr. Brotherton)  Sure.

1           Um, with regard to your training with Tank,

2     um, approximately how many training experiences did

3     you have that were outside, not in controlled --

4     indoor, controlled conditions?

12:29:54   5     A.   I couldn't tell you off the top of my head how

6     many were inside of a building or versus outside in

7     the elements.

8     Q.   Okay.  Um, more than five?

9     A.   Yes, sir.

12:30:05   10    Q.   100?

11    A.   Yeah.  Probably, yeah.

12    Q.   Okay.

13    A.    I can tell you based on my experience with Tank

14    and with dogs is that they -- whether it is tracking

12:30:21   15    or looking for drugs, that they -- if they're

16    downwind of a smell, it is easy for them to work

17    upwind to it versus if they're walking the direction

18    of the wind, it is -- the odor is being pushed away.

19           THE COURT:  That is not the question you were

12:30:35   20    asking.

21           MR. BROTHERTON:  Yes.

22           THE COURT:  You asked him about the effect

23    upon odors escaping from a car with the wind blowing

24    in that direction.

12:30:44   25    Q.   (By Mr. Brotherton)  Did you -- did you have any

1    training specifically addressed at -- specifically

2    aimed, addressing the wind variable when you're doing

3    a vehicle sniff?

4    A.   Specifically, I couldn't tell you a time that

5    I -- that we have sat down with and studied the

6    effects of wind and how it pushes odor away from an

7    object, no.

8              MS. STIRBA:  Your Honor, I would object for

9    lack of foundation.

10             THE COURT:  I sustain it.  I don't believe he

11   is qualified to give any kind of an opinion about how

12   wind would affect the escape of odors from this car.

13             MR. BROTHERTON:  Your Honor, I don't know

14   that it requires expert opinion to testify -- to give

15   testimony about the effect that wind would have

16   generally.  I think that he could testify --

17             THE COURT:  If he is going to base his

18   testimony in this case and wants to offer an opinion

19   that there was probable cause because of the effect

20   of wind on the way it was blowing on this car, I have

21   got to have some foundation for that.  It doesn't

22   appear that there is any.

23             MR. BROTHERTON:  Just so I understand the

24   Court's ruling, you're saying that there hasn't been

25   any foundation laid for --

85

1          THE COURT:  I'm not going to give any

2     credibility to his testimony about how wind affected

3     the escape of odors from this car because I don't

4     think he has any basis to give that testimony.

12:32:09    5          MR. BROTHERTON:  Okay.  Um, if I could have

6     just a moment, please.

7          (Brief pause in proceedings.)

8     Q.  (By Mr. Brotherton)  And the -- I know we haven't

9     watched the entire video with you.  About how many

12:32:51   10     times did you go around the car with Tank?

11     A.   I think it was about three times.

12     Q.   Okay.  Excuse me.  Okay.

13          Um, why did you go around three times?

14     A.   I went around three times because I -- based on

12:33:07   15     the alerts that I saw, I was trying to give him the

16     opportunity to locate its source.

17     Q.   Okay.  Um, I believe in your report you indicated

18     two areas on the car where he displayed behaviors

19     that you interpreted as alerts; is that correct?

12:33:28   20     A.   Yes, sir.

21     Q.   At the driver's side door and at the rear of the

22     vehicle.

23          Am I understanding that correctly?

24     A.   So the rear of the vehicle and then along the

12:33:37   25     driver's side between the -- yes, along the driver's

1    side of the car.

2    Q.   Okay.  And we have seen the video and you have

3    given testimony about what those behaviors looked

4    like?

5    A.   Yes, sir.

6    Q.   Am I understanding correctly?

7              If we could just watch --

8    A.   Yes.

9    Q.   I believe at this point you have gone around the

10   car one time.  You have made one pass completely

11   around the car; is that correct?

12   A.   Yes, I believe so.

13   Q.   Okay.

14             (Whereupon, Exhibit 10 was played

15             for the record.)

16   Q.   (By Mr. Brotherton)  And just there we saw Tank

17   come to the rear of the vehicle and then go back

18   along the driver's side of the vehicle?

19   A.   Correct.

20   Q.   Did that have any meaning to you?

21   A.   Yes.  So when he originally passed it and then I

22   circled him back because I saw the alerts on that

23   side so I gave him another opportunity.  As he went

24   alongside it, I backed around the back of the car.

25   He originally came around the back with me and then

12:33:49

12:33:56

12:34:19

12:34:27

12:34:41

1    on his own turned back and went back up the driver's

2    side of the car.

3    Q.   So him without prompting or order from you

4    turning back and going back up the driver's side,

12:34:54    5    what did that mean to you?

6    A.   That is an alert and that is him following his

7    nose to an order that he has been trained to find.

8    Q.   I guess we have gone -- you have gone all the way

9    around the car once, but you, in several places, you

12:35:09    10    have gone back over places on the car?

11    A.   Yes, sir.

12    Q.   Why do that?

13    A.   If I see an alert and then we continue on, I

14    might swing him back around to direct him to that

12:35:20    15    site again, give him another opportunity to locate

16    its source.  It is possible that the odor wasn't --

17    was coming out of multiple different locations the

18    first time he passed, and he may be able to narrow it

19    down a second or a third time.

12:35:37    20    Q.   Okay.  I need to ask some more questions about

21    your training before I pursue one more line of

22    questioning.

23         Um, you testified about a hide place inside

24    vehicles; is that correct?

12:35:54    25    A.   Yes, sir.

Q.   Then your training is that you're having Tank
sniff around the outside of the car looking for those
odors.  Am I understanding you correctly, sir?

A.   Yes, sir.

12:36:05   Q.   Okay.  In your training, did you cover how odors
go from the inside of the vehicle to the outside of
the vehicle?

A.   Yes.  So in my training and experience, it's -- I
haven't found a car that's airtight.  That odor --

12:36:25        MS. STIRBA:  Objection, lack of foundation.

        THE COURT:  Sustained.

Q.   (By Mr. Brotherton)  Was there any part of your
training in being a narcotic dog handler that covered
how odors go from the inside of the car to the

12:36:59   outside of the car?

A.   Just that it escapes through various points.

Q.   Okay.  Could you talk a little bit more
specifically about that, as far as what your training
consisted of?

12:37:12        How did you learn that, or how was that
taught to you?

A.   Typically in training we learn that odor escapes
through doors or where the door seams are.

        MS. STIRBA:  Objection.  That wasn't
12:37:22   responsive to the question for foundation.

1          THE COURT:  The objection is sustained.  He

2  is not answering the question.  And the answer is

3  stricken.

4  Q.  (By Mr. Brotherton)  Okay.  Was there -- did you

5  have any lectures from experts in the field that

6  could talk about how odors escape from vehicles?

7  A.  Off the top of my head, no.

8  Q.  Did you have experts in the field of narcotics

9  detection come and give demonstrations about how

10  odors escape from vehicles?

11  A.  Just from what I was trained through the various

12  instructors that are certified through POST.  But no,

13  I didn't have any -- anything like that, no.

14  Q.  Okay.  Um, as you were going around this vehicle

15  on this day, and you saw the alerts that -- the

16  behaviors that Tank exhibited that you interpreted as

17  alerts, um, what did that indicate to you?  Just what

18  meaning did you derive from that?

19  A.  That he was detecting the odor of an illegal

20  narcotic.

21  Q.  Okay.  And could you tell where that odor was

22  coming from?

23  A.  I could tell you that -- where I saw the alerts,

24  at the trunk and along the driver's side of the car.

25  Q.  Okay.  You gave testimony earlier about Tank

1  being trained to work those odors to pinpoint the

2  source.

3       Am I remembering your testimony correctly?

4  A.  Yes, sir.

12:39:25  5  Q.  And once he does find the source of those odors

6  he gives a final indication?

7  A.  Yes, sir.

8  Q.  But he never did that in this case; is that

9  correct?

12:39:33  10  A.  No, sir.

11  Q.  Do you have any idea why he never gave that final

12  indication?

13       MS. STIRBA:  Objection, speculation.

14       THE COURT:  Sustained.

12:39:47  15       MR. BROTHERTON:  I shouldn't have him

16  speculate on what the dog is thinking.  I apologize.

17       THE COURT:  I don't think we can talk about

18  what is in the mind of the dog.

19       MR. BROTHERTON:  Yeah.

12:39:56  20  Q.  (By Mr. Brotherton)  Your testimony though is

21  that Tank only performs that final indication when he

22  has pinpointed the source of odor.  Is that correct?

23  A.  Yes, sir.

24  Q.  Until he actually pinpoints that source, he won't

12:40:07  25  give that final indication; is that correct?

1    A.   No, sir.  I'll only see the alerts.

2              THE COURT:  Could we have foundation for

3    that?

4              MR. BROTHERTON:  I believe that was his prior

12:40:17   5    testimony, Your Honor.

6              THE COURT:  I understand that was his

7    testimony, but I don't know that there is any

8    foundation backed up by any real-life experience of

9    how often they verified that by some kind of

12:40:26   10   objective test.

11             MR. BROTHERTON:  Let me go back and explore

12   that then.

13   Q.   (By Mr. Brotherton)  Um, getting to that final

14   indication where he will lay down or sit, um, how

12:40:43   15   is -- you said that is a trained response; is that

16   correct?

17   A.   Yes, sir.

18   Q.   How is -- how is that training done?  How do you

19   train Tank to exhibit that behavior?

12:40:51   20   A.   Once he has been trained or imprinted on the four

21   different odors through training, as he is searching

22   for that odor, once he can get as close to it as he

23   possibly can is when we train the indication for

24   the --

12:41:08   25   Q.   How does that work?  What do you mean as close to

1    it as he possibly can?

2    A.   So pretty much in training the dog can get almost

3    where he can touch his nose to it.  Um, and in some

4    scenarios there might be a barrier such as like a

5    drawer in a desk, right.  The drawer is that -- the

6    closest that he can get to the odor but he is

7    indicating that it is there.

8    Q.   Okay.  Um, what about in vehicle searches?

9    A.   Vehicle searches it's the same.  If the car --

10   narcotic is inside of the vehicle, as he is searching

11   for the -- for the strongest point the odor is

12   escaping.  Once he has located that, he will

13   indicate.  If he can't locate the strongest point,

14   um, I will only see the alerts.

15   Q.   So am I understanding you correctly that there is

16   a progression or a buildup in the way that this

17   training progresses?

18   A.   Yes, sir.  The alerts always come before the

19   indication.

20   Q.   Okay.  I guess my question though is in the

21   beginning, he has just got the source of the odor

22   just in front of him and he can reach up and almost

23   touch it with his nose; is that correct?

24   A.   Yes, sir.

25   Q.   And then as he progresses, it is behind the

1   barrier --

2          THE COURT:  You're leading the witness

3   extremely here and this is a critical point so I

4   think it is important that you not lead.

