```
               IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF UTAH

                      CENTRAL DIVISION


In re:                      )
                            )
UNITED STATES OF            )
AMERICA,                    )
                            )
        Plaintiff,          )
                            )
vs.                         )   Case No.
                            )   2:19-CR-00125
DESMOND TRAVIS              )
JORDAN,                     )
                            )
        Defendant.          )
                            )
_____      )
```


                BEFORE THE HONORABLE CLARK WADDOUPS

                      March 4, 2020


                 Continued Motion to Suppress

**Appearances of Counsel:**

For the Plaintiff:        Joshua A. Brotherton
                          Attorney at Law
                          US Attorney's Office
                          111 S. Main Street
                          Suite 1800
                          Salt Lake City, Utah 84111

For the Defendant:        Emily A. Stirba
                          Spencer W. Rice
                          Attorneys at Law
                          Utah Federal Defender Office
                          46 West Broadway
                          Suite 110
                          Salt Lake City, Utah 84101

Court Reporter:

         Laura W. Robinson, RPR, FCRR, CSR, CP
                351 South West Temple
                8.430 U.S. Courthouse
             Salt Lake City, Utah 84101
                   (801)328-4800

I N D E X

Examinations                                                        Page

**MARY CABLK**                                                      170
DIRECT EXAMINATION                                                  171
BY MS. STIRBA
CROSS-EXAMINATION                                                   217
BY MR. BROTHERTON
REDIRECT EXAMINATION                                                242
BY MS. STIRBA
RECROSS-EXAMINATION                                                 244
BY MR. BROTHERTON

E X H I B I T S

Description                                                         Page

Government's Exhibit 7                                              248

```
 1    Salt Lake City, Utah                    March 4, 2020
 2                         (8:11 a.m.)
 3         THE COURT:  Good morning.  We are back in
 4    session in the United States versus Desmond Travis
 5    Jordan, case 2:19-CR-125.
 6         Counsel state their appearance.
 7         MR. BROTHERTON:  Joshua Brotherton for the
 8    United States, Your Honor.
 9         MS. STIRBA:  Emily Stirba and Spencer Rice on
10    behalf of Mr. Jordan.
11         THE COURT:  And we should put on the record
12    that Mr. Jordan has not yet been delivered by the
13    U.S. Marshal Service or the Weber County Sheriff's
14    Office, whichever one of them is responsible.  But,
15    Ms. Stirba, you're okay proceeding until he arrives
16    because of the necessity to get the expert on the
17    stand.
18         MS. STIRBA:  Yes.  I grudgingly accept the
19    situation, um, and I will put on the record Dr. Cablk
20    has to walk out of this courtroom no later than 10:30
21    so I think we should get started.
22         THE COURT:  We maybe can push it out a little
23    bit if we need to.  So I mean we can ask the judge to
24    move the other change of plea hearing to another
25    courtroom if we need to.
```

08:10:55 (line 5)
08:11:07 (line 10)
08:11:24 (line 15)
08:11:38 (line 20)
08:11:53 (line 25)

1           MS. STIRBA:  Okay.  Yeah, Dr. Cablk herself

2    she needs to leave.  With the Court's permission, I

3    set an alarm on the phone.  I've never done this

4    before, but I don't want anyone to be distracted by

08:12:05    5    the clock so I set an alarm for 10:15 so we have a

6    15-minute warning.

7           Is that permissible?

8           THE COURT:  Yes.  When Mr. Jordan does

9    arrive, would you visit briefly with him and make

08:12:17    10   sure that we get his waiver that it was acceptable

11   for us to proceed in his absence.  I think we should

12   put that on the record once he arrives.

13          With that, you may proceed.

14          MS. STIRBA:  Thank you.  The defense calls

08:12:32    15   Dr. Mary Cablk to the stand.

16                    **MARY CABLK,**

17    called as a witness at the request of the Defendant,

18        having been first duly sworn, was examined

19              and testified as follows:

08:12:50    20          THE WITNESS:  I do.

21          THE CLERK:  Thank you.  Please state your

22   name and spell it for the record.

23          THE WITNESS:  My name is Mary, M-A-R-Y,

24   Cablk, C-A-B-L-K.

08:13:07    25   //

**DIRECT EXAMINATION**

BY MS. STIRBA:

Q.   So Dr. Cablk, even though there is a K at end of your name, I just want to make sure everyone knows how to pronounce it.

A.   That's correct.  The K is silent.

Q.   Dr. Cablk, let's start with your educational background.  What degrees do you have and in what fields?

A.   I have a bachelor's degree in biology from Virginia Tech.  I have a master's degree in environmental management from Duke University.  And I have a PhD in forestry from Oregon State University.

Q.   And even though your doctorate is in forestry, did you have any particular focus in your studies?

A.   Yes.  I'm a remote sensing scientist.

Q.   What does a remote sensing scientist study?

A.   Remote sensing is acquiring data or information about the target without coming into direct contact with it.  So I have two types of remote sensing that I study.  One is optical and one is olfaction.

Q.   What relationship does remote sensing have to K9 detection?

A.   K9 detection is done via olfaction.  So the dogs are actually smelling the odor of the target and not

171

1    the target itself.

2    Q.   How long have you -- do you study K9 detection?

3    A.   I do.

4    Q.   How long have you studied K9 detection?

08:14:28    5    A.   20 years.

6    Q.   Where do you currently work?

7    A.   I'm an associate research professor at the Desert

8    Research Institute in Reno, Nevada.

9    Q.   How long have you held that position?

08:14:38    10    A.   I have been there 21 years.

11    Q.   As part of your work at the Desert Research

12    Institute, do you continue to study K9 detection and

13    training?

14    A.   I do.

08:14:50    15    Q.   Are you a member of any professional associations

16    regarding K9s?

17    A.   Um, yes.  I am a member of the American Academy

18    of Forensic Sciences.  I am a member of the Nevada

19    POST K9 Committee.  I am a Nevada POST K9 Evaluator,

08:15:12    20    and I am a California POST instructor.

21    Q.   You mentioned the American Academy of Forensic

22    Sciences.  Could you just briefly state what that is?

23    A.   That is the professorial society for those who

24    are involved in the forensic science fields.

08:15:30    25    Q.   Have you assisted any agencies in training and

1    deploying K9s?

2    A.    Yes.

3    Q.    Could you list a few of those agencies?

4    A.    Um, with Washoe County Sheriff's Office in

08:15:41    5    Nevada, Lyon County Sheriff's Office in Nevada, I am

6    a -- I work with the California Governor's Office of

7    Emergency Services, a whole variety of PDs and

8    sheriffs' offices across the west and across the

9    United States.

08:15:58    10    Q.    Have you conducted any research in the field of

11    K9 detection?

12    A.    A lot of research.

13    Q.    Have you published any academic articles about K9

14    detection and training?

08:16:09    15    A.    Yes.

16    Q.    Has your work been peer reviewed?

17    A.    Yes.

18    Q.    Have you given any lectures on K9 detection?

19    A.    I have.

08:16:17    20    Q.    Could you state the places, a few of the places,

21    where you have given those lectures.

22    A.    I have lectured throughout the United States.

23    Um, I have also been sent on behalf of the U.S. Army

24    and other government entities to Terkmenistan, to

08:16:34    25    Tanzania, to Norway, to the United Kingdom.  I have

1    been all over the world.

2    Q.   Have you taught any classes related to K9

3    detection and training?

4    A.   I do.  I'm actively involved in training and

08:16:48    5    teaching.

6    Q.   You said actively involved.  Have you personally

7    participated in training K9s?

8    A.   Yes.

9    Q.   How many K9s have you trained personally?

08:16:58    10    A.   Of my own?

11    Q.   Yes.

12    A.   Um, three.

13    Q.   And how many -- have you personally trained K9

14    handlers?

08:17:05    15    A.   Yes.

16    Q.   How long have you trained K9 handlers?

17    A.   18 years.

18    Q.   Have you previously been qualified to testify as

19    an expert in the field of K9 detection and training?

08:17:18    20    A.   Yes.

21    Q.   Approximately how many times have you been

22    qualified?

23    A.   Specifically for K9 detection, um, 10.

24    Q.   In both state and federal court?

08:17:30    25    A.   Yes.

1   Q.   In your capacity as an expert witness, have you

2   been called to testify by both the prosecution and

3   the defense?

4   A.   Yes.

08:17:39   5        MS. STIRBA:  Your Honor, at this time I would

6   ask to qualify Dr. Cablk as an expert in the field of

7   K9 detection and training.

8        THE COURT:  I find she meets the requirements

9   under Rule 702 and will be allowed to express her

08:17:53   10   opinions.

11   Q.   (By Ms. Stirba)  Dr. Cablk, I want to start with

12   some foundational concepts about training a detection

13   dog.

14        In a nutshell, when you are training a

08:18:03   15   detection dog, what are you training the dog to do?

16   A.   You are training them to locate the highest

17   concentration of target odor and perform a trained

18   independent response.

19   Q.   Can that target odor be anything?

08:18:18   20   A.   It can be anything that can be detected, yes,

21   Q.   And, again, in a nutshell, what do you do to

22   train a dog to perform a trained response to target

23   odor?

24        And actually, if I could have the Court's

08:18:33   25   brief indulgence for just one moment.  Mr. Jordan --

175

1          THE COURT:  Let's take a brief moment while

2    you visit with Mr. Jordan.

3               (Brief pause in proceedings.)

4          MS. STIRBA:  Thank you.  I have conferred

08:19:04   5    with Mr. Jordan.

6          THE COURT:  And, Mr. Jordan, it is probably

7    helpful for you to know that basically Dr. Cablk has

8    simply listed her credentials and qualifications to

9    testify.

08:19:15   10         And I just want to affirm on the record that

11   we have your waiver to have proceeded to this point

12   without you being present.

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Okay.  You may proceed.

08:19:24   15   Q.   (By Ms. Stirba)  In a nutshell, what do you do to

16   train a dog to do a trained response to target odor?

17   A.   That's done through what we call operant

18   conditioning.

19   Q.   Could you describe what operant conditioning is?

08:19:41   20   A.   Operant conditioning is where the dog learns --

21   well, this is sort of rhetorical, but the dog learns

22   to do a particular behavior to receive a reward.

23   Q.   And how does that translate to what you do with

24   the dog in terms of training?

08:19:59   25   A.   Once the dog has been conditioned, typically

1    through classical conditioning, to understand what

2    odor it is that you want it to locate, you literally

3    cue the dog and tell it to sit or down or scratch

4    when it gets to that highest concentration of target

08:20:19    5    odor, and then you give it its reward, either a toy

6    or food.

7    Q.   We have talked about, both yesterday and a bit

8    today, about a trained final response.

9              What is a trained final response in the field

08:20:32    10    of K9 detection?

11    A.   That is a behavior that is purposefully taught to

12    a dog, um, that the dog does independently once it

13    has made its determination that it has actually

14    identified the highest concentration.  So it's the

08:20:49    15    means by which a dog signals to its handler one, I

16    absolutely have target odor, and this is the highest

17    concentration.

18    Q.   And are all dogs trained to do the same final

19    trained response?

08:21:02    20    A.   No.

21    Q.   What are some examples of a trained final

22    response?

