IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**DESMOND TRAVIS JORDAN,**<br><br>**Defendant.** | **MEMORANDUM DECISION AND ORDER GRANTING LEAVE TO DISMISS THE INDICTMENT AND GRANTING MR. JORDAN'S MOTION TO SUPPRESS**<br><br>Case No. 2:19-cr-125<br><br>Judge Clark Waddoups |

Before the court is a Motion to Suppress filed by Defendant Desmond Travis Jordan, which seeks to suppress all evidence obtained during a traffic stop on February 28, 2019, on the basis that, among other things, the police searched Mr. Jordan's car without a warrant or probable cause. (ECF No. 22). The court held an evidentiary hearing on Mr. Jordan's motion on March 3 and 4, 2020 (the "Hearing"), at which it heard testimony from Detective David Allen, the investigating officer, Officer Clinton "CJ" Moore, the K9 handler, and Dr. Mary Cablk, an expert retained by Mr. Jordan. Following the Hearing, the court requested the parties to submit proposed findings of fact and briefing, and set a date for the court to hear oral argument. Rather than submitting briefing and proposed findings, on March 31, 2020, the United States moved for leave to dismiss the Indictment against Mr. Jordan with prejudice due to "inter alia, a lack of prosecutable evidence and for good cause." (ECF No. 44). This motion is also now before the court. Mr. Jordan does not oppose the dismissal. The court finds that the United States lacks prosecutable evidence and that the motion to suppress is well taken. The court, therefore, **GRANTS** the United States' Motion for Leave to Dismiss the Indictment. Moreover, after considering the merits of Mr. Jordan's Motion to Suppress, and the evidence presented at the

Hearing, it also **GRANTS** the Motion to Suppress.  Under the Rule 48(a) of the Federal Rules of Criminal Procedure, the United States is required to seek leave of court to dismiss an indictment.  Where the United States has proceeded on the merits of the charge and, as in this case, proceeded to oppose a motion to suppress evidence for lack of probable cause, the court has a responsibility to rule on the merits of the motion.  Moreover, the development of the law requires that conduct of the officers be assessed to provide guidance in the arena of K9 sniffs.

## BACKGROUND

### A. The Traffic Stop

On February 28, 2019, Detective Allen, a four-and-a-half-year veteran of the West Valley City Police Department, was conducting surveillance at an address he believed to be the residence of Mr. Jordan.  (ECF No. 41 at 6:4–7:20).  While conducting surveillance, Detective Allen called Officer Moore, a K9 officer for West Valley City Police Department, to alert him that he was conducting surveillance and ask him to "be available" if a vehicle left the home so that Officer Moore "could assist [him] on a traffic stop and a K9 sniff."  (*Id.* at 14:21–15:17).

Shortly thereafter, Detective Allen saw a silver Mazda Protégé leave the home, and he followed the vehicle.  (*Id.* at 10:12–15).  Detective Allen, based on prior investigation, believed the vehicle was registered to Mr. Jordan, but he did not know that Mr. Jordan was driving the vehicle when he began following it.  (*Id.* at 8:11–9:8; 10:4–17).  Almost immediately, Detective Allen called Officer Moore and alerted him that Mr. Jordan had left the home, again putting him on notice to be available with his K9.  (*See* Video of Pursuit, admitted as Gov. Ex. 9 at Suppression Hearing, hereinafter "Gov. Ex. 9").  Within one-and-a-half to two minutes of beginning to follow the vehicle, Detective Allen initiated a traffic stop after observing that Mr. Jordan was speeding.  (ECF No. 41 at 10:18–11:2).

After informing Mr. Jordan of the reason for the traffic stop, Detective Allen obtained Mr. Jordan's identification and returned to his vehicle. He then called Officer Moore again and gave him his location so that Officer Moore could respond to his location to conduct a K9 sniff; Officer Moore responded that he was on his way. (*Id.* at 14:16–16:1, 33:21–34:11; Video of Traffic Stop, admitted as Gov. Ex. 10 at Suppression Hearing, hereinafter "Gov. Ex. 10"). At this point, there was no reason for the stop other than the traffic violation. Detective Allen then completed a search of Mr. Jordan's name through a database, the results of which showed that Mr. Jordan's license had been suspended. (ECF No. 41 at 11:19–13:20). Detective Allen returned to Mr. Jordan's vehicle, told Mr. Jordan that his license had been suspended, and inquired as to whether he had a license in another state. (*See* Gov. Ex. 10). Detective Allen returned to his car, waiting for approximately three minutes, until Officer Moore arrived at the location. (*Id.*). Detective Allen informed Officer Moore that he was "waiting for a licensed driver" to come get Mr. Jordan's vehicle and that Officer Moore could therefore "take his time." (*Id.*). Detective Allen then returned to Mr. Jordan's vehicle, asked him to step out of the vehicle and to call a licensed driver to come pick up the vehicle. (*Id.*). It is undisputed that Mr. Jordan had indicated that a licensed driver was available and would pick up the car. There is no indication that Detective Allen was intending to impound the car. Officer Moore then approached with his K9, Tank, and initiated an exterior sniff of the vehicle. (*Id.*).