5          MR. BROTHERTON:  Thank you, Your Honor.

6   Q.   (By Mr. Brotherton)  How do you go -- how do you

7   train Tank to make that progression?

8   A.   So as he is -- throughout the training, um,

9   initially we start that once he has shown attention

10  to an odor, the odor he has been trained to find, the

11  narcotic, he will get a reward.

12         Once he -- once he is shown that that odor

13  has been imprinted, he -- we will progress to where

14  we will teach him once he has gotten as close as he

15  possibly can to that odor to exhibit an indication

16  which is the sit or the stay, um, and then to that

17  point is when he gets his reward.  From then on is

18  once he indicates.

19  Q.   Okay.  Is he given a reward when he makes alerts?

20  A.   In the very, very beginning stages he will, to

21  show him that that odor has value to him.

22  Q.   Okay.  Um, when -- when do you stop giving him

23  rewards on alerts?

24  A.   Once he has proven that the odor is imprinted,

25  that he can -- he can detect the odor, work his way

12:42:36
12:43:02
12:43:20
12:43:38
12:43:55

1    towards it, get to its location, and that's when we

2    will teach the indication.

3    Q.   Okay.  And how do you teach the indication again?

4    Maybe I misunderstood you.

5         How do you teach the indication?

6    A.   So once he is -- he has got to be almost right

7    on -- right at that odor, almost touching it.

8    Otherwise, they would just indicate when they first

9    detect the odor, which could be a number of feet away

10   or very close.

11        We want them to work their way as close as

12   possible they can get to that odor.  And once they

13   have done that, well, then we just -- you know, in

14   the beginning, I will tell him to sit and I might

15   guide his butt down to the ground until he sits.

16   They start to associate that, okay, once I have found

17   this odor and have gotten as close to it as I can,

18   now that I sit down that's when I get my ball.

19   Q.   Okay.  And the ball being the reward?

20   A.   The reward, right.

21   Q.   Okay.  So how do you make the progression then

22   from going from an item just placed right in front of

23   him, no barrier, to an item in a drawer, to an item

24   in a car?

25   A.   So the odor is going to -- once he detects the

1  odor and he's working his way towards it, if there is

2  a barrier there, he is -- he will get as close as he

3  can to it.  The -- they physically in some instances

4  cannot get to that source.  Whether they touch their

5  nose right to the bag of narcotics because of a door,

6  or it's in a box, um, but they will get as close as

7  they can to that strongest point of that odor and

8  then they will indicate.

9  Q.   So if -- if a hide were placed in a drawer, um,

10  at what point would you -- I'm having a little

11  trouble articulating this question.  Um --

12         THE COURT:  We're at about a point where we

13  need to take a break.  Are you close to finishing?

14         MR. BROTHERTON:  I think so, Your Honor.  Um,

15  I think it is the last point I wanted to make.

16         THE COURT:  Okay.

17  Q.   (By Mr. Brotherton)  So an item hidden in a

18  drawer and you are on an exercise with Tank trying to

19  detect that item?

20  A.   Yes, sir.

21  Q.   Once he gets as close to that item as he can, how

22  do you train him to give an indication?

23  A.   So we will -- we will set up scenarios to where

24  they physically cannot get right to the odor.  So,

25  you know, we'll create a barrier for them.  The dog

1  will then locate the strongest point of odor escaping

2  from whether it is a drawer or a car door and they

3  will indicate there.  It's like in training if I

4  don't know where the hide is, and he can't physically

5  get to it, he is going to show that searching

6  behavior, the alert behavior, trying to get to where

7  that is at.

8        But as we progress through training, um, we

9  do -- we set them up with different scenarios to

10  where they can't physically get to that odor any

11  more, there is that barrier in front of them.  So

12  they will then naturally work to find the strongest

13  point of the odor and to them they believe that that

14  is the source and they will indicate.

15  Q.   Okay.  And so how do you go from having an item

16  hidden in a drawer to having an item hidden in a car?

17        THE COURT:  I think he just explained that.

18        MR. BROTHERTON:  Okay.  Um --

19        THE COURT:  Let's take a break.  And you can

20  decide after the break that you have to ask a couple

21  of more questions.  After we take the break, we will

22  talk about how we conclude the hearing because we

23  have quite a lot of testimony, it appears to me,

24  left.

25        MR. BROTHERTON:  Thank you, Your Honor.

97

1     THE COURT:  So let's take a 15-minute break.

2    (Recess.)

3     THE COURT:  We're back in session.  Let's

4  talk for a moment about how we're going to proceed.

13:06:44 5     I have another hearing starting at 2:30.  I

6  know that the defense has an expert from out of

7  town -- I presume from out of town.

8     MS. STIRBA:  We do, Your Honor.

9     THE COURT:  I could continue the hearing to

13:06:59 10  tomorrow morning but I am reluctant to do that

11  because of the expert.  Any suggestions of how we

12  could proceed?

13     We could delay the cross-examination and put

14  your expert on, but maybe your expert needs to hear

13:07:12 15  the cross-examination.

16     Any suggestions as to how we ought to

17  proceed?

18     MS. STIRBA:  I would like to do the cross

19  first.  I don't anticipate it will be as long as

13:07:23 20  direct.

21     And other than that, my best suggestion is to

22  soldier on.

23     THE COURT:  Mr. Brotherton, any further

24  questions?

13:07:33 25     MR. BROTHERTON:  Just briefly, Your Honor.  I

1    will be very brief.

2              THE COURT:   Okay.

3    Q.   (By Mr. Brotherton)   Officer Moore, do you keep

4    records of when you have deployed Tank to do narcotic

13:07:56   5    searches or sniffs?

6    A.   Yes, sir.

7    Q.   And do you keep those records yourself, or how

8    are those records kept?

9    A.   We use a program called PackTrack.  It is the

13:08:06   10   same program we now use for our training records.

11   Q.   Okay.  I apologize.  On the screen there in front

12   of you, do you recognize that document?

13   A.   Yes.

14   Q.   Is that -- is that a record from the PackTrack --

13:08:50   15   I apologize, from PackTrack?

16   A.   Yes, sir.

17   Q.   Okay.  On there it has your name, CJ Moore, and

18   in parentheses K9.

19              Is that referring to you, sir?

13:09:03   20   A.   Yes, sir.  My name is Clinton James.  I go by CJ.

21   Q.   And there is a date range, October 20, 2018 to

22   March 1, 2019?

23   A.   Yes, sir.

24   Q.   There has -- there seems to be two different

13:09:14   25   sections, detection and patrol.

1          Do you know what is the difference between

2     those two sections?

3     A.   Detection is for narcotics related deployments.

4     Patrol is for all other tracking, K9 bites, building

13:09:29   5     and area searches for suspects.

6     Q.   Okay.  For our purposes today we are only

7     interested in detection.

8               There it says deployments and then underneath

9     it says 29.  Could you tell us what that means?

13:09:42   10    A.   So that is 29 detection entries into PackTrack

11    for my dog.

12    Q.   Okay.  And search area, it says 39.

13              Could you illuminate what does that mean?

14    A.   Correct.  Search areas could be if a warrant was

13:10:01   15    being served on a house and the cars, um, so there

16    would be multiple search areas.  Cars and then the

17    interior of the house, so that would be, you know,

18    two, three, four different search areas.

19    Q.   Okay.  And then under "alerts slash indications"

13:10:16   20    it says 25.  Can you tell us what that is?

21    A.   So those are when the dog alerts or indicates we

22    log that.

23    Q.   Okay.  And we kind of spent a lot of time today

24    discussing the difference between alerts and

13:10:28   25    indications.  But they -- but it seems to me that

1    they're included together; is that correct?

2    A.   Yes, sir.

3    Q.   Do you keep track of when a dog alerts versus

4    when it indicates, those two things, separately?

13:10:42  5    A.   So when we do a log entry into this program, we

6    will -- there is a comment section.  Typically you

7    will -- I'll say it was an exterior sniff of a car,

8    um, whether an indication was observed versus alert.

9    So I might note it.  But as far as this program, that

13:11:01  10   is how they have it listed.

11   Q.   Okay.  I'm scrolling down to Page 2 here.  Um, it

12   seems a list on the left-hand side are case numbers.

13   Is that correct?

14   A.   Yes, sir.

13:11:14  15   Q.   And then it appears the date is in reverse order

16   so I'm looking at the earliest date is November 22nd,

17   2018, to the -- up until February 28, 2019.

18        Is that -- am I viewing that correct?

19   A.   Yes, sir, based on this search criteria.

13:11:38  20   Q.   Okay.  On there it describes search areas and

21   then there is a number and then alert, slash,

22   indications and again a number.

23        Does that refer back to what you were talking

24   about before?

13:11:49  25   A.   Yes, sir.

1    Q.   Not all of the areas search have alerts or

2    indications.  Is that correct?

3    A.   That's correct.

4            MR. BROTHERTON:  Okay.  Your Honor,

13:12:31    5    Government would offer this as exhibit -- we'll call

6    this Exhibit 11.

7            THE COURT:  Any objection to receiving

8    Exhibit 11?

9            MS. STIRBA:  No objection, Your Honor.

13:12:44    10            THE COURT:  It is received.

11            (Whereupon, Government's Exhibit 11

12              was received into evidence.)

13            MR. BROTHERTON:  Thank you.

14            THE COURT:  Before we leave that exhibit,

13:12:53    15    do you have any way of determining, or have you

16    determined how many of the responses that are shown

17    as either an alert or an indication or indications

18    versus alerts?

19            MR. BROTHERTON:  No, I do not, Your Honor.

13:13:08    20            THE COURT:  No.  I'm asking the witness.

21            THE WITNESS:  Unless I have noted it in the

22    comment section, I don't.  There is no

23    differentiating, in this program, between the alert

24    and indication.  It is not a separate category.

13:13:22    25            THE COURT:  Okay.  Thank you.

1          MR. BROTHERTON:  I apologize, Your Honor.  I

2     need just a second.

3          I think that is all of the questions I have

4     for this witness, Your Honor.  I do have two other

13:14:17    5     items that I would offer as Exhibits 1 and 2.

6     Defense doesn't have any objection?

7          MS. STIRBA:  No objection to them.

8          THE COURT:  Exhibits 1 and 2 are received.

9          (Whereupon, Government's Exhibit 1 and 2

13:14:26   10          were received into evidence.)

11          THE COURT:  Cross-examination?

12          MS. STIRBA:  Yes.

13                     **CROSS-EXAMINATION**

14     BY MS. STIRBA:

13:15:13   15     Q.   Let me just log into my computer and I'll be

16     ready to go.