23    A.   A sit, a down, a scratch, a bark.

24    Q.   How important is a trained final response in the

08:21:16    25    field of K9 detection?

```
 1   A.    It's critical.

 2   Q.    Why do you say it's critical?

 3   A.    Because that is the one and only means that the

 4   dog can definitively signal to its handler that it

 5   has identified the highest concentration of target

 6   odor.

 7   Q.    I want to talk now about something called cuing.

 8   What is cuing in the context of K9s?

 9   A.    Cuing is -- cuing is a means by which a person,

10   typically a handler, imparts bias to a dog.  So it

11   can be overt.  For example, I mentioned in the

12   process of training the dog you tell it to sit,

13   that's a cue.  But there are other ways that you can

14   cue a dog inadvertently.  Um, they are extremely

15   sensitive to our body positioning and our facial

16   expressions, for example.  And this has been

17   demonstrated in the research.

18   Q.    In other words, does cuing have to be

19   intentional?

20   A.    No.

21   Q.    Can cuing happen with even the best of dogs and

22   the best intentioned handler?

23   A.    Yes.

24   Q.    And what is the danger of unintentional cuing of

25   a K9?
```

08:21:29 (line 5)
08:21:54 (line 10)
08:22:14 (line 15)
08:22:25 (line 20)
08:22:38 (line 25)

```
 1   A.   By the handler?

 2   Q.   By the handler?

 3   A.   It interferes with independence of the dog, it

 4   interferes with the definitiveness of the signal.

 5   Q.   When you say definitiveness of the signal, could

 6   you explain a little bit more?

 7   A.   If the dog has not been properly trained, we

 8   haven't put into place certain protocols that

 9   de-couples the relationship between dog and handler,

10   meaning the dog is dependent on things that the

11   handler does to help it make its determination that

12   I'm going to do my sit, for example.

13        If you don't de-couple that, then the dog

14   learns to be dependent on the handler and the handler

15   is able to -- to get the dog to do its final

16   indication whether or not it has target odor.

17   Q.   In other words, the dog could do the final

18   trained response not because of target odor but

19   because of some other --

20   A.   That's correct.

21   Q.   -- prompt?

22   A.   Right.

23   Q.   Intentional or not?

24   A.   Right.

25   Q.   You mentioned that there are studies on the
```

08:22:52

08:23:08

08:23:26

08:23:40

08:23:45

1    effect of cuing in K9 detection.

2         Are you familiar with a study by Lisa Lit?

3    A.   I am.

4    Q.   Was that study peer reviewed?

08:23:56    5    A.   Yes, it was.

6    Q.   Could you tell us about that study?

7    A.   Yes.  I apologize.  This was a study that was

8    designed to look at -- if you will, was done to ask

9    if a handler has a -- has a bias or belief, are they

08:24:15    10   able to effect the outcome of a search.

11        So to study that they had to instill a belief

12   in the handlers.  So the belief that the handlers

13   were given, and I should add so there were 18 dog

14   teams that participated in the study.  And the

08:24:33    15   handlers were told, you have four rooms you're going

16   to search and where you see a piece of red cardboard,

17   you will have target odor.

18        One of the rooms had no cardboard.  Let me

19   preface this.  None of the rooms had any target odor

08:24:50    20   at all whatsoever.

21   Q.   In other words, the handlers were told something?

22   A.   Right.  Yup.  Because they had to believe, but

23   they had to believe if you're going to test to

24   believe, you have to instill that belief in them.  So

08:25:00    25   they believed there was target odor when in reality

180

1    there was none anywhere.

2           The first room had no marker, that cardboard

3    or any distractors, and the distractors were sausages

4    and tennis balls.  So it was essentially a blank

08:25:15    5    room.

6           The second room had no marker but it had

7    sausages and tennis balls.  The third room had just a

8    marker.  And the fourth room had a marker and

9    sausages and tennis balls.  So we have four

08:25:27   10    conditions that they were looking at.

11           This was done double-blind so the people who

12    were doing data collection had no idea what the test

13    parameters were.  The handlers, of course, had no

14    idea except they believed that there would be target

08:25:40   15    odor where the red marker was.

16           And what happened was they ran the dogs, all

17    18 dogs, and they came back with 255 false alerts.

18    Q.   How many of the dog teams false alerted?

19    A.   17.

08:25:56   20    Q.   What are some of the explanations for why you

21    would get so many false alerts when there was no

22    target odor in reality?

23    A.   So what this study showed was twofold.  The study

24    demonstrated that dogs can be affected by bias on the

08:26:12   25    part of the handler.  But it also showed -- so let me

1    talk about that first.  We don't know if the dogs

2    actually did their trained final responses or not

3    because nobody was there.  But in her paper she did

4    say that some of the handlers reported they gave

08:26:32    5    their dog a verbal cue, they told their dog to sit,

6    for example, at that marker because they believed

7    that there was target odor even though the dogs

8    weren't doing it.

9            Because handlers make the call on the dog,

08:26:44    10    the handler is the one that says my dog alerted I

11    believe there is target odor, um, so the handlers

12    were able to bias those dogs and get them to false

13    alert.  That is one condition.

14            The other thing that happened was the

08:26:59    15    handlers misinterpreted, they exaggerated the

16    importance of those natural behaviors, those alert

17    behaviors that we heard about yesterday, so they

18    misinterpreted those behaviors.  And because they

19    believed that target odor was there, maybe they saw

08:27:14    20    sniffing -- I'm sure they saw sniffing at sausages

21    and they took that to mean, well, that must be target

22    odor.

23    Q.   In order for a dog to be properly trained, would

24    a training program need to take steps to prevent this

08:27:28    25    handler bias?

1    A.    Absolutely.

2    Q.    And to prevent cuing of the dogs?

3    A.    Right.

4    Q.    You mentioned double-blind in your discussion

08:27:39   5    about this study?

6    A.    Yes.

7    Q.    I want to talk about blind training.

8          Yesterday, you heard Officer Moore testify

9    about what he thought blind training meant?

08:27:52   10   A.    I did hear that.

11   Q.    Is he right?

12   A.    No.

13   Q.    What is blind training?

14   A.    Blind protocol that is applied to training is

08:28:02   15   very simply defined as the handler doesn't know the

16   outcome of the search.  So they don't know whether or

17   not anything is placed and they don't know where

18   anything might be.

19   Q.    At times, Officer Moore seemed to equate blind

08:28:17   20   training --

21   A.    May I interrupt?

22   Q.    Yes.

23   A.    I'm sorry, I need to complete that thought.

24         The handler doesn't know but somebody else

08:28:23   25   that is present does know the solution to the set.

1    Q.    Is that also called single-blind?

2    A.    Yes.

3    Q.    And before we go on to contrast that with

4    double-blind, I just want to ask at times it seemed

08:28:38    5    Officer Moore equated blind training with something

6    called a controlled negative training.

7              Are those the same thing?

8    A.    They are not.

9    Q.    What is controlled negative training?

08:28:48    10    A.    A controlled negative can be an outcome of a

11    blind protocol.  So controlled negative is simply

12    there is nothing there.  It is only valid, it's only

13    useful in training if it's done blind.  And the

14    reason that is is if the handler knows there is

08:29:12    15    nothing out there for the dog to find, that it's

16    going to affect the outcome of that search.

17    Q.    How could it affect the outcome?

18    A.    If you know there is nothing there and you start

19    to see behaviors that your dog is interested in

08:29:25    20    something, but you know there is nothing placed, you

21    are going to move that dog on.  You're not -- you're

22    going to do all these intentional and unintentional

23    cues to make sure that your dog performs correctly

24    because we all want our dogs to do well.  So that's

08:29:39    25    one thing that will happen.

184

1          You're also not going to search the area in

2     the same way.  So typically if you know there is

3     nothing there, you are going to go through your

4     search area, whatever it is, much faster so that you

08:29:52     5     don't give the dog the opportunity to be cued.

6     Q.   And if you have no idea what blind actually means

7     in K9 training, can you effectively be using those

8     methods?

9     A.   No.

08:30:09     10     Q.   Now, could you tell us the difference between a

11     single-blind and double-blind training?

12     A.   So single-blind is when the handler doesn't know

13     the outcome or the solution to the set but someone

14     else present does.

08:30:23     15          Double-blind is where the handler doesn't

16     know the outcome of the set, and there isn't anybody

17     else there that knows the outcome.  So nobody is able

18     to step in and assist.

19     Q.   Is it possible for someone other than the

08:30:38     20     handler, for example, the judge or the evaluator, to

21     cue a dog even if the handler doesn't know?

22     A.   There is research that shows that that can

23     happen.

24     Q.   Which is better, single-blind or double-blind

08:30:51     25     training?

185

1  A.   You would have to qualify that because they are

2  used at different stages of a training program and

3  they're used for slightly different purposes.

4  Q.   Do you think that double-blind training is

08:31:05  5  important?

6  A.   Yes.

7  Q.   Why?

8  A.   Double-blind is really the only means that you

9  can use to demonstrate the reliability of a K9.

08:31:17  10  Q.   How much more effort does it take to use

11  double-blind training as opposed to single-blind

12  training?

13  A.   Not much more, if any.

14  Q.   Do any K9 training programs use the double-blind

08:31:29  15  method?

16  A.   Um, some do.

17  Q.   Do you train your dogs double-blind?

18  A.   Yes.

19  Q.   I want to turn to the Utah POST K9 certification

08:31:41  20  program specifically.

21       You've mentioned Nevada POST.  Could you just

22  briefly explain the difference between POST in

23  general and the Utah POST K9 program?

24  A.   POST stands for Peace Officer Standards and

08:31:57  25  Training.  It is the governing body that certifies

186

1    peace officers.  So there are a number of states that

2    have POST programs.  Not all do.

3         Um, but when we talk about Utah POST, we're

4    talking just specifically about the agency as it

08:32:14    5    applies in the State of Utah, not anywhere else.

6    Q.   Are you familiar with the Utah POST K9 narcotics

7    detection manual?

8    A.   Yes.

9    Q.   Somebody could say you know a narcotics K9 is

08:32:30    10   reliable simply because Utah POST certified it as a

11   narcotics dog.  Do you agree?

12   A.   I do not agree.

13   Q.   Why not?

14   A.   The certification test that Utah POST has written

08:32:45    15   out is not even done single-blind.

16   Q.   So let's talk about that specific problem with

17   the certification process.

18        Does Utah POST claim or purport that it uses

19   single-blind training?

08:33:02    20   A.   I think it does.

21   Q.   According to how Utah POST talks about the

22   training that it actually does, you just said you

23   don't think it even does single-blind training?

24   A.   The certification testing is certainly not

08:33:19    25   single-blind.

```
 1   Q.   Why not?
 2   A.   Because for each of the scenarios that the
 3   handlers are going through, they know exactly how
 4   many hides are being placed.
 5   Q.   How does that interfere with whether something is
 6   single-blind or not?
 7   A.   When you know how many hides are placed, you are
 8   going to search until you find them all.  So say, for
 9   example, you had a vehicle lineup and you had five
10   vehicles, which is not the case in Utah POST.  They
11   only use two, which has its own set of problems.  But
12   let's say you had five, and you know that there is
13   one hide hidden somewhere in those vehicles and you
14   run your dog down those five vehicles and you come up
15   empty.  You are going to go back and search again and
16   you're going to search again until you find that one
17   hide.  And that is a -- that is not a realistic
18   scenario that mimics what happens on the street.
19            When you are doing that single-blind, there
20   may not be anything there.  And you have to have the
21   confidence in your training, and your dog has to be
22   able to work independently, and you have confidence
23   in the independence of that dog when you run that
24   lineup of five vehicles to say I don't think there is
25   anything there.  And that's a very different approach
```

08:33:30 (line 5)
08:33:44 (line 10)
08:34:00 (line 15)
08:34:15 (line 20)
08:34:30 (line 25)

1  than I'm just going to search this until I find it

2  because I believe there is something there.