**B. Tank's Training**

Tank was imported from Slovakia in March 2018 to a kennel in Ogden. The West Valley City Police Department got him from the kennel shortly thereafter. (ECF No. 41 at 113:23–114:10). At an initial veterinary visit in April 2018, in which Officer Moore participated, Tank was diagnosed with mild chronic bilateral hip degenerative joint disease and a suspicion for hip

3

dysplasia. (*Id*. at 114:14–115:11). It is important for the K9 to be in good health because pain or other health conditions may impact the dog's ability to be successfully trained and perform.

Officer Moore began training Tank through the Utah POST program ("Utah POST") in April 2018. Tank graduated from, and was certified by, that program in July 2018. (*Id*. at 56:22–58:24; 115:12–17). Most of the training was related to narcotics. (*Id*. at 58:3–61:3). Tank was trained to detect and respond to the odors of marijuana, heroin, cocaine, and methamphetamine. (*Id*. at 50:3–8).

In its training course, Utah POST recognizes two tiers of behaviors that K9s may exhibit in response to the odor of narcotics.  One is an innate natural response; the other is a trained response. To be certified as a drug dog, the animal must consistently demonstrate the trained response when the target odor is present. A dog will not pass certification if it only demonstrates the innate natural response, which may also be demonstrated in response to any item of interest to the dog, such as food or the scent of another animal. In its handbook, Utah POST characterizes "innate natural behaviors that a dog does when it smells something of interest" as an "alert." Such a natural response may include a long list of dog behaviors, including "[c]losed mouth sniffing" and "change in the movements of the dog seeking the highest concentration." (ECF No. 42 at 199:8–24).  Practically, the list of behaviors includes any change in the dog's actions that may indicate interest or excitement by the dog. The list is not specific or distinctive to any particular item of interest to the dog. The Utah POST manual does not define the particular behavior or any required number of behaviors necessary to conclude that the dog has focused on a particular odor or that the odor in which the dog is showing interest in the target order. These alert behaviors are not unique to detecting the odor of narcotics, but are "consistent with the dog smelling anything of interest."

4

To be certified as a drug dog, Utah POST requires the dog to demonstrate behavior that a dog is trained to perform when it detects the highest concentration of a target odor. (*Id*. at 199:4–201:3). The Utah POST manual defines this behavior as an "indication" or "trained final response." The manual states it is "the specific taught behavior that Tank uses to tell [his] handler 'I am detecting a target odor.'" (ECF No. 41 at 116:5–7). It is intended to be distinctive behavior from the natural behavior a dog demonstrates in response to any item of interest. In Tank's case, his trained final response was to "stop movement in front of the source of the odor" and "sit or lay down and focus on the sources of that odor." (*Id*. at 117:7–19). Because Tank's trained final response is a "specific instructed behavior," the only time he exhibits it is when he has detected the odor of any of the four narcotics he was trained to find—marijuana, heroin, cocaine, and methamphetamine. (*Id*. at 118:9–119:18). This trained final response is imperative because it is a "definitive signal" that is "deliberately taught to a dog so that the dog understands this is how I signal that I have target odor"—it is an objective display that removes the "subjectivity that goes into" reading a dog's behavior. (ECF No. 42 at 245:4–246:2).

As part of Tank's training, Officer Moore regularly worked with Tank to perform his trained final response. (*Id*. at 119:2–120:14). Once Tank completed enough of these training searches that he had "shown that he can locate narcotics and bypass any other novel odors that might be present in these real-world setting," he was tested for certification. (*Id*. at 59:6–14). His certification requirements required that he be able to consistently perform his trained final response during his training searches. (*Id*. at 120:11–121:10). Officer Moore testified that after Tank was certified, they continued to regularly train, both for obedience and drug locating. (*See id*. at 134:13–19).