17          Okay.  Good afternoon, sir.  On the day of

18     this incident with Mr. Jordan, you first got a call

19     from Detective Allen?

13:16:43   20     A.   Yes, ma'am.

21     Q.   And Detective Allen wanted you to come over and

22     do a dog sniff on his car -- on a car that he was

23     going to stop?

24     A.   Yes, ma'am.

13:16:56   25     Q.   Detective Allen told you -- he called you?

1   A.   I don't remember if he called me on the phone or

2   if it was on the radio.

3   Q.   But he communicated with you?

4   A.   Yes, ma'am.

13:17:04   5   Q.   He said he was following a guy.

6   A.   I don't remember the nature of the conversation.

7   I don't know if he had stopped him already or --

8   Q.   But the point is whatever is reflected on

9   Detective's Allen's body camera is what happened.  Is

13:17:25   10   that fair to say?

11   A.   Yes, ma'am.

12   Q.   But before you went over to go do the dog sniff

13   with Tank, you knew that Detective Allen suspected

14   there were narcotics in the car?

13:17:35   15   A.   Yeah.

16   Q.   Well, you also wrote that in your report,

17   correct?

18   A.   Right.

19   Q.   So you knew on your way over that Detective Allen

13:17:44   20   suspected that there were narcotics in the car that

21   he had stopped?

22   A.   Yes, ma'am.

23   Q.   You -- now, in your police report, you wrote that

24   you spoke with Detective Allen when you arrived and

13:18:03   25   that's when Detective Allen imparted this information

1    about suspecting narcotics in the car, correct?

2    A.   Correct.

3    Q.   That's what you wrote in your report?

4    A.   Correct.

13:18:11  5    Q.   Have you reviewed the body camera of this

6    incident?

7    A.   Just this sniff portion.

8    Q.   Now, I'm putting up on the screen Government's

9    Exhibit 10.

13:18:56  10           And I am starting to play, sir, from the time

11   stamp 23:06.

12              (Whereupon, Exhibit 10 was played

13               for the record.)

14   Q.   (By Ms. Stirba) Now, sir, we just watched

13:19:52  15   Detective Allen's body camera, correct?

16   A.   Yes, ma'am.

17   Q.   And that was you off screen at the window talking

18   to Detective Allen, right?

19   A.   Yeah, I believe so.

13:20:01  20   Q.   Now, you would agree that in this conversation

21   when you arrived, you did not speak about

22   Detective Allen's suspicions about narcotics in the

23   car?

24   A.   That exchange, no.

13:20:13  25   Q.   So when you wrote in your report, "When I

1    arrived, I spoke with Allen.  He informed me he had

2    suspicion to believe there may be illegal narcotics

3    inside of the vehicle."  That's actually incorrect in

4    your report?

13:20:26  5    A.    Correct.

6    Q.    And you wrote this report the same day this

7    incident happened, on February 28th, 2019?

8    A.    I believe I did.  Typically I do.

9    Q.    Would it help to see it?

13:20:39  10    A.    I have it here.

11    Q.    If you could take a look, please, at Page 8.

12    A.    I don't have all of those -- those pages.

13    Q.    Do you have your police report that you wrote?

14    A.    I do.

13:20:49  15    Q.    Do you see the date at the top, 2-28-19?

16    A.    Yes, ma'am.

17    Q.    Is that the date you wrote this?

18    A.    That's the date of this -- I would assume I wrote

19    it that night.

13:20:58  20    Q.    But within hours of this incident happening?

21    A.    I couldn't tell you exactly.  But --

22    Q.    Within a day?

23    A.    Yeah.

24    Q.    Okay.  Now, you and Tank, as a K9 team, had

13:21:14  25    worked with Detective Allen before?

A.   Yes, ma'am.

Q.   Detective Allen had called you and Tank before to come do sniffs of various vehicles that he had stopped?

13:21:22   A.   Yes, ma'am.

Q.   Detective Allen is also a detective in West Valley City Police Department, correct?

A.   Yes.

Q.   And that is your police department?

13:21:31   A.   Yes.

Q.   And, in fact, Detective Allen had asked you to come sniff cars on multiple occasions?

A.   Yes.

Q.   Now, the government admitted a deployment summary

13:22:01   as government's exhibit -- a deployment log, I'm sorry, but your department also keeps stats on which detectives or which entities request K9 assistance, correct?

A.   I believe so, yes.

13:22:23   Q.   And between the same time of the deployment log, which is Government's Exhibit 11, which is October 20th, 2018, to March 1st, 2019, Detective Allen had requested your assistance nine times.

13:22:42          Would it help to see it?

A.    Sure.

          MS. STIRBA:  I'm marking this as Defendant's
Exhibit 1 for identification.

          MR. BROTHERTON:  No objection, Your Honor.

13:22:50    THE COURT:  Defendant's Exhibit 1 is
received.

          (Whereupon, Defendant's Exhibit 1 was
           received into evidence.)

Q.    (By Ms. Stirba)  If you could just look at
13:22:56  Page 3, sir.

          You see a box in there with a bunch of names
and agencies, correct?

A.    Yes, ma'am.

Q.    And you see at the top there is D. Allen and the
13:23:06  number 5?

A.    Yes.

Q.    And then there is also just Allen, 4?

A.    Yes.

Q.    Those are the same person?

13:23:11  A.    Same person, yes.

Q.    Okay.  So in this time period, which is
October 20th, 2018, to March 1st, 2019,
Detective Allen had requested you nine times?

A.    Yes, ma'am.

13:23:23  Q.    That is out of the 29 deployments we were talking

1    about?

2    A.   Correct.

3    Q.   Now, in West Valley City, the West Valley Police

4    Department, you keep track of what you call your

13:23:40   5    stats, is that correct?

6    A.   Yes.

7    Q.   And your stats are your numbers of what you have

8    been doing that month?

9    A.   Yes.

13:23:47   10   Q.   For example, how many arrests you make?

11   A.   Correct.

12   Q.   How much contraband you seize?

13   A.   Correct.

14   Q.   And do you keep track on a monthly basis; is that

13:23:59   15   correct?

16   A.   Like me personally?

17   Q.   No.  But at the end of the month, there is a

18   tallying of what you have done over that month.  Is

19   that correct?

13:24:10   20   A.   It can be tallied.  It's not necessarily tallied.

21   Q.   Well, especially at the end of the month you want

22   your stats to look good.  Is that fair to say?

23   A.   It doesn't matter to me.

24   Q.   You're saying it doesn't matter to you what your

13:24:23   25   stats are?

1    A.    I don't tally my own stats at the end of the

2    month to see my production.

3    Q.    Is it your testimony that you're not even

4    thinking about your stats as you're doing these

5    patrols?

6    A.    Correct.

7    Q.    Okay.  All right.  I'm going to continue to play

8    from Government's Exhibit 10 starting at time stamp

9    38:40 up in the corner.

10              (Whereupon, Government's Exhibit 10

11               was played for the record.)

12   Q.    (By Ms. Stirba)  We just heard your voice on the

13   body camera, right?

14   A.    Correct.

15   Q.    What you said was, "The last day of the month, my

16   stats will look good."

17   A.    Yeah, I said that.  Yes.

18   Q.    And this is during a search of Mr. Jordan's car

19   when you're talking about two for two?

20   A.    Right.  I had just come from another sniff.

21   Q.    And so it's fair to say you were happy to find a

22   gun in Mr. Jordan's car?

23   A.    Happy for my dog.

24   Q.    Happy for your dog.

25              And it's fair to say that the way you find

1  contraband is by searching cars?

2  A.   Well, yes.

3  Q.   And the more cars you search, the better your

4  chances are of finding something?

13:26:00   5  A.   Well, that's correct.  Yes.

6  Q.   And let's be clear.  I know you testified on

7  direct that you weren't wearing your body worn camera

8  that day because you were on your way in to work.

9  Right?

13:26:17  10  A.   If I remember correctly, that's what it was.

11  Q.   But before this sniff with Mr. Jordan, you were

12  at -- you were already out working with Tank at

13  another sniff, correct?

14  A.   Correct.

13:26:30  15  Q.   And you weren't wearing your body worn camera for

16  that other incident either?

17  A.   Correct.

18  Q.   And let's talk about body worn cameras for a

19  moment.

13:26:39  20       You know that a body worn camera is important

21  to policemen?

22  A.   Yes.

23  Q.   Right?  Did you say yes?

24  A.   I said yes.

13:26:49  25  Q.   In fact, West Valley City, the police department

1   has a specific policy on body worn cameras?

2   A.   Correct.

3   Q.   The purpose of a body worn camera is to improve

4   transparency, right?

13:27:02   5   A.   The sole purpose?

6   Q.   Not the sole purpose but an important purpose?

7   A.   Sure.  Yes.

8   Q.   To create a record of exactly what happened,

9   right?

13:27:11   10   A.   Correct.

11   Q.   Because you would agree that video is more -- is

12   better than human memory.

13   A.   Yes.

14   Q.   For example, we just talked about how there was

13:27:24   15   an error in your police report about when a

16   conversation occurred, right?

17   A.   Correct.

18   Q.   And you wrote that police report within a day of

19   this happening, right?

13:27:34   20   A.   Yes.

21   Q.   And even in that short amount of time, you

22   misremembered at least that thing, correct?

23   A.   Correct.

24   Q.   But unlike human memory, a video doesn't

13:27:44   25   mis-remember, does it?

1    A.    No.

2    Q.    It just is what it is, right?

3    A.    Correct.

4    Q.    And according to your police department, officers

13:27:53   5    are supposed to wear body worn camera for events like

6    citizen contacts?

7    A.    Correct.

8    Q.    All arrests and investigative detention?

9    A.    I'm assuming you mean from policy?

13:28:07   10    Q.    I am, but you can read it, too.

11          Do you want me to give it to you?

12    A.    No.  I'm going to say correct.

13    Q.    Traffic stops?

14    A.    Yes.

13:28:17   15    Q.    Searches?

16    A.    Yes.

17    Q.    But at no point during this day as you were

18    called to do these two dog sniffs did you say, hey,

19    give me a few minutes, I just need to get a body

13:28:30   20    camera?

21    A.    No, I did not.

22    Q.    Let's talk next about your dog Tank.

23          Tank was imported here from Slovakia, right?

24    A.    Correct.  Yes, correct.

13:28:47   25    Q.    He arrived in Utah in late March, early

1   April 2018?

2   A.   I believe, yes.  Mid to end of March.

3   Q.   And were you the person who immediately took

4   custody of Tank when he first arrived?

13:29:02   5   A.   No.

6   Q.   When did you first have contact with Tank?

7   A.   The day we went and looked at the different dogs

8   available at the kennel that's up near Ogden.

9   Q.   Do you remember what day that was?

13:29:16   10   A.   I couldn't tell you exactly.