3  Q.   Does Utah POST use double-blind training?

4  A.   It does not.

08:34:42  5  Q.   Now, as of December 2018, is there any evidence

6  that Utah POST may have changed this part of its

7  certification process?

8  A.   Of December 2018?

9  Q.   I'm sorry, December 2018, yes.

08:34:57  10  A.   I don't think so.

11  Q.   And have you reviewed a revised Utah POST manual

12  even dated after 20 -- in 2019 after this incident?

13  A.   Some parts of it.

14  Q.   Does it appear that Utah POST has in any way

08:35:14  15  taken -- has in any way made it truly single-blind?

16  A.   No.

17  Q.   Let's talk about something called randomization.

18  What is randomization?

19  A.   Random means without pattern of predictability.

08:35:33  20  Q.   How do you ensure -- how do you ensure

21  randomization?  Is it just people picking different

22  numbers?

23  A.   No.  Randomization cannot be done by a human

24  making choices.  Um, it just doesn't work that way.

08:35:47  25  We have our own biases.  So if you were going to use

1   randomization, you would do a coin toss, for example.

2   You could roll dice.  You could put numbers in --

3   little pieces of paper in a hat and pull them out.

4   You could use a random number generator.

08:36:02   5   Q.   Why is randomization important in the field of K9

6   detection?

7   A.   Because humans and dogs learn to associate.  They

8   learn patterns and predictability.

9   Q.   And why is that potentially bad for training a

08:36:21   10   dog?

11   A.   If a dog comes to understand there is some

12   underlying pattern or predictability that is

13   unrelated to target odor, they come to be dependent

14   on those as the cues to help it make a decision --

08:36:40   15   its decision about getting its reward.

16        So what that means is we want the dogs to use

17   just the target odor to make their decision, to

18   alert.  I'm sorry, to give a final trained response.

19        But dogs are not machines.  They are acutely

08:37:01   20   in tune with us.  And as hard as we try, we just

21   can't help but giving these nonverbal communications.

22   And so dogs can learn things like when I come out of

23   the truck, there is always two things to be found.

24   They can learn that if there is always something in a

08:37:19   25   cabinet but there is never something smeared up

1    against the wall.

2          Those are examples of patterns and

3    predictability that dogs can pick up on and we want

4    to try to diminish those as much as possible because

08:37:32   5    we just want them using the highest concentration of

6    target odor.

7    Q.   In the spring and summer of 2018 when Tank was

8    going through the POST training process, was POST

9    using any kind of random number generator to

08:37:48   10   randomize the hides?

11   A.   No.

12   Q.   Has POST since seemingly implemented a random

13   number generator to place hides?

14   A.   Yes.

08:38:00   15   Q.   Does that address your concerns about

16   randomization?

17   A.   No.   It addresses evaluator bias because it takes

18   away the means by which an evaluator would

19   inadvertently have predictability in where he or she

08:38:23   20   sets stuff.   And we know this to be true.   It has

21   been demonstrated that some people just like to put

22   stuff in the top drawer.   They just do.

23          And if you -- so a handler who is going to be

24   evaluated by a person that has this evaluator bias in

08:38:41   25   where they want to set stuff up, they know exactly

1    where to send their dogs and they know exactly where

2    it is they're likely to have productive areas.  So if

3    you take that away by randomizing it, the handler is

4    forced to actually do a thorough search of whatever

08:38:58    5    it is they're being asked to search.

6    Q.   But in terms -- so if POST randomizes the

7    placement of its hides, that's better than not?

8    A.   It is better than not doing that.

9    Q.   Does POST in any way randomize or seem to

08:39:13    10   randomize the number of hides?

11   A.   No.  The handler still knows I have to search

12   until I find two things.

13   Q.   Let's talk next about the actual scoring system

14   that Utah POST uses to certify K9s.

08:39:26    15   A.   Okay.

16   Q.   What scoring system does Utah POST use?

17   A.   It is a very complicated grade point average.

18   Q.   Does POST provide concrete guidance on how to

19   assess that grade point average?

08:39:42    20   A.   No.

21   Q.   What is the downside of using this kind of

22   scoring process?

23   A.   It introduces -- well, it's entirely subjective.

24   Q.   And why is that bad when certifying K9s?

08:39:58    25   A.   Number one, we don't have subjectivity out in the

1    real world on the street.  So when an officer runs

2    his dog around a vehicle, he doesn't come back and

3    say, well, I'm 45-percent confident, or I'm

4    75-percent confident or this is how I feel.  Today I

08:40:15    5    feel like this is an 85-percent reliable sniff.  It's

6    black and white, yes or no.  The dog indicated or it

7    didn't.  So we don't have a match there.

8          Also, the subjectivity means that you are not

9    getting a consistent -- you're not getting

08:40:31    10    consistency in the product that is the dog team

11    because one evaluator might have some criteria, one

12    evaluator might find some criteria are more important

13    than others.  Um, some evaluators might just like a

14    dog better than another and give them a higher score.

08:40:53    15    I mean all that subjectivity that comes into it

16    really doesn't do the teams any good in terms of

17    producing a tight line, equal capability product.

18    Q.   What is the alternative?

19    A.   Pass-fail.

08:41:13    20    Q.   Is that what you use?

21    A.   Yes.

22    Q.   And why is pass-fail better?

23    A.   Well, one, it mimics what you get out in the real

24    world, yes or no.  Um, and it takes out all of that

08:41:24    25    subjectivity.  You have select criteria.  You either

1    do it or you don't.

2    Q.   Let's talk next about the quantities of drugs

3    that Utah POST uses to train its dogs.  Does Utah

4    POST have any standardized quantities for the

08:41:42   5    narcotics it uses?

6    A.   No.

7    Q.   What does it use instead?

8    A.   It relies on the different agencies to come up

9    with those parameters.

08:41:49   10    Q.   Does this go against best practices?

11    A.   It does.

12    Q.   Why?

13    A.   Again, this comes down to wanting to have

14    consistency in the skill set and reliability of the

08:42:02   15    dogs that are out working.  So if you have one

16    department that only trains its dogs on large

17    quantities of narcotics, and then you have another

18    agency that trains only on small quantities of

19    narcotics, when you're doing mutual aid and you're

08:42:19   20    assisting, you have dog teams that are working in

21    very different parts of the spectrum, for example.

22    They're not -- they're not trained to the same level.

23    So you kind of have a mismatch there.  That would be

24    one example.

08:42:33   25    Q.   In light of these concerns, do you have an

194

1    opinion about whether the Utah POST Narcotics K9

2    Certification is a valid assessment of a dog's

3    ability to detect target odor?

4    A.   I do have an opinion.  I wanted to finish my

5    second thought if I could.  I apologize.

6    Q.   Sorry.

7    A.   The reason that we have standardized amounts for

8    certification also feeds back into wanting to produce

9    equally qualified dogs.  So I just use that in a

10   mutual context assisting.  But you could also have on

11   a test one evaluator sets up certification that has a

12   whole large quantity, large amounts of drugs, and

13   another doesn't, and so those dogs are not actually

14   being tested comparably.  They're not doing the same

15   test and so that is a problem.

16        And that's why the best practices have

17   certain amounts.  And it is not like you have to use

18   six grams of something.  I mean there is a range in

19   there, there is some flexibility.  But it is not like

20   one person has one gram and another person has

21   20 grams.

22        So in terms of Utah POST, they don't have any

23   standardization on that and so you really don't know

24   what you're going to be tested to.

25   Q.   What is your opinion about whether Utah POST is a

195

1    valid assessment of a dog's ability to detect target

2    odor?

3    A.    It's not.

4    Q.    I want to talk now about training records for K9.

08:44:04    5    How important is it to keep training records

6    for a K9?

7    A.    It is critical.

8    Q.    Why is it critical?

9    A.    K9s are a forensic science discipline.  They are

08:44:18    10    an investigative tool.  And just like DNA, just like

11    gunshot residue, just like blood spatter, the

12    importance of the information and data that you get

13    from a dog needs to be documented.

14    So training records are how you document that

08:44:41    15    your dog is properly trained, where it has

16    deficiencies, how you fix those.  Because dogs are

17    not perfect, um, and if you don't have any

18    documentation on that, how do you know -- how do you

19    know anything about this tool?  It would be like not

08:44:59    20    having documentation about how you ran your DNA

21    analysis.

22    Q.    Would you agree that it is important that K9

23    training records are thorough?

24    A.    Absolutely.

08:45:13    25    Q.    Accurate?

1    A.    Yes.

2    Q.    Complete?

3    A.    Yes.

4    Q.    Do training records take on any particular

08:45:19    5    significance after a dog is certified?

6    A.    Yes.

7    Q.    Why?

8    A.    Well, that is where you calculate reliability.

9    It comes from their training records through blind

08:45:30    10    and double-blind sets.  That is where that

11    calculation comes from once the dog is certified.

12          It demonstrates that the handler is

13    continuing to do maintenance training on the dog.  We

14    don't want to see dogs that pass a certification test

08:45:44    15    and never go through training again because that is

16    not maintaining -- that is not maintaining them as a

17    valid resource.

18          So the training records, after they're

19    certified, demonstrate that they are continuing to be

08:45:58    20    calibrated and that they're working properly.

21    Q.    Does that matter particularly after a dog has

22    been certified?

23    A.    Yes.

24    Q.    Why?

08:46:06    25    A.    Because reliability on the dog comes into play

1    after they're certified because that is when they're

2    working on the street.

3    Q.   On actual cases?

4    A.   Right.

08:46:17    5    Q.   Affecting actual people?

6    A.   Absolutely.

7    Q.   You heard Officer Moore talk yesterday about his

8    training records for Tank?

9    A.   I did.

08:46:28    10   Q.   That his records may be incomplete to some

11   unknown degree?

12   A.   Right.

13   Q.   But that at a minimum he could say his training

14   logs -- he kept training logs more often than not?

08:46:42    15   A.   I heard him say that.

16   Q.   And did you hear him also say how some fields may

17   just be a default entry in the data program?

18   A.   I did.

19   Q.   Including specifically the blind field.  Based on

08:47:01    20   Officer Moore's description of how he keeps his

21   records, what is the value of Tank's training records

22   in showing his reliability as a narcotics K9?

23   A.   They have no value for that.

24   Q.   I want to turn now to another aspect of the Utah

08:47:21    25   POST training program.  We have discussed a trained

1    final response.  Does the Utah POST program train its

2    dogs to do a trained final response?

3    A.   Yes.

4    Q.   Utah POST also uses the word "indication"?

08:47:38   5    A.   Correct.

6    Q.   Is that synonymous with a trained final response?

7    A.   Yes.

8    Q.   Utah POST also teaches its handlers about the

9    term alert.  How does Utah POST define alert?

08:47:52   10    A.   Alert behavior -- it is alert behaviors.  So

11    alerts are innate natural behaviors that a dog does

12    when it smells something of interest.

13    Q.   According to Utah POST, what are some of those

14    alert behaviors?

08:48:08   15    A.   Closed mouth sniffing, change in the movements of

16    the dog seeking the highest concentration.

17    Q.   Who created this list of alert behaviors?

18    A.   Wendell Nope.

19    Q.   Who is Wendell Nope?

08:48:24   20    A.   He is the originator of the Utah POST K9 program.

21    Q.   Now Officer Moore says, "you can't have a trained

22    final response without having alert behaviors."  Do

23    you agree with that?

24    A.   With respect to target odor, yes.

08:48:44   25    Q.   Officer Moore then says, "you only have alert

1   behaviors when a dog is responding to target odor."