Notwithstanding Officer Moore's testimony, evidence at the Hearing raised serious questions about the sufficiency and veracity of Tank's training. First, the police training records supported that between July 2018, when Tank was certified, and November 2018, Officer Moore only conducted four narcotics trainings with him. (*Id.* at 134:13–135:14; *see also* Gov. Ex. 7). Moreover, from October 20, 2018 through March 1, 2019, a period that enveloped the search of Mr. Jordan's vehicle, Officer Moore only performed one narcotic training exercises that involved searching an area that did not contain narcotics, compared to 27 "normal" exercises where there were narcotics present to be found. (*Id.* at 135:22–137:6; Def. Ex. 4). As discussed below, it is important for tests to be conducted in which neither the handler nor the supervising judge knows whether narcotics are present. Otherwise, the handler will continue the search until the drugs are found, and cuing may defeat the value of the dog being an objective basis for detecting the presence of the drugs. During that same period, records show that Officer Moore did not perform any "negative controlled exercises" and only performed one "blind" exercise. (ECF No. 41 at 137:7–138:12; Def. Ex. 4).[1]

To address the importance of well-founded training and the need for an objective trained final response, Mr. Jordan called Dr. Mary Cablk. Dr. Cablk is an expert with 20 years' experience studying and teaching K9 detection and training. (ECF No. 42 at 172: 4–5). Dr. Cablk is a member of the American Academy of Forensic Sciences and the Nevada POST K9 Committee. She is a POST K9 Evaluator in Nevada and a POST instructor in California; has assisted numerous law enforcement agencies in training and deploying K9s; has personally trained K9s and K9 handlers; and has extensively researched, lectured, and offered testimony on

---

[1] While Officer Moore suggested these records may be incomplete, the court finds no basis to support such a suggestion and does not find his testimony on the subject to be credible. (*See* ECF No. 41 at 138:12—142:22).

the topics of K9 training, detection, and deployment. (*Id*. at 171:3–175:4). The court finds the testimony and opinions that Dr. Cablk offered at the Hearing to be well founded, credible, and persuasive. Dr. Cablk's testimony and opinion was not countered by any opposing expert testimony and was not meaningfully questioned on cross-examination. The United States did not offer any expert testimony at the Hearing.[2]

A critical aspect of Dr. Cablk's testimony was her discussion of handler bias or "cuing." (*See id*. at 178:7–183:3). The United States offered no testimony to contradict or challenge Dr. Cablk's testimony and, indeed that testimony appears to be well supported in the scientific literature. She explained that because dogs are "extremely sensitive to our body positioning and our facial expressions," a handler, even "the best intentioned handler" with the "best of dogs" can inadvertently impart bias on a dog, leading the dog to potentially "do its final indication whether or not it has target odor." (*See id*. at 178:7–179:16). In short, cuing "interferes with independence of the dog, [and] interferes with the definitiveness of the [dog's] signal." (*See id*. at 178:24–179:4). Thus, when the handler knows, or believes, drugs may be present, the dog will sense the cuing from the handler and continue to search until the handler cues the animal to discontinue the search.

Dr. Cablk opined that in order to properly train a K9, a program must take steps to prevent handler bias and cuing, namely through blind training. (*Id*. at 182:23–183:3). Single-blind training occurs when the handler does not know how many, if any, quantities of narcotics are hidden in a scenario, but someone else present does. (*Id*. at 185:10–14). The third person

---

[2] While the United States orally requested to postpone the hearing so that it could present Mr. Wendell Nope as a rebuttal witness, the court denied the request on the grounds that the United States failed to take sufficient steps to either arrange for Mr. Nope to testify or to request additional time, before the hearing, so that it could make such arrangements. Moreover, the court has already heard from Mr. Nope on this topic. *See United States v. Esteban*, 283 F. Supp. 3d 1115 (D. Utah 2017).

may be present to judge whether the dog passed the test. Such a procedure is important because when a handler knows how many hides are present in a scenario, he will continue to search with his dog until the dog finds them all, which does not create a "realistic scenario that mimics what happens on the street." (*Id.* at 188:5–18). Single-blind testing is important to train a dog to work independently and in turn gives a handler confidence in his dog. (*Id.* at 188:19–25). Nevertheless, single-blind training is insufficient to prevent bias and cuing. Even if the handler does not know how many hides are present in a scenario, research shows that *anyone* who is present for the training and knows the quantity and/or location of the hidden narcotics, even the judge, can inadvertently cue the K9. (*Id.* at 185:19–186:9). Thus, in Dr. Cablk's opinion, the "only means that you can use to demonstrate the reliability of a K9" is to have no one who is present during the training know how many, if any, hides are present. (*See id.* at 186:4–9). This is considered double-blind training.