11   Q.   Were you with Tank when Tank first saw a vet in

12   April of 2018?

13   A.   Yes.

14   Q.   So you were the handler who took Tank to his

13:29:30   15   April 2018 veterinary appointment?

16   A.   Yes.

17   Q.   So you were the person that the vet told that the

18   vet had concerns about mild chronic bilateral hip

19   degenerative joint disease, suspicious for hip

13:29:54   20   dysplasia?

21        So when the vet says, "I called and discussed

22   concerns for elbows and hips for a working dog," you

23   were the person the vet was talking to?

24   A.   He never called me.  This is in-person we talked

13:30:05   25   about my dog at that first initial vet visit, they

1   did x-rays.

2   Q.   Did you ever talk to anybody about mild chronic

3   bilateral hip degenerative joint disease or

4   suspicious -- suspicion for hip dysplasia?

13:30:19   5   A.   I would have to go off of memory of that first

6   visit with what the vet told me, because of his

7   breed, for the potential of hip dysplasia.

8   Q.   So you're saying your memory is it was just we

9   have no specific concerns for Tank, it is just

13:30:35   10   because of his breed?

11   A.   That's -- I mean that's the best I can remember.

12   Q.   Okay.  So Utah POST certified Tank in July

13   of 2018.  Right?

14   A.   Correct.

13:30:50   15   Q.   And he was trained with POST from April of 2018

16   until July of 2018 when he was certified?

17   A.   Yes, ma'am.

18   Q.   Now, let's talk about what is called a final

19   trained response.  Now, the Utah POST program trains

13:31:15   20   its dogs to do a trained final response, correct?

21   A.   Correct.

22   Q.   Obviously Tank doesn't speak, right?

23   A.   He hasn't yet.

24   Q.   He hasn't yet.  Hope springs eternal but hasn't

13:31:29   25   yet.

1   A.   Correct.

2   Q.   And obviously Tank doesn't use words to tell you

3   what Tank is feeling, correct?

4   A.   Correct.

13:31:37  5   Q.   So a trained final response is the specific

6   taught behavior that Tank uses to tell you, the

7   handler, I am detecting target odor?

8   A.   Where it's at.

9   Q.   Okay.  And let's be clear.  I understand that

13:31:55  10   your testimony today is that you can tell, absent a

11   trained final response, when Tank is in the presence

12   of target odor.  Okay?  I get that that is your

13   testimony.

14   A.   Okay.

13:32:04  15   Q.   But let's just talk about what Utah POST trains

16   your dogs to do, okay?

17   A.   Okay.

18   Q.   What Utah POST says -- trains the dogs to do is

19   when you are in the presence of target odor, you do a

13:32:18  20   taught specific behavior, correct?

21   A.   Correct.

22   Q.   We talked about trained final response.  Another

23   word Utah POST uses is indication, right?

24   A.   Correct.

13:32:28  25   Q.   Indicating.  So same thing, right?

1    A.    Right.

2    Q.    It is a -- and what you have talked about is POST

3    generally uses passive indications?

4    A.    I'm not sure if that is their preferred method,

13:32:47    5    passive versus aggressive.

6    Q.    Who cares what POST generally does.

7          Tank, your dog, does a passive final trained

8    response, right?

9    A.    Yes.

13:32:54    10    Q.    What is that specifically?

11    A.    So passive is they're not a -- where they'll sit

12    and lay down and focus on the source of that odor.

13    Q.    So it is sit?  It is sit and stop?

14    A.    Yes.  Well, to sit they would need to stop.

13:33:15    15    Q.    Or lie down?

16    A.    Or lie down.

17    Q.    Okay.  But to -- in other words, stop movement in

18    front of the source of the odor, correct?

19    A.    Correct.

13:33:27    20    Q.    And that behavior is different from a dog just

21    sniffing around being a dog, right?

22    A.    Yes.

23    Q.    That behavior is different from a dog sniffing a

24    ham sandwich?

13:33:40    25    A.    The indication?

1    Q.    The indication.

2    A.    Yes.

3    Q.    Just talking about the indication.

4    A.    Yes.

13:33:44    5    Q.    Because you talked in your testimony about alerts

6    and Utah POST defines alerts as natural behavior that

7    a dog does?

8    A.    Correct.

9    Q.    But the trained final response is a specific

13:34:01   10    instructed behavior, right?

11    A.    Correct.

12    Q.    And the point of it is to communicate to you as a

13    handler I smell target odor?

14    A.    In a way it is that I have found the source of

13:34:18   15    the odor.

16    Q.    Well, let me ask you this.  Would Tank do his

17    trained final response, according to you, on a ham

18    sandwich?

19    A.    No.

13:34:26   20    Q.    Would Tank do a trained final response, according

21    to you, on a squirrel?

22    A.    No.

23    Q.    Tank is trained to do his trained final response

24    to four things, right, marijuana, heroin, cocaine,

13:34:41   25    and methamphetamine?  Is that right?

A.   Correct.

Q.   And so if Tank is properly trained, the only time you are going to see a trained final response is to those four things?

13:34:52   A.   Correct.

Q.   Because obviously if a dog is doing the trained final response to say some Purell, that dog is not properly trained?

A.   Unless he was trained to find Purell.

13:35:03   Q.   Right.  And let's be clear, so you can train a dog to have a target odor of anything, right?

A.   Correct.

Q.   Your program, the program that certified Tank is for those four narcotics, right?

13:35:17   A.   Yes, ma'am.

Q.   And you would agree that a trained final response is important?

A.   Yes.

Q.   And, in fact, you have worked extensively with

13:35:34   Tank to do the trained final response?

A.   Yes.

Q.   Starting his second week of training?

A.   Correct.

Q.   The first day of the second week of training,

13:35:44   right?

A.    Yes.

Q.    According to the syllabus, yeah?

A.    Yeah.  Yes, early on.

Q.    It was immediately.  And you spent hours training Tank to do this trained final response, right?

A.    Correct.

Q.    And you spent hours, after he has been certified, maintaining his ability to do the trained final response, right?

A.    Correct.

Q.    And, in fact, Utah POST will not certify a dog who does not consistently do the trained final response.  Right?

A.    I don't believe so.  Yes.

Q.    Well, are you saying now that POST is going to certify a dog who doesn't do the trained final response?

A.    No.  On the score sheet there is a box for indication.  The indication gets scored.  So during the certification they -- yes, they have to show that they can indicate on the source of the odor.

Q.    And we have talked about how in Utah POST world, indication is the same thing as a trained final response, right?

A.    Yes, ma'am.

1   Q.   So, in other words, if a dog just starts sniffing

2   around and moving his head during a certification

3   testing period but does nothing else, are you saying

4   POST would certify that dog anyway?

13:36:59   5   A.   During a certification?

6   Q.   Yes.

7   A.   No.

8   Q.   So it is required for a dog to do the trained

9   final response during certification?

13:37:08   10   A.   Yes.

11   Q.   Okay.  And when Tank does that trained final

12   response, you don't have to guess what he is

13   responding to, right?

14   A.   As far as the narcotic odor?

13:37:25   15   Q.   Right.  You know that that is narcotic odor?

16   A.   Correct.

17   Q.   You don't have to assess the finer points of his

18   behavior, right?

19   A.   You would have to be more specific about --

13:37:37   20   Q.   I'm saying when he does his trained final

21   response, that's it.  He has clearly communicated to

22   you he is in the presence of target odor?

23   A.   Correct.

24   Q.   And so you don't have to do what you just did on

13:37:50   25   direct, which is go through all of the behaviors and

1    say, I think his head went this way, I think his tail

2    went this way, I think his ears went this way, and

3    here he did this thing, all of which I believe

4    indicates that he is in the presence of a target

13:38:05    5    odor.

6              You don't have to do that when he just does

7    his trained final response?

8    A.    Are you talking about doing a certification?

9    Q.    No.  I'm talking about during a search or

13:38:13    10    certification, either way.

11    A.    I guess I'm confused about what you're asking.

12    Q.    When he does his trained final response, you have

13    testified he only does that in the presence of target

14    odor, correct?

13:38:26    15    A.    Correct.

16    Q.    So when he does that trained final response, it

17    is not ambiguous.  You know that he is telling you I

18    smell target odor, right?

19    A.    Correct.

13:38:36    20    Q.    Because that's in fact what you have trained him

21    to do, right?

22    A.    Correct.  It's the source of that target odor.

23    Q.    And, again, I understand that your testimony is

24    you don't need the final trained response for me to

13:38:50    25    know what he is perceiving.  I get that.  But I am

1    talking about what POST trains him to do.  So when he

2    does that trained final response, it is not about you

3    weighing which behaviors you think he is doing, the

4    sum total of which means to you that he is in the

13:39:14    5    presence of target odor?  You don't have to do any of

6    that, right, because he just does the response you

7    have trained him to do?

8    A.   Right.

9    Q.   Right?

13:39:22    10    A.   Yes.

11    Q.   Okay.  So your subjective view about what he is

12    doing doesn't come into play when he is doing his

13    trained final response, correct?

14    A.   I guess I'm confused.  Are we talking about

13:39:38    15    alerts versus indication?

16    Q.   I'm talking about indications -- trained final

17    response.  That is what I'm talking about.

18    A.   Can you rephrase that or can you restate that

19    question.

13:39:50    20    Q.   Sure.  Tank didn't indicate in this case, right?

21    A.   That's correct, he did not.

22    Q.   So on direct, we watched the video with you,

23    right?

24    A.   Yes.

13:40:04    25    Q.   And you went through all of these behaviors that

1    you saw him do.  According to you?

2    A.   Correct.

3    Q.   Right?  His ears went back, right?

4    A.   Yes.

13:40:13    5    Q.   His head did some kind of semi-circle, right?

6    A.   Correct.

7    Q.   And I get that the point of your direct is I can

8    tell that that means he is in the presence of target

9    odor.  Right?

13:40:25    10   A.   Correct.

11   Q.   I get that.  But if Tank does a trained final

12   response, you don't have to do any of that, right?

13   A.   That's right.

14   Q.   He just does what you -- what you have trained

13:40:36    15   him to do, right?

16   A.   Correct.

17   Q.   It is clear, right?

18   A.   Right.

19   Q.   It is consistent with his training, right?

13:40:42    20   A.   Correct.

21   Q.   And your opinion about what his other behavior

22   means doesn't come into play because it doesn't have

23   to, right?

24   A.   My opinion about his alerts?

13:40:56    25   Q.   Right.  If he just does a trained final response,

1    we don't have to do all of this discussion about what

2    you think his alert behavior means?

3    A.   Unless you asked me about it.

4    Q.   Right, because the dog has communicated it.  The

5    dog has, right?