2   A.   That's not true.

3   Q.   Why do you think that's not true?

4   A.   When a dog -- for a dog to detect an odor of

08:49:02   5   anything, all dogs do that the same way.  They do it

6   through their nose.  The air has to come through

7   their nose so that it can get through the whole

8   complex physiological process and it -- actually the

9   detection is done in the brain.  They don't do it

08:49:20   10   through their ears.  They don't do it through their

11   feet.

12          So no matter what the dog is smelling,

13   they're going to close their mouth so that they can

14   funnel that air and those molecules in through their

08:49:31   15   nose.  So it cannot be that -- that closed mouth

16   intense sniffing is specific to target odor.  That's

17   what they do for anything that they sniff.

18   Q.   With the rest of the behaviors?

19   A.   Uh-huh (affirmative).

08:49:46   20   Q.   Are these unique to narcotics?

21   A.   They are not.

22   Q.   Are they just as consistent with the dog smelling

23   anything of interest?

24   A.   Yes.

08:49:56   25   Q.   In the absence of a trained final response, is

200

1    there a difference between a dog sniffing say a

2    hamburger and a target odor?

3    A.    No.

4    Q.    Now, Officer Moore seemed to say, "the behaviors

08:50:17    5    themselves in isolation may be the same, but I know

6    the difference because of context because the dog is

7    working."

8           What do you think of that?

9    A.    I think that the whole reason that we put

08:50:35    10    indications on dogs is because you can't actually

11    tell the difference.  If all of these natural

12    behaviors that are not trained were sufficient, that

13    they were readable and consistent and all of that,

14    there would be no reason to put an indication on a

08:50:54    15    dog.  But the fact of the matter is -- so, sorry, the

16    fact of the matter is that those behaviors are

17    natural, they're not trained, they look the same and

18    it's that final indication that lets the handler know

19    definitively it is target odor and it's not because

08:51:12    20    another dog lifted its leg on the tire.  It's not

21    because there is a cat in a crate of the backseat of

22    this car.  It is not because there is pizza or

23    they're carrying a 20-pound bag of dog food.

24    Q.    What do you think about Officer Moore's claim

08:51:26    25    that, "I see Tank do these alert behaviors when he is

1   working a car, but I don't see Tank doing these

2   behaviors when he is working my backyard"?

3   A.   Well, he is not working his dog in his backyard.

4   His dog is in his backyard and maybe he is watching

08:51:47   5   him through the window.  But it is not three feet

6   away from the dog, he is not in a position to hear

7   the sniffing, he's not in a position to see any of

8   these behaviors.  And a lot the time -- well, I don't

9   know that.  It is entirely possible that he is just

08:52:01   10   never in a position to see those behaviors when he's

11   not working.  So he really doesn't have a comparison.

12   Q.   Does his record keeping practices give you any

13   additional concerns about Officer Moore's ability to

14   say I know he only does these alerts when he is

08:52:22   15   working?

16   A.   Well, he actually hasn't done a whole lot of

17   narcotics training with that dog.

18   Q.   Could you explain a little bit more?

19   A.   The best practice and the industry standard for a

08:52:34   20   long, long time has been 16 hours a month for that

21   detection discipline.

22   Q.   Not just training in general, but specific to

23   narcotics?

24   A.   Right.  So he is not doing a lot of -- he hasn't

08:52:48   25   been doing a lot of training, he hadn't had the dog a

1    lot.  Um, and, you know, I just -- I think that

2    answers your question.

3    Q.   Yes.  Do you have any concerns about the way Utah

4    POST teaches its handlers about alerts?

08:53:05   5    A.   It's very confusing the way that they do it

6    because although Officer Moore was saying that he

7    could absolutely tell the difference, what Utah POST

8    teaches is actually an admission that a handler

9    cannot tell the difference between alert behaviors

08:53:28   10   that are target odor specific and not target odor

11   specific.

12   Q.   Could you explain a little bit more about that?

13   A.   So there is the alert matrix which is really a

14   list that are all of these things.  So the dog, it

08:53:45   15   sniffs and he is trying to figure out where the odor

16   is coming from and maybe this sniff intensifies and

17   he is moving towards it.  In that list, after the dog

18   is doing the sniffing, the handler, if the dog

19   doesn't go to final indication, that list says the

08:54:02   20   handler should step in and give the dog a verbal cue.

21        So the handler says find dope.  He sees the

22   dog sniffing, find dope.  And if the dog alerts, then

23   the lesson is that the dog was correct but it also

24   shows how there is dependency built in to how they're

08:54:22   25   training.  So that is part one of the confusion.

1          If when you give that dog the command, he is

2     sniff, sniff, sniffing because you think he has got

3     target odor, but you're not sure, so you give him a

4     verbal cue and the dog doesn't do its indication but

08:54:38  5     walks off, then that meant that the dog was just

6     sniffing something of interest.

7          So which is it?  Either the handler is sure

8     that whatever the dog is sniffing is target odor, or

9     the handler is not.  But that list right there

08:54:55 10     highlights the fact that you actually cannot be sure.

11     Q.   I want to turn to this specific case with

12     Mr. Jordan.  This case involves this dog named Tank.

13     Where did Tank come from?

14     A.   He was an import from Slovakia.

08:55:12 15     Q.   I want to talk about Tank's health.  Should a

16     working K9 be healthy?

17     A.   Yes.

18     Q.   Why?

19     A.   Well, we're expecting them to do a job that is

08:55:25 20     physically demanding.  And when we're talking

21     specifically about odor detection, it can be coming

22     from anywhere.  And if a dog is properly trained to

23     locate that highest concentration, it needs to be

24     able to identify where that is and move freely.

08:55:42 25     Needs to have all its faculties about it.  It is just

1    a basic tenet.

2    Q.   As part of this case did you review Tank's

3    veterinary records?

4    A.   I did.

08:55:54   5    Q.   Specifically records from April 2018 when Tank

6    first saw the vet after arriving from Slovakia?

7    A.   Yes.

8    Q.   When Tank saw the vet in April of 2018, was there

9    any indication that Tank had health problems?

08:56:11   10   A.   Yes.

11   Q.   What were those health problems?

12   A.   He had a number of problems when he was first

13   brought over.  He had issues in his mouth.  I think

14   he needed to be dewormed.  Um, but he also had x-rays

08:56:26   15   taken and there was evidence that he had joint

16   issues, joint disease.

17   Q.   What is the potential danger of a working dog

18   with joint disease?

19   A.    It's painful and the dog is not going to have

08:56:41   20   full range of motion potentially.

21   Q.   Can that affect a dog's performance?

22   A.   Yes.

23   Q.   Did the vet, in fact, express concern about these

24   issues on a working dog?

08:56:54   25   A.   That was noted in the record, yes.

205

1    Q.    Throughout Tank's training records at the Utah

2    POST Program, do you see any evidence that these

3    joint issues could have been affecting his

4    performance?

08:57:09    5    A.    Yes.

6    Q.    What do you see?

7    A.    This is a full-size German Shepherd, otherwise

8    healthy, but he didn't want to jump up.  And that's

9    one of the things that you see with dogs that have

08:57:22    10    joint issues.  It's painful.

11    Q.    If a dog has chronic joint issues, should that

12    dog be working?

13    A.    Unless a vet says otherwise, no.

14    Q.    Do you see any evidence that there was any

08:57:38    15    follow-up in these vet records to make sure that Tank

16    was doing fine?

17    A.    No.

18    Q.    Or to rule out hip dysplasia?

19    A.    No.

08:57:53    20    Q.    Now, we talked a little bit about the amount of

21    training that Tank did, POST certification.  And

22    between Tank being certified in July of 2018 and the

23    start of the PackTrack records in November 27, 2018,

24    we see four entries for narcotics training.

08:58:21    25           If you trained four times between July 17th

1    and November 27th, is that a lot, average, or a

2    little for a K9?

3    A.    It is a little.

4    Q.    Did you watch video footage of Tank sniffing

08:58:41    5    Mr. Jordan's car?

6    A.    I did.

7    Q.    Okay.  I want to go through that video with you

8    step-by-step.  And I would like you -- I'm going to

9    play it half speed and I would like you to narrate

08:58:55    10    what you see happening in this video, okay?

11    A.    Yes.  It is okay if I might ask you to stop it?

12    Q.    Oh sure, absolutely.  I am starting to play

13    Government's Exhibit 10 at time stamp 24:45 and I am

14    playing it at half speed.

08:59:28    15            (Whereupon, Exhibit 10 was played

16             for the record.)

17            THE WITNESS:  I want to note that we just

18    saw --

19            MS. STIRBA:  Stop at 25:14.

09:00:11    20            THE WITNESS:  -- we just saw Mr. Jordan flick

21    his cigarette onto the ground.

22            (Whereupon, Exhibit 10 was played

23             for the record.)

24            THE WITNESS:  So we got a glimpse of the dog

09:00:27    25    and the handler.  He is started at the rear of the

1   trunk.  The dog is sniffing.  He turns back towards

2   the trunk.  He sniffs the ground.  Walks down the

3   passenger side of the vehicle sniffing.  The handler

4   moves him off, circles him around to bring him back.

09:00:51  5   You can see the dog's mouth opening and closing.  He

6   is sniffing the vehicle.  He is focused on the

7   vehicle.  They move around the front of the vehicle,

8   and now we can't see the dog.  He comes right in

9   there and he is continuing to work the vehicle.

09:01:08  10   Coming back around to the back side again.  Can we

11   stop there?

12   Q.   (By Ms. Stirba) I'm stopped at 25:52.

13   A.   So what we saw was the dog lifted his head up and

14   he sniffed over the top of the trunk.  We didn't see

09:01:24  15   him try and jump up at all.  If he had target odor,

16   trained to go to the highest concentration and it was

17   coming over the back of the trunk, we might have

18   expected him to jump up and do what he had been

19   trained to do.  That's not what we see.  And in this

09:01:38  20   still shot here, um, you can see that he is actually

21   pointed away from the trunk towards the fence, um,

22   catching odor that's coming not from the car.

23      So if we play it again, we'll see what he

24   does.  He has got a taut leash on the dog at this

09:01:55  25   point.  I want to point out that the handler has the

1    leash taut.  So let's go ahead and play from here.

2              MS. STIRBA:  All right.  I'm resuming.

3              (Whereupon, Exhibit 10 was played

4               for the record.)

09:02:03    5              THE WITNESS:  So he does a couple of sniffs

6    there.  He can't continue to move because the handler

7    has him on taut leash so his handler brings him

8    around and asks him to check the driver's side again,

9    which he does.

09:02:19   10              The dog is working.  Quick head flip out into

11   traffic.  This is a dog that's just working but he

12   leaves the side of the car on his own, comes around

13   the back.  Again steps off there towards the fence

14   and his handler stops him from going there and asks

09:02:36   15   him to come back, gives a hand gesture of the license

16   plate, here is another hand gesture, check the

17   license plate again.  Tapping the rear of the

18   vehicle.  So can we stop there.

19   Q.   (By Ms. Stirba) And that's stopped at 26:22.

09:02:49   20   A.   So this is another interesting thing.  He has

21   tapped the back of the vehicle, and the dog jumps up.

22   He just -- but he doesn't jump up fully.  This is not

23   a dog who is going to -- who is jumping up fully on

24   his hind legs so he does kind of a little bit of a

09:03:05   25   hop.  Let's resume.

209

1          MS. STIRBA:  Okay.

2          (Whereupon, Exhibit 10 was played

3           for the record.)

4          THE WITNESS:  Checking.  The dog comes off,

09:03:14  5   spins him around, check the passenger side again and

6   the officer is tapping the side of the car so that he

7   will sniff this.