Utah POST does not use double-blind training or testing (*id.* at 189:3–4), and its certification testing is not even done single-blind, as the handler knows exactly how many hides will be present. (*Id.* at 187:9–188:4). The general absence of, and seemingly unawareness of the importance of, blind training as part of the Utah POST program was demonstrated by Officer Moore's equating blind training with "controlled negative training." (*Compare* ECF No. 141 at 62:13–63:18 *with* ECF No. 142 at 184:3–16). Given these deficiencies, along with additional aspects of the program that she found problematic,[3] Dr. Cablk opined that Utah POST is not a valid assessment of a K9's ability to detect the odor of target narcotics.

---

[3] These problematic aspects included Utah POST's failure to randomize the number of its hides (*see id.* at 189:17–192:12); its use of a complicated grade point average to certify dogs instead of a simple pass/fail criteria, which removes any subjectivity (*id.* at 192:13–194:1); the quantities of drugs it uses as its hides, which she believes lacks standardization (*id.* at 194:2–195:24).

Moreover, through cross-examination, it was demonstrated that Officer Moore was often not careful in accurately recording the training with Tank he did complete. Critical information about whether the training exercise involved a negative hide or whether Officer Moore knew that fact prior to the training was not recorded. From the records, it was impossible to determine whether Tank was in fact reliable or whether he was being intentionally or unintentionally cued to the presence of drugs.

### C. Tank's Sniff

Tank's sniff of Mr. Jordan's vehicle lasted approximately three minutes. (*See* Gov. Ex. 10). A review of the video shows that Officer Moore walked Tank around the vehicle three full times and made numerous additional passes of both sides of the vehicle and the vehicle's trunk. (*Id.*). Officer Moore repeatedly directed Tank's attention to certain areas of the vehicle, namely the trunk, driver's side door, and passengers' doors, by pointing to those areas and giving Tank a command or by tapping on that area of the vehicle. (*Id.*). Throughout the search, Tank's attention was often drawn away from the vehicle, and Officer Moore was repeatedly required to physically guide him back to the vehicle to continue sniffing the same. (*See id.*). Sometimes Tank was drawn to passing traffic. Other times he was drawn to something of interest on the sidewalk. The video does not confirm a consistent and intense interest by Tank in the vehicle or any odor coming from it.

Tank did not perform a trained final response while conducting a sniff of Mr. Jordan's vehicle. (*See* ECF No. 41 at 123:20–21). He never demonstrated any clearly objective behavior communicating that he had detected a target odor. Rather, Tank demonstrated the innate natural behaviors of a dog going through the paces of sniffing the vehicle. Officer Moore relied on Tank's natural behaviors, which he perceived as "alerts," to conclude that Tank had detected the odor of

narcotics emitting from Mr. Jordan's vehicle. (*See id.* at 90:14–20, 143:15–19 ("Q: The thrust of your direct is saying, I know he didn't do the trained final response for the indication, but I can tell, as his handler, from his behavior that I can see, that he is detecting narcotic, right? A: Yes.")). There is nothing on the video of the sniff from which a third person can objectively conclude that Tank had performed to respond as he had been trained to do when he detected a target odor. Indeed, Dr. Cablk, as a trained animal observer, reached the opposite conclusion, as discussed hereafter, that Tank's behavior repeatedly indicated he had not detected drugs.

At the conclusion of the sniff, Officer Moore appears to tell Detective Allen "yep," and Detective Allen informed Mr. Jordan that the dog "thinks there is something in the car" and that he was therefore going "to make sure" there was nothing in the vehicle. (*Id.*). Mr. Jordan acknowledged that he smoked marijuana, but "not much," and denied that there were any drugs in the vehicle. (*Id.*). Officers then conducted a search of Mr. Jordan's vehicle and found "a small amount of marijuana," a digital scale, and a firearm. (ECF No. 41 at 164:4–7). A review of the video shows that the "small amount of marijuana" appears to have been in the form of residue in an empty "pipe." (*See* Gov. Ex. 10). Mr. Jordan was thereafter charged with possession of marijuana and felon in possession of a firearm.