6    A.   Correct.

7    Q.   Okay.  Now, I want to be clear.  We have talked

8    about the four narcotics that Tank has been trained

9    by Utah POST to indicate to, those four narcotics

10   that we talked about.

11        Even when Tank does a trained final response,

12   there is no way to tell which of the narcotics he may

13   or may not be --

14   A.   That's correct.

15   Q.   And there is no way to tell the strength of that

16   odor when he does a final trained response?

17   A.   That is correct.

18   Q.   In other words, you don't know if it is residual

19   or fresh?

20   A.   No.  Yeah.  Yes, that is correct.  I see what

21   you're saying.

22   Q.   You don't know if it has been -- maybe narcotics

23   had been there five days ago or are there currently?

24   A.   Correct.

25   Q.   Now, you would agree that in police work in

1    general, it is important to keep accurate records of

2    what you do in your police work?

3    A.   Right.

4    Q.   That's why you write reports, police reports?

13:42:19   5    A.   Correct.

6    Q.   When you first went through your police training,

7    not your K9 training, just your basic police

8    training, you were taught it is important to be

9    accurate in your police reports, right?

13:42:32   10    A.   Yes, ma'am.

11    Q.   To document everything correctly, right?

12    A.   Yes, ma'am.

13    Q.   And to be thorough?

14    A.   Yes, ma'am.

13:42:39   15    Q.   And the same training applies to your K9

16    documentation, right?

17    A.   Correct.

18    Q.   It is very important to document exactly what

19    training exercises you do with Tank, right?

13:42:56   20    A.   Yes, as best as you can.

21    Q.   Well, let's talk about what that means in a

22    second, but just as a general principle, you would

23    agree that it is important to document what you do

24    when you're training your dog?

13:43:10   25    A.   Yes.

1    Q.   Because I mean you need to know what exercises

2    you're doing with Tank, right?

3    A.   Correct.

4    Q.   How many hours you're doing those exercises,

13:43:21    5    right?

6    A.   Correct.

7    Q.   Specifically, what Tank is doing in those

8    exercises, correct?

9    A.   Correct.

13:43:28    10   Q.   And you know it is critical to keep a complete

11   and accurate log of what that training looks like for

12   Tank?

13   A.   Correct.

14   Q.   And, in fact, you go through the Utah POST

13:43:47    15   training manual during your POST certification,

16   right?

17   A.   Yes.  That was a very long time ago.

18   Q.   Yes.  But you also know that Wendell Nope -- who

19   is Wendell Nope?

13:43:59    20   A.   He is the sergeant over the K9 program for POST.

21   Q.   He runs the dog program, right?

22   A.   Yes.

23   Q.   And so there is a chapter in your Utah POST

24   training called Narcotics Detector Dog Courtroom

13:44:14    25   Testimony, right?

1    A.    Yes.

2    Q.    You're familiar that this chapter exists?

3    A.    Once upon a time I've read it.

4    Q.    Right.  So I'm just going to show this to you.

13:44:25    5    I'm going to mark this as Defendant's Exhibit 2.

6              And if you could just read the highlighted

7    portion on number two, your instructions.

8    A.    The highlight?

9    Q.    Yes.

13:44:39    10             THE COURT:  Before he reads it, should we

11    offer it into evidence?

12             MS. STIRBA:  I hadn't planned on offering it

13    into evidence, but sure.

14             THE COURT:  Any objection?

13:44:47    15             MR. BROTHERTON:  No.

16             THE COURT:  Exhibit 2 is received.

17             (Whereupon, Defendant's Exhibit 2 was

18               received into evidence.)

19             THE WITNESS:  "Remember, the U.S. Supreme

13:44:52    20    Court has ruled that if it isn't written in the

21    report, it didn't happen."

22    Q.    (By Ms. Stirba)  So Wendell Nope also stresses

23    you should write things down, right?

24    A.    Yes, ma'am.

13:45:05    25    Q.    In fact, according to Wendell Nope, the Supreme

1    Court has said that?

2    A.   Yes.

3    Q.   So we went through your training records during

4    the government's direct.  Specifically, we went

13:45:29    5    through Government 7 which was your training records

6    from a program called Spillman, is that right?

7    A.   Yes, ma'am.  Yes.

8    Q.   Is Government's Exhibit 7, your training records

9    for this period, a complete body of your

13:45:54    10    documentation for training Tank during this period?

11    A.   Um, not complete.  I think there is -- sometimes

12    there is days when I've missed a training entry for

13    any number of reasons.  But as often as I can, those

14    are the training entries for Tank.

13:46:13    15    Q.   Okay.  Are you saying that you often don't

16    document the training exercises that you do with

17    Tank?

18    A.   Not often, but there are times when it doesn't

19    get entered.

13:46:24    20    Q.   Okay.  So you're saying that this document does

21    not contain -- there are some exercises you just

22    didn't document with Tank?

23    A.   It is possible I'm saying.

24    Q.   Okay.  Do you know it to be true?

13:46:35    25    A.   Yeah.  I would say yes, I have missed training

1    entries --

2    Q.    Okay.

3    A.    -- from the last three years.

4    Q.    And I'm not talking about three years.  I'm

13:46:43   5    talking from April 10th, 2018, when this record

6    starts, to November 1st, 2018, when this record ends.

7    A.    I believe it's possible that I have missed a

8    training entry.

9    Q.    Okay.  Are we talking a lot?

13:46:59   10    A.    I couldn't tell you whether it's a lot.

11    Q.    So we don't even know if this is missing one?

12    A.    More often than not, everything is logged.

13    Q.    Okay.  So more often than not, you memorialize

14    the training that you do with Tank?

13:47:14   15    A.    Correct.

16    Q.    Okay.  So then -- so is Spillman just a data

17    entry program?

18    A.    It's the program we use for our department.

19    Q.    Okay.  And then what is PackTrack?  PackTrack is

13:47:31   20    another data entry program?

21    A.    PackTrack is the program we moved to to log

22    training logs and deployment logs.  Before that we

23    were putting them in Spillman, like you said.

24    Q.    Okay.  So there was -- you basically just

13:47:46   25    switched from Spillman as a recording device to

1    PackTrack?

2    A.   Correct.  So Spillman still is around, but this

3    other training log program was available to us and

4    people above me decided to go with that.

13:48:01    5         MS. STIRBA:  Okay.  I'm going to mark

6    Defendant's Exhibits 3 and 4 and move to admit them.

7    I'm showing them to the government.  Okay.  So I am

8    moving to admit them?

9              THE COURT:  3 and 4.

13:48:23    10             MS. STIRBA:  3 and 4.

11             MR. BROTHERTON:  No objection, Your Honor.

12             THE COURT:  Exhibits 3 and 4 are received.

13             (Whereupon, Defendant's Exhibits 3 and 4

14               were received into evidence.)

13:48:29    15    Q.   (By Ms. Stirba)  Now, before we talk about these

16    records, I just want to be clear.  During Utah POST

17    training, you are also taught how to write about your

18    K9's behavior; is that correct?

19    A.   I don't know word for word how it is worded, but

13:48:52    20    yes.

21    Q.   Sure.  I'm happy to show you the syllabus, but

22    according to the syllabus, week 1, day 4, one of the

23    things you're supposed to do is be taught to

24    introduce to students the use of factual descriptions

13:49:07    25    and verbiage, avoiding language like vicious or

1    failed to, and instill the value in using

2    professional language when speaking and writing about

3    the K9 behavior.

4            Does that sound familiar?  Do you want to see

5    it?

6    A.   Familiar no, but I mean you're reading it from

7    the POST manual so this looks like the POST manual.

8    Q.   And you did the POST program, right?

9    A.   Yes, ma'am.

10   Q.   So according to the POST manual, you are taught

11   to avoid language like saying your dog failed to do

12   something?

13   A.   So yes.  So according to that POST manual, yes.

14   Q.   What if your dog fails to do something?

15   A.   Um, I log what he struggles with in my journal.

16   Q.   So instead of -- do you ever use the word fail?

17   A.   It is possible I have.  I am not sure off the top

18   of my head.

19   Q.   But it seems to you instead you would use the

20   word struggle?

21   A.   Yes.  It is -- I mean I guess it would depend on

22   what we were training or what the dog was trying to

23   learn that night, whether he failed to learn it or

24   whether he struggled to learn it.

25   Q.   And to you -- well, I should say to you

1    documenting what your dog is doing in training,

2    saying your dog struggled to do something is the same

3    as saying your dog failed to do something?

4    A.   I wouldn't phrase it that way, no.

13:50:41    5    Q.   Okay.  So if your dog failed to do something, how

6    would you document it?

7    A.   I guess we would have to be specific, what did he

8    fail to do.  If he's -- if he fails to do something

9    and it is not something that is trainable, well, then

13:50:59    10    that dog is -- you know, either it needs to be fixed,

11    you know, maybe they're struggling to learn a

12    concept.  It could be anything from obedience to

13    narcotics searches.

14    Q.   Why would you be afraid to use the word fail?

13:51:16    15    A.   I guess that's -- I wouldn't be afraid to.  Um, I

16    just can't think of, off the top of my head, when I

17    would have used it if I have used it.

18    Q.   Are you saying you have never seen a dog fail to

19    do something?

13:51:30    20    A.   No, that's not true.

21    Q.   Okay.  So the Spillman records, which is

22    Government's 7, contain mostly the record of the

23    training you did with Tank, right?

24    A.   Yes, ma'am.

13:51:59    25    Q.   Okay.  I want to talk about the training.  And

1  let's be clear, not all of those entries are specific

2  to narcotics training?

3  A.   I would have to look through them.

4  Q.   I am handing you Government's Exhibit 7.

13:52:16  5  A.   Okay.  I would, just based off of memory, because

6  we started him on narcotics training in the early

7  stages, that most of it would be narcotics.  There

8  might be some obedience training mixed in, maybe some

9  bite work training but --

13:52:33  10  Q.   Okay.  I won't take the time now, the records are

11  what they are, right?

12  A.   Yes.

13  Q.   Let's talk about the training you did after

14  certification specific to narcotics training.

13:52:57  15      We talked about how Tank was certified in

16  July.  This would be easier if you look at it.  In

17  July of 2018, right, if you could just flip to the

18  entries documenting training after July of 2018.

19  A.   After July.

13:53:16  20  Q.   Yes.  And what you see, sir, is that between the

21  time Tank was certified in July of 2018, and October

22  1st of 2018, so in those -- in those months, you did

23  narcotics training with Tank four times, specifically

24  August 14th, August 28th, October 2nd, and

13:53:44  25  November 1st.

134

A.   After we finished the narcotics training that's

when we would begin the patrol training to get him

certified for patrol.

Q.   You're doing other kinds of training, not

13:54:02   narcotics training, right?