8          He sniffed this a few times at this point.

9   The dog is still working the vehicle.  No indication

09:03:30  10  that the dog is slowing down, attempting to do a sit

11  and the handler is having some leash trouble as he

12  comes around the front.

13          The dog sniffs the ground, walks out into

14  traffic.  Luckily doesn't get hit by that big moving

09:03:47  15  truck.  Down the driver's side, again.  Standing

16  there.  And the dog is checking something out.  We

17  can't see exactly where the dog's head is.  So

18  he -- can we stop right there?

19  Q.   (By Ms. Stirba) I'm paused at 27:03.

09:04:11  20  A.   So the dog has come off the vehicle and just done

21  a nonverbal communication with his handler.  This is

22  the first time the dog has looked his handler square

23  in the face and made eye contact with him.  Let's

24  start on there.

09:04:25  25  Q.   Still hasn't done an indication?

```
 1   A.   He still hasn't done an indication.

 2              MS. STIRBA:  All right.  I'm resuming.

 3              (Whereupon, Exhibit 10 was played

 4                for the record.)

 5              THE WITNESS:  And stop.  So -- and the dog

 6   moves off on his own and goes to the unmarked vehicle

 7   behind him.  So what we have seen is the dog has been

 8   around the vehicle a couple of times.  He has sniffed

 9   all sides of the vehicle multiple times.  He has come

10   off of the vehicle and been brought back many times

11   by his handler.  Um, and at this point, he has looked

12   his handler in the face, done a nonverbal

13   communication, and left that vehicle.

14              MS. STIRBA:  All right.  I'm resuming.

15              (Whereupon, Exhibit 10 was played

16                for the record.)

17              THE WITNESS:  The handler brings him back to

18   the front of the vehicle.  I can't see -- we can't

19   see the dog.  We see him sniffing the ground.

20   Handler points.  The dog comes back into view, comes

21   around the rear of the trunk, sniffs the ground, goes

22   around the passenger side.  We see some head high

23   just general but his mouth is open.  The handler

24   directs him to sniff the license plate again.  The

25   dog starts to walk off.  He gets a little tangled
```

09:04:30  (line 5)
09:04:45  (line 10)
09:04:56  (line 15)
09:05:17  (line 20)
09:05:48  (line 25)

1    with the leash, so he is just untangling him right

2    now.

3            The dog is looking at him, shakes him off.

4    Starts to walk off again, handler brings him around,

09:06:10    5    again sniffing high.  Leaves it.  Comes down the

6    passenger side.  Again starts to walk off from the

7    vehicle and the handler comes back and gives him more

8    direction to the back of the tire.  Dog sniffs the

9    door handle, no indication.  Sniffing low, sniffing

09:06:31   10    the curb.

11            I can't see the dog at this time.  Sniffing

12    the ground, walks out into traffic again.  The

13    handler brings him around.  Dog flips there, does a

14    little loop-de-loop, does nothing and walks up and

09:06:54   15    sniffs the door handle of the unmarked police vehicle

16    and that's the end of the sniff.

17    Q.   (By Ms. Stirba) I'm stopping at 28:25.

18            Now, Dr. Cablk, in total how long did Tank

19    sniff Mr. Jordan's car?

09:07:11   20    A.   Almost three minutes.

21    Q.   In K9 detection is that a short, medium, or long

22    time to do a dog sniff?

23    A.   That's on the upper end.  That's actually the

24    upper limit, in some certification tests, to sniff a

09:07:31   25    series of vehicles.

1   Q.   Now in total, how many times does Officer Moore

2   direct Tank to sniff the trunk of the car?

3   A.   If I can see my report I can give you an exact

4   number.

09:07:45   5   Q.   Sure.  I'm approaching with a copy of your

6   report.

7   A.   I can tell you how many times he was directed to

8   sniff each of the sides of the vehicle.  I believe he

9   went in total around the vehicle four times, but it's

09:08:32   10   not like they just circled around the vehicle four

11   times because they went back and forth so many times.

12        So, um, Tank was directed to sniff the trunk

13   eight times, the passenger side seven times, front of

14   the vehicle four times, which means he probably went

09:08:47   15   around four times total, um, and the driver's side

16   seven times.

17   Q.   At any point, did Tank even try to perform a

18   trained final response?

19   A.   No.

09:09:01   20   Q.   If Tank had wanted to perform a trained final

21   response, are these conditions conducive to him doing

22   that?

23   A.   They are.  It's flat ground.  There is nothing --

24   there is no barrier for this dog to be able to do a

09:09:17   25   sit or a down.

213

1  Q.   Now, we have talked about handler bias and the

2  Lisa Lit study which suggests that handlers can

3  misread their dogs in a training exercise.

4       Are those dangers also present in a

09:09:41  5  real-world police stop?

6  A.   They are.

7  Q.   Officer Moore yesterday spoke about Tank sniffing

8  the driver's side door which we can't completely see

9  in this video.

09:09:59  10      But is there anything during this traffic

11  stop that could have directed Tank's -- or drawn

12  Tank's attention to the driver's side door other than

13  target odor?

14  A.   Yes.

09:10:11  15  Q.   What is that?

16  A.   Detective Allen handled the top of the door there

17  and he also touched the passenger door as well.

18  Q.   So I'm going to play now from Government's

19  Exhibit 10 starting at time stamp 23:59.

09:10:33  20      (Whereupon, Exhibit 10 was played

21       for the record.)

22  Q.   (By Ms. Stirba)   I am stopping at 24:17.

23      Now in that clip we saw Detective Allen

24  touching Mr. Jordan's car?

09:11:13  25  A.   Yes.

214

1    Q.    How could that potentially affect Tank in the

2    sniff?

3    A.    This would be one of those unconditioned cues

4    which is something that isn't target odor that the

5    dog comes to associate with productivity with target

6    odor.    And so Detective Allen is a familiar person to

7    the dog, um, and the fact that his odor --

8    Detective Allen's odor is often present in sniffs,

9    and when the dog is successful, is an indicator, it's

10    a cue to the dog I need to pay extra attention here.

11    Q.    And could that affect Tank?

12    A.    Yes.

13    Q.    Now, Officer Moore testified that Tank's ears

14    became visibly more rigid during this sniff.    Did you

15    observe that in the video?

16    A.    We can't see that in the video.

17    Q.    Officer Moore testified that Tank's focus was on

18    the seam of Mr. Jordan's trunk.

19          Do you see that in the video?

20    A.    That doesn't happen in the video.

21    Q.    Officer Moore testified that there was an abrupt

22    change in Tank's behavior.

23          Do you see that in the video?

24    A.    His behavior around that car is pretty

25    consistent.

09:11:26 (line 5)
09:11:49 (line 10)
09:12:06 (line 15)
09:12:19 (line 20)
09:12:30 (line 25)

215

1    Q.   Officer Moore talked about Tank's mouth being

2    closed.  What do you think of that in this sniff?

3    A.   It is closed and open.

4    Q.   And are any of these behaviors unique to target

09:12:49   5    odor?

6    A.   No.

7    Q.   We have also watched Tank walk away from

8    Mr. Jordan's car multiple times.

9         What does that tell you?

09:13:03   10   A.   It could mean a few things.  It could mean that

11   he doesn't have target odor on that vehicle, so he is

12   going to see what he can find someplace else.  It

13   could mean that there is something of interest going

14   on on the other side of the fence or out in traffic

09:13:26   15   or elsewhere that he is drawn to.

16   Q.   Are there any environmental conditions that you

17   can see that would have interfered with Tank's

18   ability to do a final trained response?

19   A.   No.

09:13:45   20   Q.   In fact, should a working dog be able to do a

21   final trained response on a normal, sunny, outdoor

22   day?

23   A.   Yes.

24   Q.   Now, you have heard Officer Moore's ultimate

09:14:01   25   opinion that he could tell from this concert of

1    behaviors that Tank was smelling target odor even in

2    the absence of a trained final response.

3             What do you see on this video?

4    A.   I see a dog that, um, understands that he is

09:14:21    5    being asked to sniff this vehicle.  I think he does

6    sniff the vehicle.  Um, I think he clears the vehicle

7    and comes off of the vehicle because he doesn't have

8    target odor.  And I think he attempts to communicate

9    that to his handler multiple times.

09:14:38   10    Q.   Based on your training, your expertise, and your

11    review of all of these materials, what do you think

12    we can learn from Tank's behavior in this dog sniff?

13    A.   Nothing.

14             MS. STIRBA:  Thank you.  I have no further

09:14:53   15    questions.

16             THE COURT:  Cross-examination?

17             MS. STIRBA:  Your Honor, may I?  I'm sorry to

18    interrupt.  If we could uncuff one of Mr. Jordan's

19    hands.

09:16:05   20             THE COURT:  Yes, if you would, please.

21                      **CROSS-EXAMINATION**

22    BY MR. BROTHERTON:

23    Q.   Good morning, Dr. Cablk.  Thank you for being

24    here today.

09:16:20   25    A.   Good morning.

1    Q.   I think I would rather wait for Mr. Jordan to be

2    seated before we continue.

3         I want to begin by asking you some questions

4    about trained final response.  Um, your testimony

09:16:51    5    today is that trained final response occurs when a

6    dog reaches the highest concentration of target odor;

7    is that correct?

8    A.   Yes.

9    Q.   In order for a dog to reach the highest

09:17:07    10    concentration of the target odor, it has to first

11    have some sense of that target odor; is that correct?

12    A.   It needs to detect it.

13    Q.   So before the dog can make that final trained

14    response, it has to have smelled it at some point; is

09:17:23    15    that fair?

16    A.   Yes.

17    Q.   If a dog made that final trained response upon

18    first detection of the odor, it wouldn't be of any

19    use?

09:17:37    20    A.   It wouldn't be wrong because it detects the odor,

21    but that's not how they are trained.

22    Q.   Right.  I guess my point is, a dog that's 30 feet

23    away from a vehicle, if it detects an odor of

24    narcotics 30 feet away from a vehicle and performed

09:17:56    25    that final trained response 30 feet away, that

1    wouldn't be of much use to a handler or to police,

2    generally?

3    A.    Well, they wouldn't necessarily know where that

4    odor was emanating from.

09:18:06    5    Q.    Exactly.  It wouldn't know if it was coming from

6    a car or from a bush or from across the street.  It

7    could be coming from anywhere.  Is that correct?

8    A.    Yes.

9    Q.    That doesn't mean that the dog doesn't smell that

09:18:16   10    target odor?

11    A.    That's true.

12    Q.    Okay.  The dog can smell the target odor during

13    any number of times during the course of a sniff

14    around a vehicle.  Is that correct?

09:18:26   15    A.    Um, I'm thinking.  Um, sure.

16    Q.    Um, in fact, it would be odd for a dog to --

17    well, let me rephrase.  It's not uncommon for a dog

18    when sniffing a vehicle to encounter target odor and

19    then move to a place where it does not smell that

09:18:52   20    target odor and then want to come back to it.  Is

21    that fair to say?

22    A.    Is that typical?

23    Q.    Yeah.

24    A.    Is that what you're asking me?

09:18:59   25    Q.    Yes.

1    A.    No.

2    Q.    So a dog that is performing a sniff on a car,

3    once it encounters a target odor, it will do nothing

4    except focus solely on that target odor?  It won't

09:19:12    5    move around the car in any way?

6    A.    It will -- I can't say it is not going to move

7    around the car, um, but it will actively seek the

8    highest concentration.

9            So a dog encounters odor, detects it,

09:19:26    10    recognizes it through its training, immediately

11    follows that -- attempts to follow that to the

12    highest concentration.