At the Hearing, Dr. Cablk reviewed each critical segment of the video of Tank's sniff. She explained what the dog was doing and stated her interpretation and opinions of the actions of Tank and Officer Moore shown therein. (*See* ECF No. 142 at 207:7–217:15). Based on her experience and training, she stated there was no objective basis upon which Officer Moore could interpret Tank's alleged "alerts," to communicate the presence of drugs. Among other things, Dr. Cablk testified that some of the alleged "alerts" were simply not present in the video,[4] that none

---

[4] Officer Moore was not wearing a body camera during the sniff, although he was required to under West Valley City Police Department policy. (ECF No. 41 at 77:4–14; 111:6–113:21). The only video of

of the cited behaviors were unique to a target odor of narcotics, that Tank's interest in the driver's side door could have easily been due to the presence of Detective Allen's familiar scent in the area, and that had Tank detected the odor of narcotics, there was nothing about the scenario or environment that would have prevented him from performing a trained final response. Dr. Cablk then offered her own analysis of Tank's behavior, stating that Tank sniffed the vehicle and then cleared and came off it "because he [didn't] have target odor," a fact that he "attempt[ed] to communicate that to his handler multiple times." (*Id.* at 217:3–9). In conclusion, she found that Tank's behavior in the sniff provided "nothing" that the officers could learn. (*Id.* at 217:10–13).

## **ANALYSIS**

Mr. Jordan moves to suppress the evidence obtained from the search of his vehicle on the ground that, among other things, the officers lacked probable cause to conduct the search. The officers' finding of probable cause was predicated on Tank's sniff of the vehicle and Officer Moore's belief and representation that Tank had determined that there were narcotics in the vehicle. (*See* Gov. Ex. 10). Mr. Jordan argues that Tank's sniff did not and could not reasonably support a finding of probable cause for the officers to search his vehicle.

The Tenth Circuit has stated that a dog's alert may give officers "probable cause to search [a] car and its contents." *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007); *see also United States v. Ludwig*, 641 F.3d 1243, 1250–51 (10th Cir. 2011) (finding "a positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to

---

the sniff was that captured by Detective Allen, who stood a distance from the vehicle in a stationary position. (*See* Gov. Ex. 10). Given the angle of Detective Allen's camera, portions of Tank's and Officer Moore's actions are not visible in the footage, as they are obstructed by the vehicle. To the extent that Officer Moore testified of events occurring that are not depicted on the video, the court finds the video to be the more reliable source of information.

11

search a vehicle"). The Tenth Circuit has also said, a K9 need not display a "final indication," and that probable cause may be supported by a dog's "alert." *See United States v. Parada*, 577 F.3d 1275, 1281–82 (10th Cir. 2009); *see also United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004) (recognizing that a dog's "alert . . . does not implicate the precision of a surgeon working with scalpel in hand," and that probable cause does not require such exaction). In none of these cases, however, does the Tenth Circuit analyze whether the "alert" testified to by the dog handler was sufficiently distinct from the dog's natural behavior to be objectively identifiable as a response to narcotics. Behavior by the dog that is so subjective that only the handler may be able to identify it risks allowing a search in violation of the Fourth Amendment that is based on nothing more certain that the officer's hunch that drugs may be present.

Allowing a K9's alert to support a finding of probable cause to search a vehicle on the unverifiable, subjective interpretation of the handler would seriously erode long protected Constitutional rights. K9 responses have been found sufficient to support probable cause sufficient to satisfy the Constitution because the dog's proven ability to detect the odor of a narcotic reduces the risk that an officer is simply acting on a hunch. This protection of the Constitutional right, however, becomes meaningless if the dog's communication of its detection of drugs is so subjective that it is nothing more certain than a reflection of the handler's hunch that drugs must be there. Because of this risk, a search based on such behavior must always be subject to review and challenge. The review and challenge is met by demonstrating both the handler and the canine's proper training and proven reliability. *See e.g.*, *Ludwig*, 641 F.3d at 1251 (noting that "it surely goes without saying that a drug dog's alert establishes probable cause only if that dog is reliable"); *see also United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993) (observing that "[a] dog alert might not give probable cause if the particular dog had a

12

poor accuracy record"). Moreover, over-arching the Tenth Circuit's willingness to recognize alerts as sufficient is the Supreme Court's long-standing recognition that "the 'touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno,* 500 U.S. 248, 250 (1991)). Here, Mr. Jordan has raised serious questions as to adequacy of Officer Moore and Tank's training and reliability, as well as to the reasonableness of this search.