A.   Well, something becomes more time consuming.

Q.   My question is after Tank was certified in July

of 2018, through those records, you did narcotics

training four times, August 14th, August 28th,

13:54:24   October 2nd, and November 1st, before switching over

to PackTrack?

A.   Okay.

Q.   Is that what those records show?

A.   Yes.

13:54:34   Q.   Okay.  Now, let's talk about PackTrack.  So I'll

grab that from you.

During direct you talked about some

methodology in the Utah POST training.  And

specifically you talked about how sometimes those

13:55:08   exercises were blind.

A.   Yes, sometimes.

Q.   How do you define blind training?

A.   Um, I would define the blind training as there is

not -- I'm given an area to search but there is not

13:55:26   necessarily -- there is not a hide there.  That would

1    be a blind scenario, or a controlled negative

2    scenario.  The two phrases sometimes get mixed up.

3    Q.   Are you saying that to you, your understanding is

4    blind and controlled negatives are the same?

13:55:45   5    A.   That's my understanding.

6    Q.   Okay.  Based on what POST has taught you?

7    A.   Correct.

8    Q.   Okay.  The exercise that you described was that

9    sometimes you don't know where the hides are?

13:56:03   10    A.   Yes, ma'am.

11    Q.   Sometimes you do?

12    A.   Yes.

13    Q.   In fact, the vast majority of times you do,

14    correct?

13:56:13   15    A.   I don't know the vast majority.

16    Q.   I'm showing you Defense Exhibit 4, which is your

17    PackTrack training summary record.  And I am

18    specifically directing you to Page 3 of 5, and I am

19    going to direct you specifically to the pie chart

13:56:34   20    underneath blind detection exercises.

21          Now what is the time period of these

22    PackTrack records?

23    A.   October 20th of 2018 through March 1st, 2019.

24    Q.   All right.  According to this pie chart, how many

13:56:55   25    blind exercises did you do in that time period?

1    A.    One.

2    Q.    And how many normal exercises did you do?

3    A.    27.

4    Q.    What percentage of the exercises that you did

5    were blind?

6    A.    Four percent.

7    Q.    And I'm going to direct you to the pie chart

8    underneath controlled negative detection exercises.

9            According to this pie chart, how many

10   negative controlled exercises did do you during that

11   time period?

12   A.    This says zero percent.

13   Q.    Okay.  And in Defense Exhibit 3 this is a

14   PackTrack training odor list, right?

15   A.    Yes.

16   Q.    For that same time period we have been talking

17   about, right?

18   A.    Yes, ma'am.

19   Q.    And there is a specific column -- it has a number

20   of columns, correct?

21   A.    Correct.

22   Q.    The date of the exercise, right?

23   A.    Right.

24   Q.    The location of the exercise?

25   A.    Correct.

1   Q.   The environment?

2   A.   Correct.

3   Q.   The odor type?

4   A.   Correct.

13:58:04   5   Q.   And one of those columns is blind, right?

6   A.   Correct.

7   Q.   And you can see all through that column, except

8   for one date, what does it say?

9   A.   It says, excuse me, false.

13:58:23   10   Q.   And then on one date, on November 27th, 2018,

11   what did it say in that blind column?

12   A.   It says true.

13   Q.   That's the one date that you did a blind

14   exercise?

13:58:35   15   A.   According to that.

16   Q.   Okay.  Let's talk about that for a second.

17   A.   Okay.

18   Q.   Are you saying -- these are your training

19   records, right?

13:58:41   20   A.   Yes, ma'am.

21   Q.   This is -- PackTrack is the way your police

22   department keeps and maintains training records for

23   your dog, right?

24   A.   Yes.

13:58:53   25   Q.   In other words, everything that you do to make

1  sure that your dog is doing what it is supposed to

2  do, you keep and maintain in these records, right?

3  A.   Yes, ma'am.

4  Q.   Are you in any way suggesting that these records

5  are incorrect?

6  A.   I wouldn't say it that way.  There are maybe

7  sometimes information that doesn't get added.

8  Q.   Well, that is not the case here because it is not

9  a blank.  It is a false, right?

10 A.   That is either a -- when that entry was done, the

11 box wasn't checked for whether it was a blind or a

12 negative.  It was just browsed over.

13 Q.   So it -- is it your testimony that we have this

14 data field which is how you conducted the training,

15 who knew what and when, who knows what this entry

16 could be, it could be anything?

17 A.   I mean it's just not complete.

18 Q.   Okay.  I want to be very clear because this is

19 very important.

20 A.   Yes, ma'am.

21 Q.   In the column that says blind, there are entries,

22 correct?

23 A.   Correct.

24 Q.   Are you saying that these entries might not be

25 complete, meaning that there were other training

13:59:05 (line 5)
13:59:18 (line 10)
13:59:37 (line 15)
13:59:57 (line 20)
14:00:13 (line 25)

1   exercises you did that are not included here, or are

2   you saying that the entries in this column could be

3   correct, could not be correct?

4   A.   What I'm saying is that some of the details from

5   a training might not have been added as far as

6   whether blank vehicles were ran or not.

7   Q.   Do you consider whether a test was done blind or

8   not blind to be a detail?

9   A.   Well, yes.

10   Q.   Not important?

11   A.   Well, it's -- it is important, yes.

12   Q.   Okay.

13   A.   It is important that the dog is exposed to or ran

14   on areas where there are no drugs hidden so that

15   there are blind areas.  I guess it oftentimes gets

16   overlooked to being added when we're going through a

17   training and adding in our training at the end of the

18   night.

19   Q.   Okay.  And I'm not trying to put words in your

20   mouth, again this is important, but I just want to

21   make sure I understand what you're saying.

22        Are you saying that your training records

23   could be incomplete?

24   A.   I wouldn't phrase it that way.

25   Q.   How would you phrase it?

A.   Some of the boxes that are available to check or
not check or have been overlooked.  And what is
focused on when we're adding those in is the odor
that was tested that night, the amount, and where it
was hidden, so it shows what type of environment it
was in.

          Um, but as you can see, oftentimes things
such as whether there is a blind exercise involved,
that box doesn't get checked.

Q.   Are you saying -- but there is a -- there is an
entry point here.  It says false or true, right?

A.   Well, if you don't say that you put one in there,
then I think that it just auto-fills as a false.

Q.   You think that or you know that?

A.   Well, I -- I don't know that for sure.  But I
don't remember ever purposely putting false on the
blind or negative box every single time.

Q.   But at a minimum you're saying the conditions
under which these training exercises were conducted,
specifically whether it was blind or not, is not a
detail you're focused on when you're looking at what
actually happened?

A.   Well, it is -- I mean I don't want to say it is
not important, but the things that we -- we focus on
putting in there is the -- is the date, the location,

1    the time frame we were doing the training, the odors,

2    the amounts, where they were hidden, um, who they

3    were placed by.  There is just a whole list of things

4    we go through to enter.

14:03:32    5    Q.    Okay.  So let me make sure I understand.  I

6    understand you don't want to say that it is not

7    important.  But what you are saying is you are more

8    focused on all of those things you just said, that

9    whole list of things, before you are focused on

14:03:46   10    whether it was done blind or not?

11    A.    Yes, those are the things that get taken care of

12    first.

13    Q.    Such that you might not even think to check or

14    not check a box?

14:03:58   15    A.    Correct.

16    Q.    Okay.  If something was done as a controlled

17    negative, would you at least check that?

18    A.    If I even remembered to or not.  And obviously,

19    I -- at one point I did.  Um, but like I said,

14:04:18   20    it's -- it's something in our entry that oftentimes

21    just gets scrolled through as we're adding in the

22    other information.

23    Q.    Okay.  In this particular case you would agree

24    that Tank did not do his trained final response,

14:04:40   25    right?

```
 1    A.    He did not indicate, no.

 2    Q.    Now, we have watched the video with you of the

 3    dog sniff?

 4    A.    Yes, ma'am.

 5    Q.    And you are saying -- well, you would agree that

 6    there are a number of points when Tank leaves

 7    Mr. Jordan's car and starts sniffing in any number of

 8    directions, the fence, the patrol car behind him, out

 9    into traffic.  You saw that on the video, right?

10    A.    Yes.  That's why we keep him on a leash.

11    Q.    Okay.  But multiple points, he stops sniffing

12    Mr. Jordan's car and sniffs in a whole host of other

13    directions, right?

14    A.    Yes.

15    Q.    Okay.  Now, your -- let's just be clear.  The

16    thrust of your direct is saying, I know he didn't do

17    the trained final response for the indication, but I

18    can tell, as his handler, from his behavior that I

19    can see, that he is detecting narcotics, right?

20    A.    Yes.

21    Q.    Okay.  And your basis for saying that the

22    behavior you are specifically pointing us to is that

23    his ears became rigid, right?

24    A.    Yes, ma'am.

25    Q.    His sniffing intensified, right?
```

14:04:52 (line 5)
14:05:12 (line 10)
14:05:26 (line 15)
14:05:58 (line 20)
14:06:16 (line 25)

1    A.    Yes.

2    Q.    And that he moved his head in various directions

3    quickly, right?

4    A.    Yes, ma'am.

14:06:27    5    Q.    And let's be clear, in your report, when you

6    wrote about this, your report is different from what

7    we see on the video.  We talked about that on direct,

8    right?

9    A.    Which part?

14:06:39    10    Q.    In your report you wrote -- do you have it up

11    there?

12    A.    Yes, ma'am.

13    Q.    And I'm specifically looking at the third

14    paragraph.  "I deployed Tank at the front driver's

14:06:52    15    side of the vehicle.  Tank began his search moving in

16    a counterclockwise direction.  As Tank passed the

17    driver door, I noticed an abrupt change in his

18    behavior.  Tank's head quickly turned back towards

19    the driver's -- driver door vertical seam.  His ears

14:07:11    20    became visibly more rigid and his mouth closed as his

21    sniffing intensified."  Right?

22    A.    Yes, ma'am.

23    Q.    Now we know from the video that's not, at least,

24    the order in which this happened, right?

14:07:22    25    A.    No.  I started at the rear of the vehicle.

1   Q.   Right.  You started at the rear, you worked your

2   way counterclockwise and then we can see Tank coming

3   out back towards the trunk area, right?

4   A.   Yes, ma'am.

14:07:39   5   Q.   Are you saying -- and I just want to be clear.

6   In that first pass towards the driver's side, are you

7   saying that Tank did all of these things in the

8   report or did you just get the report wrong?

9   A.   When he passed the driver's side?

14:07:54   10   Q.   Yes.

11   A.   The alerts and where they were at are accurate in

12   my report.

13   Q.   Okay.  And I just want to make sure that we are

14   talking about the same thing.

14:08:16   15       All right.  Now, I'm going to start playing

16   from Government's 10 at time stamp 25:24, just the

17   very beginning.