13            If I understand you correctly, you're saying

14    that a dog would hit the odor and say I smell that,

09:19:40    15    I'm going to keep going.

16    Q.    Well, I suppose my question then is, in seeking

17    the highest concentration, could a dog lose the odor?

18    A.    It is possible, yes.

19    Q.    And when it would -- in that circumstance if a

09:19:54    20    dog smelled it and then lost it, it would try to find

21    it again?

22    A.    Yes.

23    Q.    And that behavior would, if I could describe it,

24    it would be the dog moving from one direction and

09:20:05    25    then turning back the opposite direction, would it

1    not?

2    A.   It's possible.

3    Q.   The dog detects an odor -- let's say at the

4    license plate area on the rear of the vehicle, moved

09:20:19   5    to try and follow that to its highest concentration,

6    lost the odor, it would naturally want to go back to

7    the license plate, would it not?

8    A.   I'm thinking about what you're getting at, um,

9    and a lot of this is dependent on a number of

09:20:38   10    factors.  So what you're describing could happen, but

11    it also might not.

12    Q.   I think that's fair.  But when a dog loses that

13    target odor, seeks to find it again like you said,

14    that would be the expected behavior is the dog would

09:20:54   15    seek to find that target odor again.

16    A.   Right.

17    Q.   Now, in that circumstance, the dog wouldn't

18    perform a final trained response?

19    A.   In that circumstance that's right.

09:21:05   20    Q.   Because he had not yet found the highest

21    concentration of that target odor?

22    A.   That's correct.

23    Q.   That doesn't mean he hadn't smelled it, just that

24    he hadn't found the highest concentration yet?

09:21:16   25    A.   Right.

1  Q.   You have never personally met Tank, our dog in

2  this case; is that correct?

3  A.   I have not.

4  Q.   You haven't had an opportunity to work with him?

09:21:41  5  A.   No.

6  Q.   You haven't trained with him?

7  A.   No.

8  Q.   You haven't had a chance to run him around a car

9  or perform any kind of a sniff or deployment?

09:21:52  10  A.   That's true.

11  Q.   In fact, the only information that you have about

12  Tank is the three-minute video of his sniff around

13  the car, and his -- the records kept by Officer Moore

14  in West Valley City.  Is that correct?

09:22:06  15  A.   That's why those records are so important.

16  Q.   But is it fair to say the person that knows the

17  most about a dog, that is most intimately familiar

18  with the dog, is the dog's handler?

19  A.   Not always.

09:22:21  20  Q.   The person that has trained hundreds of hours and

21  has been deployed on dozens of active searches would

22  not know more than anyone else about the dog?

23  A.   It turns out not everybody is skilled at reading

24  dog behavior.

09:22:35  25  Q.   So Officer Moore's testimony was that he trains

1    two hours every day with Tank whether on narcotics or

2    patrol, two hours every single day with Tank.

3            I haven't done math, but that is considerably

4    more than a three-minute video and reviewing his

09:22:58   5    records.  Is that fair to say?

6    A.    We don't have any record that he is training two

7    hours a day every day with the dog.

8    Q.    We have his testimony.

9    A.    Okay.

09:23:07   10   Q.    Um, in ideal circumstances, though, a dog's

11   handler is in the best position to understand what

12   the dog is communicating and understand the dog's

13   behavior.  Is that fair to say?

14   A.    Possibly.

09:23:27   15   Q.    Now, these -- the final trained response that

16   we've talked about, or, as POST uses the term,

17   indication, and you've said that they're used

18   synonymously.  So I apologize if I use one instead of

19   the other because this is not my area of expertise,

09:23:44   20   but I'm doing the best I can.  That is a trained

21   response, right?  That is not a natural behavior for

22   a dog?

23   A.    Correct.

24   Q.    But when a dog does encounter narcotic odor

09:23:57   25   during the course of a sniff, it doesn't perform that

223

1  final trained response until it has reached the

2  highest concentration.  I think we have established

3  that already so I apologize for my duplicative

4  question.

09:24:13  5      But when it does encounter that target odor,

6  the behavior of the dog does change; is that correct?

7  A.   Yes.

8  Q.   There is -- the way the dog behaves when it

9  encounters the target odor is different than if it is

09:24:34  10  just walking along the sidewalk or resting in the

11  police car.  Is that fair to say?

12  A.   And not smelling anything else?

13  Q.   Yes.

14  A.   Yes.

09:24:44  15  Q.   Officer Moore has articulated that when his dog

16  encounters a target odor it behaves in certain

17  specific ways.

18      He has articulated that Tank's ears become

19  rigid, that his head changes direction as he is

09:25:03  20  following the odor, his mouth becomes closed and his

21  sniffing intensifies.

22      Are those behaviors typical of a dog that is

23  encountering a target odor?

24  A.   Yes.

09:25:16  25  Q.   Okay.  Do any of those behaviors seem strange or

1  atypical of a dog that is actively pursuing a sniff

2  that has -- and has encountered a target odor?

3  A.   I'm sorry, can you say that again?

4  Q.   Do any of those behaviors seem strange or

09:25:35  5  atypical of a dog that is performing a sniff and has

6  encounter a target odor?

7  A.   Are you asking me is it weird that a dog would

8  close its mouth and do active sniffing when it hits

9  target odor?

09:25:48  10  Q.   Yes.

11  A.   Is that weird?  No.

12  Q.   But those are natural behaviors, right?  They're

13  not -- they're not trained into the dog?

14  A.   Correct.

09:26:03  15  Q.   But not all dogs exhibit the same natural

16  behaviors when they encounter target odor or any

17  other odor that interests them?

18  A.   That's not true.

19  Q.   Dogs behave differently, different dogs behave

09:26:14  20  differently?

21  A.   All dogs have to close their mouth to funnel that

22  scent through their nasal cavity so that they can

23  make that detection.

24       So that is consistent and it doesn't matter

09:26:23  25  which dog it is or what they're smelling.

1   Q.   Okay.  But not all dogs have their ears go rigid.

2   Is that fair?

3   A.   You know what, we don't have an answer to that.

4   Q.   Okay.  But the person who has spent the most time

09:26:43   5   with the dog, has trained with the dog, has been

6   actively deployed with the dog on dozens of occasions

7   would be in the best position to recognize those

8   behaviors --

9   A.   I don't agree with that.

09:26:53   10   Q.   -- when he encounters them?

11   A.   I don't agree with that.  I think if you have

12   somebody who has trained hundreds and hundreds of

13   dogs, who has a lot of experience working with a wide

14   variety of dogs is possibly even better adept at

09:27:07   15   recognizing behaviors in dogs.

16   Q.   There is a purpose behind having certain dogs and

17   handlers paired together, isn't there?

18   A.   A purpose to have a dog and a handler paired

19   together?

09:27:30   20   Q.   You want a dog and a handler that are well

21   matched, don't we?

22   A.   Yes.

23   Q.   We want a dog and handler that work well together

24   and understand each other.  Is that fair to say?

09:27:38   25   A.   Um, I don't know what you mean by understand each

1  other, but certainly there are characteristics of

2  dogs and handlers that can work extremely effectively

3  together.

4  Q.   And if there was a problem between a dog and a

09:27:54   5  handler, um, they wouldn't work together anymore; is

6  that fair to say?

7  A.   Um, it depends on what that problem is.

8  Q.   If -- if the handler just were not able to work

9  with the dog, there would be a change made, wouldn't

09:28:11   10  there?

11  A.   I don't know.

12  Q.   Um, in ideal circumstances we want dogs and

13  handlers that work well together.  I think that's

14  fair to say.

09:28:22   15  A.   Um, a dog and handler need to work together to be

16  effective.  I think we can all agree to that.

17  Q.   I want to address one item with you.  I am

18  looking at Tank's deployment log.  This was City's

19  Exhibit 11 from yesterday.

09:28:48   20       Um, if I may approach, Your Honor?

21       THE COURT:  You may.

22       MR. BROTHERTON:  And, Your Honor, I said

23  City's Exhibit 11 and that's what I'm comfortable

24  saying but this is United States Exhibit 11.  I

09:29:16   25  apologize.

1          THE COURT:  Thank you.

2    Q.   (By Mr. Brotherton)   This is entitled deployment

3    log, it says officers list, October 20th, 2018, to

4    March 1, 2019.  And are you following with me?

09:29:27    5    A.   I am sorry, yes.

6    Q.   On the first page, it has a couple of boxes, one

7    for detection, one for patrol.  Um, and it says

8    officer name and duty assignments, and then there is

9    some other information, deployments, search areas,

09:29:41    10   alerts/indications, items seized and some numbers

11   below that.  Are you comfortable with that?

12        Um, but on Page 2, it kind of drills down

13   more into the details of these deployments.  I want

14   to draw your attention to a couple of places.

09:30:01    15        Um, you testified earlier that it's possible

16   for a handler to cue a dog to alert even when there

17   is not a presence of target odor.  Is that correct?

18   A.   Yes.

19   Q.   If you would look for me about halfway down the

09:30:28    20   page under the case number column, I'm looking at

21   case number C11336090.  Could you follow that along

22   with me?

23        The date is January 29th, 2019.  Search area

24   is one; alerts/indications, zero; and items seized,

09:30:46    25   zero.

1    A.    Okay.

2    Q.    This appears to be an instance where

3    Officer Moore deployed Tank, they performed a search,

4    and Tank did not indicate and there was no search or

09:31:04    5    item seized?

6    A.    Okay.

7    Q.    Um, immediately below that C11336018, again

8    January 29th, one search area; no alert/indication;

9    no item seized; is that fair to say?

09:31:17    10    A.    Yes.

11    Q.    Um, we can continue through this, but there are

12    14 different instances, 14 different cases -- or

13    excuse me, 12 different cases where Tank was

14    deployed, performed a search and he did not indicate.

09:31:53    15    A.    Okay.

16    Q.    In those instances, were there cues to the dog to

17    alert?

18    A.    Um, I don't know and we can't tell that from

19    this.

09:32:06    20    Q.    I think that's fair.

21         If we could look at -- if you'll look toward

22    the top of the page with me, case number 19I003732.

23    This is February 28th, 2019.

24    A.    I see it.

09:32:25    25    Q.    Search area is one; alerts/indication, one; and

1    items seized, three.  This appears to be an instance

2    where Tank was deployed, there was an alert or an

3    indication, and items were found and seized.  Is that

4    fair to say?

09:32:38    5    A.   Yes.

6    Q.   Below that, case number 19I003738, February 28th,

7    2019.  Again, search area is one; alerts or

8    indications, one; and items seized, two.

9          Again, Tank was deployed and alerted or

09:32:54    10   indicated and items were found?

11   A.   Right.

12   Q.   We can go through the rest of these and there are

13   14 instances where Tank was deployed, um, where he --

14   where he performed a search, there was an alert or

09:33:10    15   indication and items were found and seized.

16          Is that fair -- is that fair to say?

17   A.   I'll believe you on the count.

18   Q.   Okay.  Now, there is one other instance.  There

19   is one other specific circumstance.  Towards the top

09:33:28    20   of the page, but not the very top, there is a case

21   number that says "no case," February 13th, 2019.

22   Five search areas; three alerts or indications, and

23   no items seized.

24          A couple of lines down, C11353614, February

09:33:44    25   7, 2019.  One search area, one alert/indication and

1    zero items seized.

2          And then just a little further down the page

3    there is a line that says, NA, that says January

4    24th, 2019.  Two search areas, two alerts/indications

09:33:57   5    and no items seized.