### A. The court has serious concerns about Tank's training and reliability.

In allowing a K9's indication, or even its alert, to serve as a basis for finding probable cause to search an individual's personal property, we, as a society, are placing an enormous amount of trust, and indeed our very civil liberties, in the responses of creatures that have limited ability to communicate with us. It is therefore imperative that a K9 be meticulously trained so that we can be assured that its signals are clear and direct and that we, as a community, can be confident in the reliability of the message that the K9 is communicating. The Tenth Circuit has recognized that in assessing the reliability of a K9, "courts typically rely on the dog's certification." *Ludwig*, 641 F.3d at 1251. The courts have consistently recognized that that the training necessary to support certification must be completed successfully, that the certification must be current and updated through ongoing training, and that both must be supported by accurate and timely kept records. Here, the manner by which Tank was trained and certified, together with the supporting records, does not warrant such confidence.

First, the court finds, based on the testimony of Dr. Cablk and the records before it, that Utah POST Training inadequately addresses, and therefore fails to remove the risk of, inadvertent handler bias or cuing. Specifically, Utah POST's failure to implement double-blind training raises questions as to the independence of its K9s and casts doubt as to whether the K9s

are alerting or indicating because they actually detect the odor of narcotics or because they have learned that displaying such action is the best way to please their masters. This doubt is not allayed by Utah POST's certification process, as the final test that a K9 must pass in order to be certified is not even performed single-blind. As such, the K9's handler in the exam, who is the same officer who has worked with the K9 for months and has a clear interest in having his K9 be certified, knows exactly how many hides will be present in the exam and can therefore continue to search until the K9 finds them all. (ECF No. 42 at 187:9–188:18). Such an examination does not reflect a real-world setting and does not, therefore, indicate that a passing K9 can reliably detect, and communicate his detection of, narcotics in the field. The training and certification should objectively demonstrate that the dog can find the hides, and all of the hides, only when neither the handler nor the judge knows how many or where they were placed. Such a change in the training and certification would be easy and inexpensive.

Generally, the court should rely on the credentialing organization to manage the certification and training[5]. But that assumes that organization bases its credentialing on accepted and proven procedures. It also assumes that the organization consistently applies those procedures and that the K9 at issue has met the requirements. The requirements include repeated examination and testing and medical history. In this case, Tank's medical history and training raise additional questions as to his reliability. First, it is clear that Tank had hip problems that could be painful to him and therefore interfere with his abilities to perform his assigned tasks. (*See* ECF No. 41 at 114:14–115:11). Second, the court's above-discussed concerns with Tank's training and certification are enhanced by the nature and infrequency of Tank's post-certification

---

[5] The Tenth Circuit has stated that ordinarily courts should limit their task in review performance of K9 "to assessing the reliability of the credentialing organization, not individual dogs." *See Ludwig*, 641 F.3d at 1251.

training. Tank only underwent four narcotics trainings in the four months after he was certified, and in the following months almost all of his narcotics training consisted of scenarios that made it impossible for Tank to make a false-identification of narcotics. (*See id.* at 134:13–137:6; Def. Ex. 4; Gov. Ex. 7). These trainings are insufficient to maintain, let alone make up for the deficient nature of, Tank's initial training and certification and prepare him to perform in the real world. Moreover, the records of the training are incomplete and not reliable, as Officer Moore testified that sometimes he filled in reports from "muscle memory" and on occasion simply disregarded filling in boxes or providing information. (ECF No. 41, at 146) To meet the requirement to allow a K9's responses to satisfy the Constitutional requirement for probable cause, there must be a record supporting both the reliability of the K9 and the handler. There are lapses in this case as to both.

Given these concerns, the court declines to recognize Tank's certification by Utah POST as proof that the results of his sniff of Mr. Jordan's vehicle were reliable.

### B. The court has serious concerns as to whether the search of Mr. Jordan's vehicle, and specifically the officers' finding of probable cause, was reasonable.