18       And what we can see on the screen, we can see

19   you and Tank in the bottom lefthand corner, right?

14:08:29   20   A.   Yes, ma'am.

21           (Whereupon, Government's Exhibit 10 was

22            played for the record.)

23   Q.   (By Ms. Stirba)  So we just saw, and I'm stopping

24   at 25:46.  We just see Tank, now he is back towards

14:08:57   25   the trunk, right?  He has passed the driver's side,

145

1    he is now back towards the trunk?

2    A.   Yes, ma'am.

3    Q.   Are you saying that in that amount of time, from

4    the time you went around to the time we now see him

5    at the trunk, that he did all of those things?  That

6    he --

7    A.   I got my order mixed up in my report of the --

8    which alert came first and where.

9    Q.   Okay.  That's what I want to clarify.  So is your

10   report just --

11   A.   So I -- I obviously didn't have my camera.  So

12   later in the evening or whenever I sat down to write

13   this report, I was going off the mental notes I made

14   of the alerts and where they took place.  The vast

15   majority of my time I start my sniffs at the front of

16   the vehicle, just -- that is just where I do it,

17   unless there is an environmental issue to where I

18   have to start somewhere else.

19        Um, so I think when I wrote that I deployed

20   him at the front, that is my muscle memory from the,

21   you know, the nine times out of ten I start at the

22   front.  And then in our --

23   Q.   Let me just pause you there.  Are you saying that

24   you write your police report out of muscle memory

25   from your previous experiences, not specific to the

```
 1    incident you're describing?
 2    A.   No.  But when I start a sniff, most of the time
 3    it is in the exact same location.
 4    Q.   You're describing this sniff, not other sniffs,
 5    and you're saying that you just start wrote --
 6    writing what you have written for previous sniffs?
 7    A.   I am saying I made a mistake.
 8    Q.   Okay.  So your report is incorrect.  But let me
 9    just make sure I understand.  We just saw Tank go
10    around the front of the car, come around the driver's
11    side, and now we see him again poking out towards the
12    trunk?
13    A.   Correct.
14    Q.   Are you saying that Tank did anything that we
15    can't see in that amount of time on the driver's side
16    that said to you it is an alert?
17    A.   When he is turning right here (indicating),
18    that's an alert.
19    Q.   That's what you're talking about right there,
20    that turn that we can see?
21    A.   Correct.
22    Q.   Okay.  Now, I understand that you wouldn't have
23    an indication without what you call alert behaviors,
24    right?
25    A.   Yes, ma'am.
```

1    Q.   And let's be clear, Utah POST trains handlers

2    that an alert is a natural response of a dog?

3    A.   Correct.

4    Q.   I want to be clear with you.  Are you saying it

5    is a natural response to a narcotics odor or a

6    natural response to just an odor of interest?

7    A.   Well, he was given his command to search for

8    narcotics.  This is --

9    Q.   So let's just talk about Utah POST training.

10   A.   Okay.

11   Q.   When Utah POST trains you, a handler, about alert

12   behaviors, right?

13   A.   Okay.

14   Q.   You have said that there are natural behaviors in

15   a dog?

16   A.   Correct.

17   Q.   Untrained behaviors, right?

18   A.   Correct.  When they're -- when they're sniffing

19   the odor of illegal narcotics.

20   Q.   So according to you an alert behavior is a unique

21   untrained response to narcotics specifically?

22   A.   Yes.  In the scope of a narcotics sniff.

23   Q.   Is it your testimony that a dog would not display

24   any of these behaviors just sniffing something of

25   interest?

1    A.    I guess it would depend on the environment.

2    Q.    What does that mean?

3    A.    Well, like I -- like I said, the sniffing of a

4    vehicle for narcotics sniff is something that he has

14:12:42    5    done many different times in training.  He is given

6    his command to look for drugs.  So when he gets that

7    command and starts on his sniff, he's actively

8    looking for what I have just told him to look for.

9    Q.    I think is it a fault of the question.  Let me

14:13:00    10    rephrase the question.

11    A.    Okay.

12    Q.    I understand that you're saying that you never

13    have an indication without a preceding alert

14    behavior, right?

14:13:09    15    A.    Correct.

16    Q.    Are you also saying that the only time you see

17    alert behaviors is when there is narcotics?

18    A.    In this setting, yes, when is he looking for

19    narcotics.

14:13:25    20    Q.    In the setting.  So it depends on whether he is

21    working or whether he is doing something else?

22    A.    Well, I guess I mean if we were talking about him

23    running around my backyard.

24    Q.    Are you saying that behaviors you are observing

14:13:38    25    are the same, it is just the context that tells you

1  that it is narcotics?

2  A.  Yes.  So the -- it is -- it is a combination of a

3  lot of things.

4  Q.  Okay.  Let me just make sure before we do a

5  combination.

6       So you just mentioned your backyard.  Have

7  you seen Tank close his mouth sniffing something in

8  your backyard?

9  A.  Yes.

10  Q.  Have you seen Tank's ears become rigid in your

11  backyard?

12  A.  Yes.

13  Q.  Have you seen Tank smell things in your backyard?

14  A.  Yes.

15  Q.  Have you seen Tank move his head from side to

16  side in your backyard?

17  A.  Yes.

18  Q.  So what we're talking about when you're saying I

19  know this is not a squirrel or a ham sandwich, I know

20  it's narcotics, is because here it's he's sniffing a

21  vehicle, right?

22  A.  Yes, ma'am.

23  Q.  It's not that the behaviors are distinctive to a

24  target odor according to you.  It is that it is the

25  context in which I am seeing them?

1    A.    In combination with a lot of things.

2    Q.    What other things?

3    A.    So he is at work.  He is in my work car so he

4    knows he is at work.  He's positioned at a vehicle

5    and given the command to sniff for drugs, which that

6    is the only time he ever gets it is when he is

7    looking for drugs.

8    Q.    And you gave him a command to search for drugs?

9    A.    Yes.

10   Q.    What is that command?

11   A.    It's dope.

12   Q.    And you told him that?

13   A.    Yes.

14   Q.    Okay.  So when he gets that command, his movement

15   from then on -- or his -- I guess his purpose is to

16   find the narcotics?  His work?

17   A.    He is working.

18   Q.    Okay.

19   A.    So once he has discovered the odor of narcotics

20   that he has been trained to find in the setting of

21   when I told him, given him a specific command to look

22   for those narcotics, once he has discovered that odor

23   is when I see the alert, the change in his body

24   behavior.

25   Q.    Okay.  So I am going to repeat my question.

1    A.    Okay.

2    Q.    So again, the behaviors that you are saying you

3    see in this video, you have seen in other

4    nonnarcotics contexts, for example, your backyard?

5    A.    I guess in a way there is -- when I talk about

6    his sniffing intensifying, I don't hear that, that

7    loud in and out, in and out in any other setting than

8    in a narcotic related setting.

9    Q.    You're saying that you have never heard Tank

10   sniff something intensely except for when he is

11   deployed?

12   A.    Not like this, no.

13   Q.    Okay.  Now, Utah POST does train the trained

14   final response, right?

15   A.    They train it?

16   Q.    No.  They train -- they train the dogs to do it

17   and they train that's part of the certification?

18   A.    I train it -- we train our dogs to do it.

19   Q.    I should say as part of the Utah POST

20   certification program, dogs are trained to do this

21   final indication?

22   A.    Yes.

23   Q.    Now, you said that nonetheless there are these

24   alert behaviors in specific contexts?

25   A.    Yes, ma'am.

14:15:58
14:16:17
14:16:31
14:16:44
14:16:57

1   Q.   Okay.  Does POST and the POST manual, that binder

2   over there, are there any standards about how many of

3   these alert behaviors a dog would need to

4   demonstrate?

14:17:12   5   A.   I couldn't tell you off the top of my head.  I

6   don't know.

7   Q.   Okay.  Would one be sufficient?

8   A.   I guess if you had a dog that only had one alert,

9   I -- it is specific to the dog.

14:17:25   10   Q.   So it could be as few as one?

11   A.   I could -- I could imagine that being the case

12   for some people.

13   Q.   But POST doesn't give any guidance about it needs

14   to be X number --

14:17:40   15   A.   If --

16   Q.   -- of alerts?

17   A.   If they do, I have since forgotten what they have

18   written about it.

19   Q.   Well, certainly it's not anything you applied in

14:17:48   20   this case if you have forgotten about it, right?

21   A.   Correct.

22   Q.   And does POST have any standards about how many

23   hours you would need to spend with the dog in

24   controlled environments where they don't do a trained

14:18:07   25   final response for you to feel confident that you can

1   properly interpret their behavior?

2   A.   I'm not sure they list anything specifically like

3   that, to my knowledge.

4   Q.   Does POST have any standards about the order in

14:18:18   5   which you need to see these alert behaviors?

6   A.   Not that I am aware of.

7   Q.   Or under what conditions or environments such an

8   alert behavior might be affected?

9   A.   Not that I'm aware of.

14:18:31   10   Q.   Or a dog might do them?

11   A.   (Witness nodded.)

12   Q.   Okay.  POST has this alert matrix that talks

13   about various dog behaviors, right?

14   A.   Yes, ma'am.

14:18:48   15   Q.   Okay.  And according to POST's own alert matrix,

16   one potential indication -- well, I should say one

17   potential alert behavior according to POST is that a

18   dog resists leaving the area where an odor was

19   detected, right?

14:19:07   20   A.   Correct.  I would have to see it but if you are

21   reading from the manual, then yes.

22   Q.   No.  I don't want you to trust me.

23        MS. STIRBA:  This is Defendant's 5 for

24   identification purposes only.

14:19:31   25   Q.   (By Ms. Stirba)  If you could look at number

154

1   seven of the POST matrix, one of those examples is a

2   dog resisting leaving an area of interest, right?

3   A.   It says resist leaving the area where the odor

4   was detected.

5   Q.   Resist leaving?

6   A.   Yes, ma'am.

7   Q.   Okay.  And like we talked about, Tank leaves

8   Mr. Jordan's car repeatedly, right?

9   A.   Leaves the car?

10  Q.   Leaves the car, smells away from the car

11  repeatedly?

12  A.   Yes.

13  Q.   So his behavior is inconsistent with one of the

14  things that POST identifies as an alert behavior?

15  A.   I guess you would have to define what the area is

16  in this -- in this particular sniff.

17  Q.   Well, let me -- does POST define the area for you

18  in its training materials?

19  A.   No.

20  Q.   Does it give you any guidance about what any of

21  this means?

22  A.   No.

23  Q.   About what it even means to leave an area where

24  an odor was detected?

25  A.   No, it doesn't.

1    Q.    Another alert behavior that POST talks about is

2    that when a dog alerts, it resists distractions.    And

3    I'm looking specifically at number eight.

4            You would agree with that, right?

14:21:16    5    A.    Yes, ma'am.