6          But that's it.  There are just those three

7    where Tank performed an alert or they were -- Tank

8    was deployed, he alerted or indicated, and there was

9    not an item seized.

09:34:17   10          Is this what you would expect from a dog who

11   is being cued?

12   A.   We have no idea whether -- we can't tell anything

13   about cuing in this summary.  We have no idea if on

14   those times where it says search areas and then there

09:34:37   15   was an alert indication and items were seized, we

16   have no idea whether or not Officer Moore gave a

17   verbal cue, told his dog to sit.  Whether he did what

18   we saw in this case here where the dog actually

19   didn't do an indication and he said, yeah, yeah,

09:34:54   20   positive for drugs.  We can't tell anything about

21   that based on this summary here.

22   Q.   In total, there were 17 instances where Tank

23   either alerted or indicated.  17.

24   A.   Okay.

09:35:08   25   Q.   And 14 of those instances items were found and

1    seized.

2    A.    Okay.

3    Q.    And only three where they were not?

4    A.    Okay.

09:35:19    5    Q.    Would we expect a dog who is being cued to be

6    successful 14 out of 17 times?

7    A.    It's entirely possible if there is an expectation

8    that, um, there is a likelihood that you have

9    narcotics in the vehicle and we need a reason to get

09:35:35    10    in there.

11    Q.    At the same time, 12 other instances where Tank

12    was deployed and there was not an alert or an

13    indication?

14    A.    I'm sorry, could you say that again?

09:35:45    15    Q.    There were 12 other instances where Tank was

16    deployed and there was not an alert or an indication?

17    A.    Okay.

18    Q.    Does that not contrast with his success rate on

19    the other 17 cases?

09:36:00    20    A.    Well, I'm curious.  So where you have a search

21    and there is no alert indications, we would have to

22    get into the details on that because how are they

23    validating that there was nothing there.

24          If the dog doesn't alert -- let's say these

09:36:14    25    are vehicles -- we don't know, we don't know anything

1   about these.  If it's a vehicle and the dog doesn't

2   alert, how are they getting in to do the search to

3   demonstrate there is nothing there.  I mean, I can't

4   answer these questions, nobody can, based on just

09:36:27   5   these numbers.

6   Q.   Well, let me ask you some questions about

7   these -- generally about a dog alert with a -- excuse

8   me, a deployment or a sniff where the dog does alert

9   or indicate, a search is performed, and there is not

09:36:48   10   an item found.  Is that a common occurrence?

11   A.   I don't know.

12   Q.   Have you seen it happen before?

13   A.   Yes.

14   Q.   Do you have explanation for why that might occur?

09:37:00   15   A.   Yes.

16   Q.   And could you provide that for us, please?

17   A.   Well, sometimes not everybody is great at

18   searching, physically searching.  So it is entirely

19   possible that the officers missed.  They don't always

09:37:12   20   take the vehicle down and have it fully processed.

21   They just search there.  So it is entirely possible

22   that the dog is correct and there is nothing there.

23         It is entirely possible that -- let me make

24   sure I'm understanding.  The dog alerts and they

09:37:25   25   don't find anything.  Why does that happen?

1          Yeah, they don't do a thorough job searching.

2  Um, it's possible that it's just hidden.  It's

3  possible that there was something there 30 seconds

4  before they got pulled over and it's not there at the

09:37:42   5  time.

6  Q.  I would like to look at just a couple of portions

7  of the video with you as well and then I think we'll

8  wrap this up.

9  A.  I'm sorry, I can't see it.  Now I see it.

09:38:57  10  Q.  Ms. Stirba did that real cool thing showing the

11  video at half speed and I'm not technologically

12  sufficient to make that happen.  I think that was a

13  lot more effective.

14          (Whereupon, Exhibit 10 was played

09:39:51  15           for the record.)

16  Q.  (By Mr. Brotherton) So what we saw there was Tank

17  was deployed at the rear driver's side of the

18  vehicle.  Officer Moore gave an indication for him to

19  search.  Um, he sniffed along the trunk area, he

09:40:04  20  raised his head in an arc above the license plate,

21  went to the passenger side and then on his own came

22  back to the rear of the vehicle.  Is that fair?

23  A.  We don't actually hear Officer Moore give him a

24  command to search.  So all we see is that he starts

09:40:20  25  the dog.

1    Q.   He does give him a visual cue.  He points to the

2    corner of the car.

3    A.   Um, that's not the same thing as a search

4    command.

09:40:30    5             (Whereupon, Exhibit 10 was played

6                  for the record.)

7                  THE WITNESS:  I don't actually see him

8    pointing.

9    Q.   (By Mr. Brotherton) Um, okay.

09:40:52    10    A.   And yesterday I did hear Officer Moore say that

11    he started him with a verbal command but we can't

12    hear that.  So I assumed that, perhaps incorrectly,

13    that that is what you were referring to.

14    Q.   Okay.  He did say that his verbal command was

09:41:06    15    "dope"?

16    A.   Find dope.

17    Q.   Is that correct?

18    A.   That's what I remember.

19    Q.   That's what I remember as well.

09:41:10    20    A.   Yes.

21    Q.   We can't hear it on the video, but Tank does

22    begin a search there; is that fair to say?

23    A.   Yes.

24    Q.   Okay.

09:41:16    25             (Whereupon, Exhibit 10 was played

235

1               for the record.)

2          THE WITNESS:  So he is pretty close to the

3    vehicle, wouldn't you say.  He is --

4    Q.  (By Mr. Brotherton) I'll ask you to wait until I

09:41:28   5    ask you a question, please.

6          The question I asked was he starts at the

7    back rear corner, sniffs in an arc above the license

8    plate, goes to the passenger side and then on his own

9    returns to the rear of the vehicle.  Is that -- is

09:41:45  10    that fair to say?

11   A.  Yes.

12   Q.  One of the things we talked about is

13   Officer Moore indicated returning back to the scent

14   is one of those alert behaviors that communicated to

09:42:00  15   him the presence of target odor.

16          Is that not what we're seeing in this video,

17   Tank returning back to the presence of target odor?

18   A.  We can't tell that Tank is returning to the

19   presence of target odor, no, because we can't see it

09:42:18  20   and we don't know for sure.

21   Q.  But it is the same behavior we would expect to

22   see from a dog who has scented target odor, left that

23   odor, and is seeking to come back to it, is it not?

24   A.  What I was starting to explain, if I may, to

09:42:35  25   address your question, when he starts him on the back

236

1    of the vehicle, the dog is very close to the back of

2    the vehicle, square on.  So that arc that he does is

3    the way that he is able to move along the vehicle.

4    He started right up against it.  I'm not going to

09:42:55   5    disagree with you that the dog -- about the fact that

6    the dog comes back towards the trunk.  It's obvious

7    that he does that.  Yes.

8    Q.   He has got his mouth closed when he lifts his

9    head up above the trunk?

09:43:13   10   A.   Can we see it again?

11                  (Whereupon, Exhibit 10 was played

12                   for the record.)

13                  THE WITNESS:  So it appears that his mouth is

14   closed there, yes.

09:43:36   15   Q.   (By Mr. Brotherton) When he returns back to the

16   trunk, his mouth is closed and he is sniffing?

17   A.   Right there he is sniffing the ground.

18                  (Whereupon, Exhibit 10 was played

19                   for the record.)

09:43:51   20                  THE WITNESS:  Actually, his mouth is opening

21   and closing.  We can see that.

22   Q.   (By Mr. Brotherton)  Tank's behavior here is not

23   sniffing the ground, though?

24   A.   That's correct.

09:44:28   25   Q.   He has walked toward the rear of the car,

237

1    stopped, and again turned back up the driver's side?

2    A.   Yes.

3    Q.   That same kind of behavior where he has come from

4    one direction and then on his own turned and gone

09:44:41    5    back in the other direction?

6    A.   That's true.

7    Q.   And, again, that is what Officer Moore testified

8    he looks for when Tank is in the presence of target

9    odor?

09:44:48    10    A.   Okay.

11         (Whereupon, Exhibit 10 was played

12          for the record.)

13    Q.   (By Mr. Brotherton)  And, again, sniffing low,

14    mouth closed, then at the license plate, and then up

09:45:06    15    again high, again mouth closed.  Is that fair to say?

16    A.   Yes.

17    Q.   Those are all behaviors we would expect to see of

18    a dog that is encountering some kind of an odor?

19    A.   Those are behaviors we would expect to see of a

09:45:19    20    dog encountering some kind of an odor.

21    Q.   Now, I know you talked about the taut leash so I

22    won't try to say Tank comes back on his own here, but

23    we do return to the driver's side.

24         (Whereupon, Exhibit 10 was played

09:45:35    25          for the court.)

```
        1   Q.   (By Mr. Brotherton)   And this part of the video

        2   is kind of important because we can't see what Tank

        3   is doing.  He is almost completely blocked by the car

        4   and by Officer Moore.  Is that fair?

09:45:51 5   A.   That's true.

        6   Q.   So we can't actually see his behavior there, but

        7   we can compare and contrast the amount of time he

        8   spends on this side of the car versus other places on

        9   the car?

09:46:04 10              (Whereupon, Exhibit 10 was played

        11              for the court.)

        12  Q.   (By Mr. Brotherton)   And again, as he comes down

        13  the driver's side, turns around the back of the car,

        14  and then immediately turns his head back up towards

09:46:27 15  the driver's side?

        16  A.   That's not true.  Look where his head is.  He

        17  actually does change his direction 180 degrees and he

        18  flips it out to traffic.

        19              (Whereupon, Exhibit 10 was played

09:46:34 20              for the record.)

        21  Q.   (By Mr. Brotherton)   I see him sniffing the car

        22  there --

        23  A.   At that point --

        24  Q.   -- as he continues back up the driver's side?

09:46:42 25  A.   That's correct at that point but not where you
```

1  had stopped the video before.  That's not what we

2  saw.

3  Q.   Okay.  Let's watch it all in context then.

4        (Whereupon, Exhibit 10 was played

09:47:01  5        for the court.)

6        THE WITNESS:  Right there and then he goes

7  back to the car.

8  Q.   (By Mr. Brotherton) That movement up the driver's

9  side is not cued by Officer Moore?

09:47:13  10  A.   What do you mean?

11  Q.   He doesn't give a verbal or visual command to go

12  back up the driver's side?  He doesn't pull the dog

13  with the leash to go back up the driver's side?

14  A.   We have no idea what he says to the dog.

09:47:24  15  Q.   Well, we can see that he doesn't give a visual

16  command?

17  A.   You said a verbal cue.  Maybe I misheard you.

18  Q.   I said both, but you're right, we can't hear if

19  he says anything to the dog.  We can hear some things

09:47:37  20  on the video, right.  We can hear traffic going by,

21  we can hear the dock bark, we can hear officers

22  speaking?

23  A.   We can hear other things, yes.

24  Q.   It would stand to reason that we should also be

09:47:49  25  able to hear Officer Moore if he gives a command?

240

1 A. That's not true.

2 Q. We do see -- we are able to see what he is doing

3 though.  He doesn't -- he doesn't pull Tank back with

4 the leash?

09:48:01  5 A. Um, on that part, no.

6 Q. He doesn't use a hand gesture to direct him back

7 up the driver's side?

8 A. I didn't see one.

9    (Whereupon, Exhibit 10 was played

09:48:08  10    for the record.)

11 Q. (By Mr. Brotherton)  From Officer Moore's

12 position it appears he expects Tank to continue

13 towards the trunk area?

14 A. What was the question?

09:48:36  15 Q. There is nothing that he does that would cue Tank

16 to go back up the driver's side there.  Is that fair

17 to say?