Whether a search is "reasonable" under the Fourth Amendment "is measured in *objective terms* by examining the totality of the circumstances." *See Robinette*, 519 U.S. 33, 39 (1996) (emphasis added); *see also United States v. Hernandez*, 847 F.3d 1257, 1268 (10th Cir. 2017) (observing that "the Fourth Amendment requires at least 'some minimal level of objective justification for making [a] stop.'" (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989))). Here, an objective viewing of all aspects of Mr. Jordan's traffic stop and sniff raises serious questions as to the reasonableness of the Officers' search of Mr. Jordan's vehicle.

Officer Moore's finding of probable cause here was purely subjective. As discussed above, a K9's trained final response is an objective and "definitive signal" that a dog has

15

detected the odor of a narcotic in a vehicle, but here Tank did not display his trained final response.  (*See Compare* ECF No. 41 at 123:20–21 *with* ECF No. 42 at 245:4–246:2).  Rather, the determination that Tank had detected narcotics was made by Office Moore and was based on his interpretation of Tank's behavior and his subjective classification of those actions as "alerts." (*See* ECF No. 41 at 90:14–20, 143:15–19 ("Q: The thrust of your direct is saying, I know he didn't do the trained final response for the indication, but I can tell, as his handler, from his behavior that I can see, that he is detecting narcotic, right? A: Yes.").  Officer Moore conceded on cross-examination that the behavior he observed by Tank that he perceived as indicating the presence of drugs would not have satisfied the requirements for certification. (ECF No. 41, at 157). The purely subjective nature of Officer Moore's interpretation is enhanced by the fact that after objectively viewing footage of the sniff, Dr. Cablk, an expert with over 20 years' of experience in reviewing and judging K9 detection, concluded that the sniff indicated "nothing." (ECF No. 42 at 217:10–13).  All she observed was innate natural responses to the K9 going about the search. Nothing was definite and certainly not a clear communication by the dog that he had detected narcotics. The court reached the same conclusion after objectively viewing the sniff twice at the Hearing and numerous more times in drafting this order.  Indeed, absent Officer Moore's mono-syllabic "yep," the video contains no evidence that could be interpreted by an objective viewer as showing, let alone indicating, that Tank had detected the scent of narcotics in Mr. Jordan's vehicle.

      Thus, the finding of probable cause here was based solely on Officer Moore's subjective interpretation of what he believed Tank's actions meant.  Such a finding cannot be considered "reasonable" under the Fourth Amendment, as the Supreme Court has long held that more than such "inarticulate hunches" are necessary in order to permit "intrusions upon constitutionally

guaranteed rights," recognizing that "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police." *See Terry v. Ohio*, 392 U.S. 1, 22 (1968) (quotations and citations omitted). Indeed, even in the Tenth Circuit, where alerts may be sufficient to support probable cause, a court must find an officer's testimony that he believed his dog alerted to be credible in order to sustain a finding of probable cause. *See Parada*, 577 F.3d at 1281.

The court does not find Officer Moore's interpretation of Tank's "alerts" to be credible, as the "alerts" that Tank allegedly displayed cannot be objectively viewed as a clear communication that he had detected the odor of narcotics. Rather, the actions on which Officer Moore relied—Tank moving his head back and forth quickly (*id.* at 79:12–80:18, 124:5–6, 144:2–4); going back to the vehicle on his own (*id.* at 80:22–81:6, 82:3–7, 87:16–88:7); pinning his ears back (*id*. at 82:11–21, 124:3–4, 143:21–24); intensifying his sniffing (*id.* at 143:25–144:1); and sniffing the wind (*id*. at 82:11–21)—were not unique to a dog smelling narcotics, but were instead "consistent with the dog smelling anything of interest." (ECF No. 42 at 200:12–24). Dr. Cablk explained that "no matter what the dog is smelling, they're going to close their mouth so that they can funnel that air and those molecules in through their nose. So it cannot be that -- that closed mouth intense sniffing is specific to target odor. That's what they do for anything that they sniff." (*Id*.).[6] The court accepts Dr. Cablk's testimony as credible and persuasive and concludes that while the behavior upon which Officer Moore relied may have indicated that Tank was smelling something of interest, the sniff lacked objective behavior by

---

[6] Moreover, Utah POST's own manual indicates that Tank pulling away from the vehicle and sniffing the wind was inconsistent with the recognized alerts of "resisting leaving an area of interest" and resisting distractions. (ECF No. 41 at 154:15–156:5; Def. Ex. 5).