6    Q.    Okay.    A distraction could be cars passing on

7    your side, right?

8    A.    Yes.

9    Q.    And we saw Tank multiple times wander out into

14:21:32    10    traffic and look at the passing cars, right?

11    A.    Yes.

12    Q.    So that behavior we saw on the video is also

13    inconsistent with some of Utah POST's alert matrix?

14    A.    Correct.

14:21:44    15    Q.    Does POST give you any guidance about how you

16    formulate your opinion whether some things may be

17    consistent with alert behaviors and some aren't?

18    A.    Does POST give me any?

19    Q.    Right.    Does Utah POST give you any guidance

14:21:57    20    about --

21    A.    Not off the top of my head that I can think of.

22    Q.    And I want to be clear, sir.    I understand your

23    opinion about what you're seeing on this video, but

24    if we were in the certification moment, Tank's test

14:22:19    25    to be certified, and Tank did only what we saw in

1    this video in that test, would Utah POST certify him

2    as a narcotics dog?

3    A.   That wouldn't be the only part of the test

4    though.

14:22:37    5    Q.   I understand.   Does that --

6    A.   That scenario, he wouldn't be scored for an

7    indication.   No.

8    Q.   And would that mean that he would not pass that

9    part of the test?

14:22:49    10    A.   No, not necessarily, because there is multiple

11    other areas that are scored.

12    Q.   So you're saying that POST will certify a dog

13    that won't do a trained final response it trains dogs

14    to do?

14:23:05    15    A.   Well, it's -- it's kind of -- to explain -- it is

16    not just one sniff you get scored on and you're

17    certified or not.

18    Q.   How about this.   If Tank exclusively in the

19    certification testing did only the behaviors that we

14:23:22    20    see in this video, that's all Tank did, would Utah

21    POST certify --

22    A.   No, if that is all he did.   No.

23             MS. STIRBA:   I have no further questions.

24             THE COURT:   I have a question.   After Tank

14:23:37    25    performed his sniff around the car, did you reward

1    him?

2             THE WITNESS:  No.

3             THE COURT:  Okay.  So at the time you thought

4    he hadn't done what he was entitled to do or required

14:23:51   5    to do in order to be rewarded?

6             THE WITNESS:  In real-world sniffs I will not

7    reward him until I have been able to verify that he

8    was correct.  And then if I -- if I have time and am

9    safely able to, I will -- I would likely.

14:24:11  10             THE COURT:  So after you found the drugs in

11    this car, did you reward him?

12             THE WITNESS:  No, I had to take off and go.

13             THE COURT:  So you never verified that he

14    completed the assignment sufficiently that you would

14:24:24  15    reward him?

16             THE WITNESS:  I don't always get the chance

17    to reset the exact same scenario back up.  Um, I

18    verified his alerts based on searching the car later.

19             THE COURT:  So why should the Court be

14:24:39  20    satisfied that you satisfied the requirements for

21    probable cause when you yourself couldn't verify it

22    at the time?

23             THE WITNESS:  Well, even on an indication, it

24    is not, I guess, verified until --

14:25:01  25             THE COURT:  This is a serious right.  This is

1    not loosey-goosey business.

2              THE WITNESS:  Okay.

3              THE COURT:  You're affecting someone's rights

4    here.  And you just testified to me that you couldn't

5    verify that your dog did what he was supposed to do

6    to satisfy the test.

7              THE WITNESS:  I was confident, based off of

8    his alerts, that he had detected the odor.

9              THE COURT:  So confident that you didn't

10   reward him?

11             THE WITNESS:  I don't reward him on

12   real-world sniffs.

13             THE COURT:  Isn't that an important factor?

14   If you didn't reward him, why should I reward you?

15             THE WITNESS:  I guess I'm just -- this is the

16   way I was trained.

17             THE COURT:  And maybe there is something

18   wrong with your training.

19             Redirect?

20             MR. BROTHERTON:  Thank you, Your Honor.

21                     **REDIRECT EXAMINATION**

22   BY MR. BROTHERTON:

23   Q.   To follow up with the Judge's questions, um,

24   under what circumstance, um, is there a scenario

25   where Tank would not give a final trained response or

1    an indication but only have alerts and you would give

2    him a reward?

3    A.   Only have alerts?  No.  It is -- he gets rewarded

4    in training -- he gets rewarded on the indication.

14:26:27    5    Q.   Okay.  Um, and we have already seen there was no

6    indication or final trained response in this case; is

7    that correct?

8    A.   Correct.

9    Q.   So through your own training methodology, that is

14:26:39    10   not a scenario -- without that final indication, that

11   is not a scenario where you would give him a reward;

12   is that correct?

13   A.   That is correct.

14   Q.   Okay.  Is there a -- is there any other

14:26:50    15   situation -- is there a situation without a final

16   trained response that Tank does get a reward?

17   A.   No.

18   Q.   Okay.  Does Tank provide the final trained

19   response, the indication, in every single case, in

14:27:16    20   every single real-world scenario that you go out and

21   do a sniff on?

22   A.   Not every scenario, no.

23   Q.   Okay.  Where he does do sniffs and you interpret

24   his behavior as alerts, without that final trained

14:27:32    25   response, and you have subsequently searched cars,

1    are there situations in those circumstances where you

2    have been able to find illicit narcotics that he is

3    trained to recognize?

4    A.   Yes, sir.

14:27:46    5    Q.   In those situations, did you give him a reward?

6    A.   No.  Because I -- unless I'm able to reset up the

7    scenario, if there is time and there are a lot of

8    factors that go into it, whether the car is being

9    towed, somebody is being arrested, if I need to help

14:28:02    10   transport someone to jail.  If I can, I will try and

11   reset the exact same scenario up, rerun Tank, if he

12   indicates, then he will get paid.

13   Q.   Why is that important to reset the scenario?

14   A.   So it is exactly like it was in the beginning.

14:28:21    15   So I have now verified that his indication was

16   correct so I can reward him, it's important to reward

17   him.  Um, so like I said, if I have the opportunity

18   to, and I'm not tied up with helping the other

19   officers throughout the rest of the investigation, or

14:28:41    20   for whatever reason, I will try to reset up that

21   scenario the exact same way if I can.  A lot of times

22   all of the evidence has been collected at that time

23   so I can't go take the evidence back and then re-put

24   it back in the car and set up the exact same

14:28:58    25   scenario.

1    Q.   Okay.  Mr. Jordan's car was searched in this

2    case, correct?

3    A.   Yes, sir.

4    Q.   And was there any narcotics found in his car?

14:29:08    5    A.   Yes.  I believe there was a small amount of

6    marijuana behind the driver's seat and then in the

7    trunk there was a digital scale.

8    Q.   Okay.  Were you able to reset the scenario with

9    Mr. Jordan's car and have Tank go around again in

14:29:25    10   order to give him a reward?

11   A.   In this scenario I don't think I was able to or

12   didn't.  I could only speculate as to why I didn't.

13         MR. BROTHERTON:  Okay.  I think that is all I

14   have on redirect, Your Honor.

14:29:45    15         THE COURT:  When you give a reward, is it

16   important that the reward be given almost immediately

17   after the dog shows the trained response?

18         THE WITNESS:  I guess in training, yes, once

19   it's a controlled environment.

14:30:01    20         THE COURT:  Otherwise the dog would not be

21   able to associate the reward with the behavior you're

22   trying to train for.

23         THE WITNESS:  Correct.  That's why in

24   training we do a far superior number of training

14:30:14    25   sniffs versus the real-world so that the reward is

162

1  always given.

2          THE COURT:  So if in a situation where you

3  re-created it, you couldn't duplicate the same

4  behavior that the dog exhibited at the time you

5  reached the conclusion there were narcotics in the

6  vehicle.

7          THE WITNESS:  I could try, but I don't --

8          THE COURT:  So it wouldn't really tell us

9  anything meaningful about the advocacy, the

10  effectiveness of the dog, would it?

11          THE WITNESS:  No.  It would just be more for

12  the own -- the dog's reward for working hard.

13          THE COURT:  Is there any further cross?

14          MS. STIRBA:  No, Your Honor.

15          THE COURT:  You may step down.

16          Let's talk about how we want to proceed.  I'm

17  sorry, but we are at 2:30 and we have gone pretty

18  much straight through.  I am -- I wish I didn't have

19  to proceed but we have prisoners who have been

20  transported and we need to take care of their pleas

21  and sentence.

22          How do you want to proceed?

23          MS. STIRBA:  Um --

24          THE COURT:  I can go again first thing

25  tomorrow morning.

1            MS. STIRBA:  Let me just have a moment to

2     confer.

3            Your Honor, may I ask what is first thing?

4            THE COURT:  Whatever you want it to be.

14:31:43    5            MS. STIRBA:  Could we do 8:00 a.m.?

6            THE COURT:  Well, let me check.

7            MS. STIRBA:  I would incur the wrath of

8     everybody.

9            THE COURT:  But I need to check with the

14:31:54   10     courtroom deputy and the reporter.

11            Can we start as early as 8:00?  I think we

12     can do that.

13            MS. STIRBA:  Yes.

14            THE COURT:  That may allow her to get an

14:32:07   15     earlier flight.

16            MS. STIRBA:  Yes, Your Honor.

17            THE COURT:  Anndrea, is the 3:00 schedule

18     canceled?

19            THE CLERK:  I believe so.

14:32:16   20            THE COURT:  So I don't think that would give

21     you enough time but I am going to push the 2:30

22     hearing back by 15 minutes to 3:00.

23            Does that work for counsel in the back.

24            MR. BRIDGE:  I was going to volunteer to do

14:32:31   25     mine.  I have a 2:30 and 4:00 I'm happy to

1  accommodate the Court.

2          THE COURT:  So we'll push the 2:30 back to

3  3:00.  I don't think a half hour is probably going to

4  give you enough time but we'll -- we'll continue

5  again at 8:00 in the morning.  If that works.

6          Okay.  We will be in recess.

7          (Whereupon, court adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3          I, Laura W. Robinson, Certified Shorthand

4   Reporter, Registered Professional Reporter and Notary

5   Public within and for the County of Salt Lake, State

6   of Utah, do hereby certify:

7          That the foregoing proceedings were taken

8   before me at the time and place set forth herein and

9   were taken down by me in shorthand and thereafter

10  transcribed into typewriting under my direction and

11  supervision;

12         That the foregoing pages contain a true and

13  correct transcription of my said shorthand notes so

14  taken.

15         In witness whereof I have subscribed my name

16  this 20th day of March, 2020.

17

18                    _____

19                    Laura W. Robinson

20                    RPR, FCRR, CSR, CP

21

22

23

24

25