18 A. Well, he is continuing with the dog.  Sure, he

19 could stand there, he continues with the dog, he lets

09:48:50  20 the leash out.  I mean it sounds -- I'll let you ask

21 the questions.

22 Q. I guess my question is, Tank going back up the

23 driver's side of the door is voluntary?  It is Tank's

24 decision to do it?

09:49:01  25 A. Yes.  Yes.

1      MR. BROTHERTON:  Okay.  I don't have any

2  further questions, Your Honor.

3      THE COURT:  Redirect?

4      MS. STIRBA:  Just a few questions.

09:49:56  5                  **REDIRECT EXAMINATION**

6  BY MS. STIRBA:

7  Q.   Dr. Cablk, during direct we talked about two

8  forms of potential bias in K9 detection.  One is

9  cuing, when the dog gets a cue either intentional or

09:50:25  10  not from something other than the target odor.

11       Could you explain the second form again in

12  terms of the handler's bias?

13  A.   That is where a handler has a belief about an

14  outcome of a search and misinterprets the behavior of

09:50:42  15  the dog.

16  Q.   Even if we say that Officer Moore in no way cued

17  Tank during the search of Mr. Jordan's car, is there

18  still the danger of handler bias in this case?

19  A.   Yes.

09:51:00  20  Q.   To work a vehicle, does the dog necessarily have

21  to sniff it?

22  A.   Yes.

23  Q.   And to sniff, does a dog necessarily have to

24  engage in sniffing behavior?

09:51:12  25  A.   Yes.

1  Q.   If a dog sniffs something more than once, or even

2  multiple times, is that unique to target odor?

3  A.   No.

4  Q.   Could it be anything?

09:51:24  5  A.   Yes.

6  Q.   And even if Officer Moore is right about all of

7  these so-called alert behaviors, are those -- for

8  Mr. Jordan's car, are those unique to target odor?

9  A.   No.

09:51:42  10  Q.   Can we tell with any degree of confidence, in the

11  absence of Tank doing a trained final response, based

12  on what we see, that Tank is smelling target odor?

13  A.   No.

14  Q.   Mr. Brotherton asked you some questions about

09:51:59  15  Tank's deployment summary from October 20th, 2018 to

16  March 1st, 2019.

17        Can we tell anything about Tank's reliability

18  based on this document?

19  A.   No.

09:52:12  20  Q.   Why not?

21  A.   Reliability can only be calculated where you know

22  the outcome with certainty.  And deployments on the

23  street are never known with certainty.

24  Q.   So even if Tank searched 17 times and did

09:52:30  25  something that -- sorry, let me rephrase.

243

1          Even if Tank sniffed a car 17 times before he

2     sniffed Mr. Jordan's car, and there was a search and,

3     lo and behold, they found something, does that in any

4     way indicate his reliability.

09:52:47   5     A.   It doesn't.  It does not go into the reliability

6     calculation because we don't know anything about the

7     other three aspects.

8     Q.   Based on your review of the records, can we in

9     any way calculate Tank's reliability?

09:53:10   10    A.   No.

11              MS. STIRBA:  I have no further questions.

12              MR. BROTHERTON:  Can I ask just one question,

13    Your Honor?

14              THE COURT:  You may.

09:53:16   15                    **RECROSS-EXAMINATION**

16    BY MR. BROTHERTON:

17    Q.   This is just a brief follow-up.

18              Your testimony then is a dog that performs a

19    sniff, makes an alert or an indication, and then a

09:53:28   20    subsequent search reveals a narcotic, let's say in

21    the vehicle, that successful or that correct alert or

22    indication does not help -- does not aid in assessing

23    a dog's reliability?

24    A.   That does not go into the reliability

09:53:47   25    calculation.  You can have one success and 9,000

244

1    misses.

2          MR. BROTHERTON:  Okay.  That's all I wanted

3    to know.

4          THE COURT:  Would you explain, for purposes

5    of establishing probable cause, why in your

6    experience and based on your opinion is it important

7    to have a trained final response?

8          THE WITNESS:  It's not a natural behavior.

9    It is deliberately taught to a dog so that the dog

10   understands this is how I signal that I have target

11   odor and I'm going to be rewarded for doing so.  It

12   is the definitive signal.

13         THE COURT:  And why is it, in your opinion as

14   I understand it, unacceptable to rely upon the

15   handler's interpretation of the dog's alerts or

16   natural responses?

17         THE WITNESS:  Not everybody can correctly

18   read dog behavior.  Not all handlers are trained the

19   same.  The behaviors that you see, that we talked

20   about, are not unique to target odor.

21         There is so much subjectivity that goes into

22   that reading of the dog and we know that that's one

23   of the forms that handlers can be biased to

24   misinterpret, to exaggerate, to not understand.  What

25   happens when the dog does something that you have

09:54:02
09:54:22
09:54:43
09:54:57
09:55:16

1    never seen it do before -- and that happens -- what

2    does that mean?

3              THE COURT:  Okay.  Any follow-up to my

4    questions?

5              MS. STIRBA:  No, Your Honor.

6              MR. BROTHERTON:  No.

7              THE COURT:  Thank you for your testimony.

8              Does the defense have additional witnesses to

9    call?

10             MS. STIRBA:  No additional witnesses, just

11   evidence, Your Honor.

12             THE COURT:  Any additional witnesses by the

13   prosecution?

14             MR. BROTHERTON:  Your Honor, we would ask an

15   opportunity to present a rebuttal witness.  I don't

16   have a person available at this time, but based on

17   the testimony provided this morning and the questions

18   posed by the Court, we would like an opportunity to

19   present rebuttal evidence.

20             THE COURT:  Well, you gave no notice of any

21   expert and you have known about an expert.  I don't

22   think that you have satisfied the procedural

23   requirements to reserve that right.

24             MR. BROTHERTON:  I have had a week's notice

25   of Dr. Cablk's testimony today.  That's when I

1   received notice of her testimony was a week ago, I

2   believe.

3           THE COURT:  Well, you could have taken some

4   steps to address that issue if you thought that you

09:56:28   5   had the need to acquire an expert and didn't have

6   sufficient time.  You could have requested that from

7   the Court.  But to wait until we have completed the

8   hearing and then say, well, now I want to go find an

9   expert to come back and rebut this testimony doesn't

09:56:42   10   seem to me that that's appropriate or allowed

11   procedurally.

12           MR. BROTHERTON:  Your Honor, my request is

13   based mostly in hearing the testimony presented by

14   Dr. Cablk this morning.

09:56:55   15           THE COURT:  It's not different from her

16   report.

17           MR. BROTHERTON:  Okay.  Thank you.

18           THE COURT:  Do you even have an expert in

19   mind?

09:57:03   20           MR. BROTHERTON:  I do.  Dr. Cablk testified

21   regarding Mr. Wendell Nope.

22           THE COURT:  I have heard Mr. Nope before.  If

23   you have read *Esteban* you can assess how this Court

24   would deal with Mr. Nope.

09:57:14   25           MR. BROTHERTON:  I understand, Your Honor.

```
 1    Thank you.
 2              THE COURT:  Any further -- you can step down
 3    and you're excused.
 4              Is there additional evidence that the defense
 5    wishes to present?  Did I understand you correctly?
 6              MS. STIRBA:  Yes.  Just to enter into the
 7    record, first, we would ask to enter Defense
 8    Exhibit 6 which is Tank's training log from the
 9    PackTrack Report.  And second is Defense Exhibit 7
10    which are Tank's veterinary records.
11              THE COURT:  Any objection?
12              MR. BROTHERTON:  No, Your Honor.
13              THE COURT:  Those will be received.
14              (Whereupon, Government's Exhibits 6 and 7
15               were received into evidence.)
16              THE COURT:  Anything further?
17              MS. STIRBA:  Nothing for the defense.
18              THE COURT:  Do the parties wish to brief this
19    issue?
20              MR. BROTHERTON:  Yes, Your Honor.
21              MS. STIRBA:  Yes, Your Honor.
22              THE COURT:  Laura, when could they expect to
23    have a transcript?
24              THE COURT REPORTER:  March 23rd.
25              THE COURT:  The 23rd.  If we have the
```

09:57:27
09:57:46
09:57:52
09:57:59
09:58:18

248

1   transcript on March 23rd, how much time does the

2   defense need to prepare a brief?

3           MS. STIRBA:  Three weeks.

4           THE CLERK:  April 13th.

09:58:36   5           THE COURT:  April 13th.

6           How much time does the United States need to

7   respond?

8           MR. BROTHERTON:  If we could have the same

9   three weeks, Your Honor, please.

09:58:44   10           THE CLERK:  May 4th.

11           THE COURT:  That would be the date.  Let's

12   set a time for oral argument.  I am concerned

13   somewhat about this briefing schedule but I think I

14   am going to allow it.

09:59:03   15           Mr. Jordan is in custody and there appears to

16   be serious issues and I think we should not extend

17   the time that he remains in custody while we resolve

18   this issue.

19           MS. STIRBA:  Your Honor, I can actually amend

09:59:14   20   the briefing schedule.  I could have it done -- if I

21   get the transcript on the 23rd, I could have it done

22   April 3rd.

23           THE COURT:  Okay, let's do that.  Yours are

24   due on April 3rd.

09:59:25   25           Mr. Brotherton?

1          MR. BROTHERTON:  I would like to have an

2    opportunity to read and respond to defense brief.

3    Um, it looks like she has asked for about two weeks

4    after receiving the transcript.  If I could have two

09:59:38   5    weeks.

6          THE COURT:  If we go two weeks from

7    April 3rd.

8          THE CLERK:  April 17th.

9          MR. BROTHERTON:  Thank you.

09:59:43   10         THE COURT:  Let's make that the 17th.

11         And based on that schedule, what would be the

12   hearing time?

13         THE CLERK:  Wednesday, April 29th, at

14   3:00 p.m.

09:59:57   15         THE COURT:  Let's set that as the hearing.

16         MS. STIRBA:  Your Honor, I would say that in

17   light of the evidence that this hearing has produced,

18   we would ask for the Court to release Mr. Jordan

19   while we litigate this issue.

10:00:12   20         If the Court doesn't want to address this off

21   the cuff right now, that's fine.  But I just ask.  If

22   the Court is completely opposed to it, I won't brief

23   it, but if the Court is open to --

24         THE COURT:  I'm open to entertaining a motion

10:00:24   25   to review of detention.  And if you wish to make that

1    motion and provide appropriate evidence for the Court

2    to consider, I will act on the motion.

3         MS. STIRBA:  Yes, Your Honor.

4         THE COURT:  I'll act on the motion for

10:00:36   5    detention.

6         MS. STIRBA:  Very well.

7         THE COURT:  It seems to me that there is a

8    sufficiently serious issue on this case that we need

9    to seriously think about whether or not Mr. Jordan

10:00:44  10    should remain in detention pending the outcome of

11    this motion.

12        MS. STIRBA:  Thank you.

13        THE COURT:  Anything further before we

14    recess?

10:00:52  15        MR. BROTHERTON:  No, Your Honor.

16        MS. STIRBA:  No, Your Honor.

17        MR. RICE:  Thank you, Your Honor.

18        THE COURT:  We will be in recess.

19        (Hearing concluded at 10:00 a.m.)

20

21

22

23

24

25

1          **REPORTER'S CERTIFICATE**

2

3          I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7          That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12         That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15         In witness whereof I have subscribed my name

16   this 20th day of March, 2020.

17

18                    _____

19                    Laura W. Robinson

20                    RPR, FCRR, CSR, CP

21

22

23

24

25