17

which a reasonable observer could have determined that Tank was detecting the odor of marijuana and not that of a squirrel, sandwich, or anything else that piqued his interest. Tank's behavior, especially the breathing through the mouth and moving his head back and forth, may also have been nothing more than the dog performing his search. Without a clear indication, there is no way for an objective observer to conclude Tank had detected the odor of any narcotic.

Finally, events leading up to the sniff indicate that it was inevitable the officers were set upon searching Mr. Jordan's car. Detective Allen testified that approximately six months before Mr. Jordan's car was searched, he had observed Mr. Jordan conduct a hand-to-hand narcotics transaction. (ECF No. 41 at 7:25–8:10). Then, approximately two weeks before the search, Detective Allen witnessed what he believed was a narcotic transaction being conducted from a silver Mazda Protégé, which he later learned belonged to Mr. Jordan. (*Id*. at 8:11–9:8). Thus, on February 28, 2019, when Detective Allen began performing surveillance at the address at which he believed Mr. Jordan lived, he had suspicion that Mr. Jordan dealt narcotics and used his silver Mazda Protégé in those transactions. Indeed, Detective Allen referred to Mr. Jordan as his "primary" for the investigation, which he defined as someone "who we have reason to believe is either selling narcotics or is in possession of a firearm or has a felony warrant, that we're going to arrest." (ECF No. 141 at 20:3–9). This suspicion led Detective Allen to contact Officer Moore twice to put him on notice to be ready to have a K9 sniff Mr. Jordan's vehicle, just in case he had an opportunity to pull him over—first while he was outside the home conducting surveillance (*see id*. at 14:21–15:17) and again shortly after he began following Mr. Jordan's vehicle (*see* Gov. Ex. 9).[7] Thus, it appears to the court that the primary purpose of Detective

---

[7] On this point, the record before the court is unclear. Detective Allen testified that he first called Officer Moore while he was outside of Mr. Jordan's home, but unlike the second call made while Detective Allen was driving, this call was not included in the video footage presented to the court. As such, it is possible that Detective Allen's testimony was referring to the call he made while driving, and

18

Allen's surveillance was to initiate a traffic stop on Mr. Jordan's silver Mazda Protégé so that a K9 could perform a sniff of the vehicle, and officers could then search the vehicle.

Viewing this evidence together with Officer Moore's completely subjective determination that Tank had detected the odor of narcotics in Mr. Jordan's vehicle one must question whether a reliable and objective assessment of probable cause could have been made. The "totality of the circumstances" suggests that when Officer Moore arrived on site, he was already of the belief drugs were in the car and that this belief influenced him, perhaps even inadvertently, to interpret Tank's uncertain "alerts" as supporting a conclusion of probable cause. A K9 sniff cannot simply be a formality or an excuse to support a search. In this case, the court is reluctant to and does not reach that conclusion. The court recognizes that narcotics are a serious problem and that the officers often do their work in dangerous and uncertain circumstances. The court also recognizes that the officers understand and take their Constitutional duties seriously. Nevertheless, in the heat of the hunt, judgment can be compromised and even zeal to apprehend a perceived criminal may influence a decision that would not otherwise be justified. The court does not conclude that either Detective Allen or Officer Moore gave sway to such pressures, but the risk of such clouded judgment is the very reason that the K9's behavior signaling the presence of drugs must be clear, distinctive, and objectively observable. That is the very reason the Utah POST certification requires an "indication," not just natural innate behavior. A search, like the one conducted here, based on such subjective behavior that only the handler can see it could hardly be considered "reasonable" under the Fourth Amendment. As such, Mr. Jordan's Motion to Suppress (ECF No. 22) is **GRANTED**.

---

that only one call was made before the traffic stop was initiated. The court notes that its analysis is the same whether Detective Allen called Officer Moore once or twice before initiating the traffic stop. The court also notes that Detective Allen called Officer Moore a third time, after he had initiated the traffic stop, to provide Officer Moore with his location so that he could perform the sniff. (*See* Gov. Ex. 9).

## **CONCLUSION**

For the reasons stated herein, Mr. Jordan's Motion to Suppress (ECF No. 22) is **HEREBY GRANTED**.  Further, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, for good cause shown, and because the United States lacks prosecutable evidence, the United States' Motion for Leave to Dismiss the Indictment against Mr. Jordan with Prejudice (ECF No. 44) is also **HEREBY GRANTED**.

DATED THIS 21st day of April, 2020.

BY THE COURT:

_____
Clark Waddoups
United States District Judge